UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

VARISCITE NY FOUR, LLC AND VARISCITE NY
FIVE, LLC,

*Plaintiffs*,

-against-

NEW YORK STATE CANNABIS CONTROL BOARD;
NEW YORK STATE OFFICE OF CANNABIS
MANAGEMENT; TREMAINE WRIGHT; and CHRIS
ALEXANDER,

*Defendants*.

1:23-CV-01599

(AMN)(CFH)

---

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION AND IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS**

LETITIA JAMES
Attorney General
State of New York
Attorney for Defendants
The Capitol
Albany, New York 12224

Ryan W. Hickey
Assistant Attorney General
Bar Roll No. 519020
Telephone:  (518) 776-2616
Fax:  (518) 915-7738 (Not for service of papers)

Date: January 16, 2024

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ...................................................................................................... 4

STANDARD OF REVIEW ..................................................................................................... 12

ARGUMENT ............................................................................................................................ 14

POINT I ...................................................................................................................................... 14

    PLAINTIFFS FAIL TO ESTABLISH A CLEAR OR SUBSTANTIAL
    LIKELIHOOD THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS
    OF THEIR CLAIMS ......................................................................................................... 14

POINT II ..................................................................................................................................... 25

    PLAINTIFFS FAIL TO ESTABLISH THAT THEY WILL SUFFER
    IRREPARABLE HARM .................................................................................................. 25

POINT III .................................................................................................................................... 28

    THE EQUITIES BALANCE IN FAVOR OF THE DEFENDANTS, AND
    ISSUANCE OF A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC
    INTEREST ......................................................................................................................... 28

POINT IV .................................................................................................................................... 32

    THE COMPLAINT MUST BE DISMISSED ............................................................... 32

CONCLUSION .......................................................................................................................... 33

Defendants New York State Cannabis Control Board, New York State Office of Cannabis Management, Tremaine Wright in her official capacity as Chair of the Cannabis Control Board, and Chris Alexander, in his official capacity as Executive Director of the New York Office of Cannabis Management (collectively, "Defendants"), respectfully submit this memorandum of law, together with the accompanying Declarations of Jodi Bryon, Patrick McKeage, John Kagia, and Damian Fagon, and attached exhibits, in opposition to Plaintiffs' motion for a temporary restraining order and preliminary injunction, and in support of Defendants' cross-motion to dismiss the Complaint.

## PRELIMINARY STATEMENT

The New York Cannabis Law legalizes adult-use cannabis and regulates the production, manufacturing, distribution, and sale of cannabis within the State. N.Y. Canbs. §§ 3, 61-89.  The law creates a system for licensing cultivators, processors, distributors, and retailers of adult-use cannabis, among other license types. *See id*.  The Cannabis Law requires the New York Cannabis Control Board ("the Board") to "create and implement a social and economic equity plan and actively promote applicants from communities disproportionately impacted by cannabis prohibition . . . by prioritizing consideration of applications by applicants who are from communities disproportionately impacted by the enforcement of cannabis prohibition or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans." N.Y. Canbs. § 87(1).

As relevant here, the Board may give "extra priority" to applications of individuals who, in addition to satisfying several other licensing requirements, demonstrate they were convicted of a marihuana-related offense prior to the effective date of the Marihuana Regulation and Taxation

Act or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual with such a conviction. 9 NYCRR 121.1(k).

Plaintiffs Variscite NY Four, LLC and Variscite NY Five, LLC are limited liability companies organized under New York State law who applied for licenses to operate adult-use dispensaries, but who do not qualify for "extra priority" under 9 NYCRR 121.1(k) because they are not 51% owned by a person with a conviction for a cannabis offense pursuant to New York State Law. Plaintiffs allege that New York's licensing requirements violate the dormant Commerce Clause of the United States Constitution by affording extra priority only to those applicants who can prove they have been convicted of a marihuana-related offense in New York. ECF No. 1 at ¶ 50. Plaintiffs further allege that Defendants' application system gives unlawful preference to New York citizens because it does not allow applicants to prove that they are from a community disproportionately impacted by the enforcement of marihuana prohibition that is outside the New York State. *Id.* at ¶ 51. Solely based on this meritless constitutional argument, Plaintiffs ask this Court to issue a preliminary injunction prohibiting Defendants from processing or issuing any licenses, effectively halting New York's adult use marijuana industry in its tracks.

Plaintiffs' motion must be denied. As established below, as well as in the accompanying Declarations and exhibits, Plaintiffs do not meet any of the requirements for a temporary restraining order and preliminary injunction.

*First*, Plaintiffs cannot show a likelihood of success on the merits. As a threshold matter, Plaintiffs lack standing as they do not meet the other requirements to receive extra priority for reasons unrelated to the challenged New York conviction requirement. Specifically, neither Plaintiff has a 51% owner who possesses "sole control" of the company as required by the Board's regulations. 9 NYCRR §118.1(101). Therefore, regardless of the New York conviction

requirement, Plaintiffs would not qualify for extra priority and therefore cannot prove an injury that is fairly traceable to the New York conviction requirement.

Further, even if Plaintiffs did have standing, their dormant Commerce Clause claim is meritless. The dormant Commerce Clause cannot be applied to the circumstances at bar because distribution of marihuana, and in particular its movement outside of a state's borders, remains illegal at the federal level. Even if the dormant Commerce Clause did apply, Defendants' licensing requirements do not violate it on their face, or in effect. The extra priority criteria do not require that anyone associated with an applicant be a resident of New York, only that an owner or their relative have a marihuana conviction under New York law. 9 NYCRR 121.1(k)(1)(ii). An individual need not be a current or former resident of New York to have a marihuana-related conviction under State law.

Further, the licensing requirements do not have a discriminatory purpose. To the contrary, the purpose of requiring a New York conviction is to ameliorate the harm done by *New York's* prior laws criminalizing marihuana. Likewise, the New York conviction requirement imposes, at most, an incidental burden on interstate commerce that does not exceed the local public benefit of addressing the severe collateral consequences of New York's prior marihuana laws.

Finally, Plaintiffs' assertion that the application process fails to provide applicants who reside in counties outside of New York the opportunity to prove that their majority owner lived in an area disproportionately impacted by cannabis prohibition is false. OCM's application process does, in fact, allow applicants who reside out-of-state the ability to prove that they resided in an area disproportionately impacted by cannabis prohibition.

*Second*, Plaintiffs have not shown that they will suffer irreparable injury absent the requested preliminary injunction. Plaintiffs fail to demonstrate that they will suffer an actual and

3

imminent harm.  Instead, this action is nothing more than a tactic by Plaintiffs to obtain priority consideration for their applications despite not meeting the requirements for such priority.

*Third*, Plaintiffs do not establish that the balance of the equities weighs in their favor, or that the requested injunction is in the public interest.  If issued, the requested injunction would cause substantial harm to the nascent adult-use cannabis industry, including the thousands of prospective licensees and cultivators who have already invested hundreds of millions of dollars in their aspiring cannabis businesses.

*Finally,* Defendants' cross-motion to dismiss the Complaint should be granted and this action should be dismissed.  For the same reasons that Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied, the Complaint must be dismissed.

## STATEMENT OF FACTS

### A.  Statutory and Regulatory Framework under the Cannabis Law

In 2021, the New York Legislature concluded that the State's existing laws criminalizing marihuana and their enforcement had "resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise law-abiding citizen's ability to access housing, employment opportunities, and other vital services." New York Cannabis Law ("N.Y. Canbs.") § 2.  To correct these effects, the Legislature passed the Marihuana Regulation and Taxation Act ("MRTA"), which codified New York's Cannabis Law.  The Cannabis Law legalizes adult-use cannabis and regulates the growing, processing, distribution, and sale of cannabis within the State. N.Y. Canbs. §§ 3, 61-89.

Article II of the Cannabis Law establishes the Cannabis Control Board and Office of Cannabis Management ("OCM" or "the Office"), which are responsible for implementing and enforcing the Cannabis Law within the State. N.Y. Canbs. §§ 7-11. The Cannabis Law vests broad

authority in the Board, authorizing it to "perform such acts, prescribe such forms and propose such rules, regulations and orders as it may deem necessary or proper to fully effectuate the provisions" of the Cannabis Law. N.Y. Canbs. § 13(1); *see also id*. § 10(16) (authorizing Board to "draft and provide for public comment and issue regulations, declaratory rulings, guidance and industry advisories" without limitation).  The Cannabis Law authorizes the Board to "promulgate any and all necessary rules and regulations governing the cultivation, manufacture, processing, transportation, distribution, testing, delivery, and sale of . . . adult-use cannabis." N.Y. Canbs. § 13(2)

Among the Board's areas of authority, the Cannabis Law vests the Board with discretion to promulgate "any and all necessary rules and regulations governing . . . the *licensing* and/or permitting of adult-use cannabis cultivators, processors, cooperatives, microbusiness, distributors, laboratories, and retailers." N.Y. Canbs. § 13(2) (emphasis added).

**B.  Prioritization of Applications under the Board's Social and Economic Equity Plan**

To achieve the Cannabis Law's restorative justice and social equity goals, the Board created a "social and economic equity plan" ("SEE Plan"), a plan for the distribution of adult-use licenses, including retail dispensary licenses, which will prioritize individuals from communities disproportionately impacted by the enforcement of cannabis prohibition, minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans. N.Y. Canbs. § 87(1), (2).  The Cannabis Law provides the framework and the goals for the SEE Plan, but leaves the creation of the specifications, operation, and implementation of the SEE Plan to the Office and Board.  *Id.*

Consistent with Section 87 of the Cannabis Law, the Board promulgated regulations prioritizing applicants who are from communities disproportionately impacted by the enforcement of cannabis prohibition.  *Id.* at § 87(1).

An applicant seeking to qualify as an individual from a community disproportionately impacted ("CDI") by the enforcement of cannabis prohibition must meet the following requirements:

> (1)    ownership and *sole control* over the applicant by one (1) or more individuals from communities disproportionally impacted as set forth in subdivision (e) of this section; and
>
> (2)    one (1) or more individuals that have an ownership interest in the business have resided in a community disproportionately impacted for an aggregate of five (5) of the first eighteen (18) years of their life or an aggregate of seven (7) years of their life.

9 NYCRR §121.1(d) (emphasis added).

"Sole control" means a person or persons who:

> (i)    has real, substantial, and continuing ownership of 51% equity share in the business;
>
> (ii)    has the right to execute any material contracts;
>
> (iii)    has the ability to exercise the authority to materially influence the day-to-day business decisions, operations, strategic priorities, capital allocations, acquisitions and divestments;
>
> (iv)    has no timed or triggered recusal provisions or side letters or side agreements related to their recusal; and
>
> (v)    has an ability to direct decisions, voting or otherwise, such that no other person may exercise or have the ability to control the majority of voting rights or appoint or remove the majority of director seats or their equivalent or corporate officers or their equivalent on the governing body.

*Id.* at §118.1(101).

The purpose for requiring that the individual that is being used to satisfy the social and economic equity portion of the application has sole control over the applicant is to "protect applicants and licensees from predatory arrangements and to guarantee that they have the necessary autonomy over their businesses." Declaration of Damian Fagon ("Fagon Dec.") at ¶ 17 and Exhibit A, p. 54.

Further, an applicant need not be from a CDI *in New York* to apply for SEE status. *Id.* at ¶ 32. The Office of Cannabis Management published guidance on its website explaining that an applicant may use a community *in any state* that has experienced disproportionate law enforcement cannabis enforcement during cannabis prohibition. *Id.* at ¶¶ 34-35 and Exhibit H. The Office provides guidance to out-of-state CDI applicants about the methodology they may use to prove that they resided in a CDI outside New York. *Id.* at ¶ 36.

Finally, the Board may give "extra priority" to SEE applicants who meet the requirements of 9 NYCRR § 121 (k), which states:

(k) Extra Priority

> (1) A person who demonstrates that they are an individual from a community disproportionately impacted by the enforcement of cannabis prohibition may receive extra priority if:
>
> > (i)    they have an income lower than eighty (80%) of the median income of the county in which the applicant resides; and
> >
> > (ii)   was convicted of a marihuana-related offense prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

### C. Plaintiffs Apply for Adult Use Retail Dispensary Licenses

1. Plaintiffs' Applications

On December 18, 2023, Plaintiff Variscite NY Four, LLC ("Variscite Four") applied for an adult use retail dispensary license.  Declaration of Jodi Bryon ("Bryon Dec.") at ¶ 11 and Exhibit C ("Variscite Four Application").  Variscite Four applied as a SEE applicant and requested extra priority. *Id.* at ¶¶ 11-12.  Variscite Four is 51% owned by Dante Kinsey and 49% owned by Jeffrey Jensen.  Variscite Four's application indicates that Kinsey resided in a CDI in California for an aggregate of five of the first eighteen years of his life. *Id.* at Exhibit C, p. 47.  Further, the application indicates that Kinsey was convicted of a marihuana-related offense under California law and has an income lower than 80% of the median income of Los Angeles County, where he resides. *Id.*

On December 18, 2023, Plaintiff Variscite NY Five, LLC ("Variscite Five") applied for an adult use retail dispensary license.  Bryon Dec. at ¶ 16 and Exhibit F ("Variscite Five Application").  Variscite Five also applied as a SEE applicant and requested extra priority. *Id.* at ¶¶ 16-17.  Variscite Five is 51% owned by Justin E. Palmore and 49% owned by Jeffrey Jensen.  Fagon Dec. at ¶ 25.  Variscite Five's application indicates that Palmore resided in a CDI in California for an aggregate of five of the first eighteen years of his life.  Bryon Dec. at Exhibit F, p. 47.  Further, the application indicates that Palmore was convicted of a marihuana-related offense under California law and has an income lower than 80% of the median income of Los Angeles County, where he resides. *Id.*

2. The Application Review Lottery

The application window for applicants seeking a retail dispensary license with proof of control over a proposed premises from which they intend to operate closed on November 17, 2023

("November Applications").  *Id.* at ¶ 26.  The application window closed on December 18, 2023 for applicants who applied after November 17, 2023, or for a provisional license without proof of control over a premises ("December Applications").  *Id.*

On December 7, 2023, the Office randomly ordered the November Applications using the Pick 4 lottery numbers as a seed for a random number generator. Each application was assigned a number that will determine the order in which applications would be reviewed. *Id.* at ¶ 27.

The November Applications will be reviewed in the order they were assigned in the queue until the number of licenses that the Office intends to issue is reached.  *Id.* at ¶ 28.  As such, the applications are not reviewed until after the lottery has been completed.  *Id.*  Because there were more applications than the number of licenses the Office intended to issue for the November Applications, it is likely that not all applications will be reviewed before all licenses are issued. *Id.*  The November Applications that indicated they were seeking extra priority were each counted three times in the random ordering process which increased the opportunity that such applications would have an opportunity to be reviewed. *Id.* at ¶ 29.

Variscite Four and Variscite Five submitted their applications on December 18, 2023 and accordingly are part of the December Applications pool.  *Id.* at ¶ 30.  There were 2,853 December Applications submitted for a retail dispensary.  *Id.* at ¶ 32.  The Office intends to issue up to 450 retail licenses from the December Applications.  *Id.* at ¶ 33.

Based on the large number of December Applications submitted for a retail dispensary, and the small number of December Applications that indicated they were seeking extra priority, if the Office uses the same randomization and weighting process as it did for the November

Applications, Plaintiffs' applications will have only a slim chance of being selected for review.[1]
*Id.* at ¶ 34.

### D. Plaintiffs' Owner Jeffrey Jensen Settles and Releases Dormant Commerce Clause Claims in the Variscite One Action

On or about August 25, 2022, through September 26, 2022, the Office accepted applications for Conditional Adult-Use Retail Dispensary ("CAURD") licenses. Declaration of Patrick McKeage ("McKeage Dec.") at ¶ 7.

To be eligible for a CAURD license, an applicant had to establish, among other things, that they (a) were convicted of a marihuana-related offense in New York State prior to the thirty-first of March two thousand twenty-one; (b) had a parent, legal guardian, child, spouse, or dependent who was convicted of a marihuana-related offense in New York State prior to the thirty-first of March two thousand twenty-one; (c) were a dependent of an individual who was convicted of a marihuana-related offense in New York State prior to the thirty-first of March two thousand twenty-one…" 9 NYCRR § 116.4(a)(2)(i).

On or about September 26, 2022, Variscite NY One, Inc. ("Variscite One") commenced an action against the Office, Chris Alexander, and the State of New York ("Variscite Defendants") based on the dormant Commerce Clause and sought a declaratory judgment and an injunction against the Office from issuing any CAURD licenses (the "First Variscite Action"). McKeage Dec. at ¶ 5 and Exhibit A.

The First Variscite Action alleged, among other things, that it was a violation of the dormant Commerce Clause to require an applicant for a license to operate a cannabis retail business

---

[1] The Office intends to use a similar process to that used for the November Applications, though any changes to the process would not increase Plaintiffs' chance of being selected for review. Bryon Dec. at ¶ 34, n.4.

in New York State to have (or their relative have) a prior marihuana related offense under New York law, rather than under the law of any other state. *Id.* at ¶ 6.

On or about May 25, 2023, the United States Court for the Northern District of New York in the First Variscite Action approved a settlement between Variscite One and the Variscite Defendants. *Id.* at ¶ 7 and Exhibit B (the "Settlement Agreement").

The Settlement Agreement provides for a release of claims against the Office and Chris Alexander. Specifically, the settlement agreement states:

> Plaintiff [Variscite NY One, Inc] on behalf of itself, and any and all of its **other corporate entities**, subsidiaries, **affiliates**, agents, representatives, **directors**, **officers**, employees, **members**, successors, personal representatives, agents, directors, **shareholders**, **attorneys**, administrators, fiduciaries, and assigns (collectively, "Releasing Parties"), hereby releases and forever discharges OCM, Chris Alexander, in his individual and official capacity, and the State of New York …(collectively, "Released Parties") from all manner of actions, proceedings, suits, grievances, injuries, debts, obligations, dues, sums of money, accounts, contracts, controversies, agreements, promises, damages, judgments, **claims**, and demands whatsoever, director or indirect, **known or unknown**, discovered or **undiscovered**, that the Releasing Parties **ever had, now has, or shall or may have in the future** against some, any, or all of the Released Parties, related to or incurred in connection with the [First Variscite Action] up to an including the date of this Settlement Agreement.

*Id.*

Pursuant to the Settlement Agreement, as part of the consideration thereunder, Variscite One, which includes Jeffrey Jensen as its true party of interest,[2] is supposed to be issued an adult-use retail dispensary license (not a CAURD license) in the first group of such licenses to be awarded. *Id.*

---

[2] True Parties of Interest include persons or entities with a direct or indirect interest in a licensee, including owners, executives, stockholders, individuals with a right to receive revenue or profit, among others. 9 NYCRR §118(a)(105). The Office takes into consideration not only the entities that hold a license but also their True Parties of Interest when issuing licenses.

## STANDARD OF REVIEW

### A. *Temporary Restraining Order and Preliminary Injunction*

Injunctive relief, such as the preliminary injunction sought by Plaintiffs here, is "an extraordinary remedy *never* awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008) (emphasis added).   Specifically, the movant bears the burden of establishing, by clear and convincing evidence, that (a) it is likely to succeed on the merits; (b) it is likely to suffer irreparable harm in the absence of preliminary relief; (c) the balance of equities tips in its favor; and (d) an injunction is in the public interest. *See Winter*, 555 U.S. at 20.   The final two factors—the balance of equities and the public interest— "merge when the Government is the opposing party." *L&M Bus Corp. v. Bd. of Educ. of the City Sch. Dist. N.Y.*, 2018 WL 2390125, *13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where (i) an injunction is "mandatory" (i.e., altering the status quo, rather than maintaining it), or (ii) the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015).[3]   In such cases, the movant must show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest. *See id*. (quoting *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999) and *Doe v. New York University*, 666 F.2d 761, 773 (2d Cir. 1981)).

---

3 The requested temporary restraining order and preliminary injunction are mandatory in nature because Plaintiffs seek to alter the status quo by enjoining Defendants' ongoing review of applications and issuance of licenses to CAURD and adult use retail dispensary applicants.

B. *Motion to Dismiss*

Under Rule 12(b)(6), to survive a motion to dismiss, a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006) (internal quotation marks and some alterations omitted).

Under Rule 12, the Court may consider documents referenced in the complaint and documents which plaintiff has necessarily relied upon and/or incorporated into the pleading by reference. *See, e.g.*, *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986); *see also Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (stating that a court may consider documents that are "integral" to the complaint, even if they are neither physically attached nor incorporated by reference to the complaint); *see also Carter,* 882 F.3d, at 47 (in resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court may refer to evidence outside the pleadings); *Kamen v. American Tel. & Tel. Co*., 791 F.2d 1006, 1011 (2d Cir. 1986).

**ARGUMENT**

**POINT I**

**PLAINTIFFS FAIL TO ESTABLISH A CLEAR OR SUBSTANTIAL LIKELIHOOD THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS**

Plaintiffs' motion for a temporary restraining order and preliminary injunction must be denied because they do not establish a clear or substantial likelihood that they are likely to succeed on the merits. Plaintiffs cannot show likelihood of success on the merits, let alone a clear or substantial one, because: (1) they lack standing; and (2) New York's requirements for extra priority retail dispensary applications do not implicate the dormant Commerce Clause, and, in any event, do not violate it.

A. *Plaintiffs Lack Standing to Challenge New York's Licensing Requirements*

Article III limits the Court's jurisdiction to actual "cases or controversies." U.S. Const. art. III, § 2. One element of this "bedrock requirement" is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). To have standing, a plaintiff must demonstrate (1) an injury-in-fact, which is "concrete and particularized" harm that is actual or imminent, (2) a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant, and (3) a non-speculative likelihood that the injury can be remedied by the requested relief. W.*R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). A federal court lacks jurisdiction to consider an action in which the plaintiff cannot demonstrate standing. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020). On a preliminary injunction, plaintiff's burden to demonstrate standing is "no less than that required on a motion for summary judgment," and a plaintiff must demonstrate standing by specific evidence

rather than resting on mere allegations.  *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)).

Here, Plaintiffs lack standing for several reasons.  First, under the Board's lottery procedures, by requesting extra priority consideration in their applications, Plaintiffs' applications will receive weighted entry into the December Applications pool.  Plaintiffs have indicated in their applications that they qualify for extra priority, which is sufficient to obtain extra priority in the first instance.  Bryon Dec. at ¶ 29.  However, in the event Plaintiffs' applications are then selected and reviewed by the Board, by virtue of their spot in the review order, and it is determined that Plaintiffs do not have the required convictions under New York law, they will be returned to the normal pool for another opportunity to be reviewed under different set of criteria applicable for the other prioritized groups or as a non-prioritized applicant.  Fagon Dec. at ¶ 67.  As a practical matter, this means that Plaintiffs will receive what they attempt to achieve through this preliminary injunction, namely an increased chance that their applications will come up for initial review when the Board begins reviewing applications.

This raises a second reason why Plaintiffs lack standing.  Plaintiffs cannot demonstrate that the alleged constitutional infirmity of Defendants' licensing requirements will cause them a concrete and particularized injury.  Plaintiffs' alleged harm is necessarily speculative because even if Plaintiffs were to receive extra priority it would only give them a slightly increased probability of being selected for review, and in turn a chance for obtaining a license.  This sort of speculative harm cannot be remedied by the requested relief.  Indeed, as described above, the Board gives weighted entry into the review queue based only on an applicant's request for extra priority, and later determines whether, if an extra priority application is reached in the review queue, the New York conviction requirement has been met.  In short, the requested injunctive relief is based on a

remote, speculative harm to Plaintiff's *opportunity to be reviewed* that falls well short of the showing required for standing.

Third, Plaintiffs have no standing because they do not satisfy the *other* requirements for obtaining extra priority as a SEE applicant besides the New York conviction requirement. Specifically, Plaintiffs fail to demonstrate that they have a 51% owner from a CDI who possess "sole control" over Plaintiffs.  Under the Board's regulations, "sole control" requires much more than a 51% ownership share by an individual from who resided in a CDI.  The 51% owner must also:

- have the right to execute any material contracts;

- have the ability to exercise the authority to materially influence the day-to-day business decisions, operations, strategic priorities, capital allocations, acquisitions and divestments;

- have no timed or triggered recusal provisions or side letters or side agreements related to their recusal; and

- have an ability to direct decisions, voting or otherwise, such that no other person may exercise or have the ability to control the majority of voting rights or appoint or remove the majority of director seats or their equivalent or corporate officers or their equivalent on the governing body.

*See* 9 NYCRR § 118.1(101).

Neither Plaintiff has a 51% owner who meets these criteria.  To the contrary, Plaintiffs' application materials show that 49% owner Jeffrey Jensen, who has also appeared as counsel to Plaintiffs in this action, has the above powers.  First, not only is it Jensen that has the ability to appoint the majority of director seats, Jensen *is* the *sole* director on each Plaintiff's board of

directors.  *Id*. at ¶¶ 22, 29. Further, as established in Variscite Four and Variscite Five's respective LLC Agreements, Jeffrey Jensen is the sole director, chief executive officer, and managing member of both companies.  Fagon Dec. at ¶¶ 20, 27.  Under the LLC Agreements, Jensen has "sole right to assign a management agreement for the company."  *Id*. at ¶¶ 21, 28.  The director has all the "rights and powers of a 'manager'" under New York Law.  *Id*.  Moreover, the board (which consists only of Jensen) may make all decisions and take all actions for the Company, including: entering into, making, and performing contracts; opening and maintaining back accounts; acquiring or disposing of real or personal property; and borrowing money, among numerous other powers.  *Id*. at ¶¶ 23, 30.

Accordingly, Plaintiffs' LLC Agreements specifically vest Jensen with the sort of control over each company's affairs that is supposed to be held by their 51% owners.  Therefore, Plaintiffs' 51% owners do not meet the "sole control" criteria and Plaintiffs would not be entitled to priority, let alone extra priority, under the Board's regulations regardless of the New York conviction requirement.  Plaintiffs cannot demonstrate any injury that is fairly traceable to the challenged conviction requirement or that could be remedied by this Court.

B.   *The Dormant Commerce Clause Does Not Apply to New York's Licensing Requirements*

Plaintiffs argue that the licensing requirements discriminate against interstate commerce by affording extra priority only to those applicants who can prove they have been convicted of a marihuana-related offense in New York State. ECF No. 1 at ¶ 50.  Plaintiffs' argument is meritless.

First, the dormant Commerce Clause cannot be applied to New York's licensing requirements because there is no interstate market for legalized cannabis.  The Commerce Clause of the U.S. Constitution provides Congress with the power to regulate commerce "among the several States." U.S. Const. art. I, § 8, cl. 3. The Clause contains a "negative aspect" that "prevents

17

the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).

Here, there is no interstate market at stake because the manufacturing, sale, and distribution of marihuana remains illegal at the federal level. *See* 21 U.S.C. § 841(a)(1). As such, courts have held that challenges to state residency requirements for cannabis licenses do not implicate the dormant Commerce Clause. *See Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, 2023 WL 1798173, at *10-*11 (W.D. Wash. Feb. 7, 2023) (concluding that the dormant Commerce Clause is inapplicable because there is no national market for marihuana); *Shelton v. Liquor & Cannabis Bd.*, 2022 WL 2651617, at *5 (W.D. Wash. July 8, 2022) (declining to issue declaratory relief because a federal court "cannot order activity that remains federally illegal"); *Original Invs., LLC v. State of Okla.*, 542 F. Supp. 3d 1230, 1235 (W.D. Okla. 2021) (dismissing case because to hold otherwise would facilitate plaintiff's participation in federally criminal activities). Further, this Court should decline to follow those courts which have found that the dormant Commerce Clause should be applied to the *illicit* interstate cannabis market. *See Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 547-48 (1st Cir. 2022) (concluding that an illicit interstate market for marihuana exists and warrants application of the dormant Commerce Clause).

Earlier this month, the United States District Court for the Western District of Washington denied a motion, similar to the one at bar, which sought a preliminary injunction against Washington's residency requirements for retail cannabis licenses based on the dormant Commerce Clause. *Peridot Tree WA Inc. v. Wash. State Liquor & Cannabis Control Bd.*, No. 3:23-cv-06111-TMC, 2024 U.S. Dist. LEXIS 3213(W.D. Wash. Jan. 5, 2024). Notably, Plaintiffs' 49% owner Jeffery Jensen is also a 49% owner of the plaintiff in *Peridot*. McKeage Dec. at ¶ 36. The *Peridot* court found that plaintiff was not likely to succeed on its claim that a residency requirement violates the dormant Commerce Clause by discriminating against out of state applicants. *Peridot*

*Tree WA Inc.*, 2024 U.S. Dist. LEXIS 3213 at *27.  In so ruling, the court rightly disregarded the First Circuit's holding in *Northeast Patients Group*, explaining that the dormant Commerce Clause should not be interpreted to promote a competitive market in goods or services that are not legal according to the Federal government beyond a state's borders and forestall interstate rivalries in illicit activities. *Id.* at *23-24.[4.]

The same reasoning must be applied here.  As the *Peridot* court explained, "it makes little sense why the dormant Commerce Clause would protect an interstate market that Congress affirmatively prohibited, given that protecting this market would facilitate illegal interstate activity." *Id.* at * 26.  Like the *Peridot* plaintiff, Plaintiffs here "cannot use the dormant Commerce Clause to demand a constitutional right to participate in an illegal interstate market." *Id.*

Because the dormant Commerce Clause does not apply to New York's licensing requirements, Plaintiffs fail to demonstrate that they are likely to succeed on the merits.

C. *New York's Priority Criteria Do Not Violate the Dormant Commerce Clause*

Even if the dormant Commerce Clause applied to this case, New York's licensing requirements do not violate it.  If a state law clearly discriminates against out-of-state goods or economic actors, the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).  A law may be "clearly discriminatory" against out-of-state economic actors in three ways:

---

[4] The *Peridot* court also found that the First Circuit's holding in *Northeast Patients Group* pertained only to *medical* cannabis licenses insofar as "Congress's action through the Rohrabacher-Farr Amendment . . . prohibits the Department of Justice from using its appropriated funds to prevent states from implementing laws legalizing medical cannabis."  *Peridot Tree WA Inc.*, 2024 U.S. Dist. LEXIS 3213 at *24.  As such, the First Circuit found that Congress demonstrated an expectation that there will be an interstate market in *medical* cannabis, but that no such expectation exists for retail cannabis sales such that the dormant Commerce Clause is triggered. *Id.* at * 25.

(1) by discriminating against interstate commerce on its face, (2) by having a discriminatory purpose, or (3) by discriminating in effect. *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 48 (2d Cir. 2007). However, if a law only "incidentally burdens interstate commerce," it is subject to a permissive balancing test "and will be struck down if the burden imposed on interstate commerce clearly exceeds the putative local gains." *Id.* at 47; *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

First, the New York conviction requirement does not discriminate against out-of-state economic actors either on its face or in effect. Namely, it does not require that anyone associated with an applicant be a resident of New York, only that an owner or their relative have a marihuana conviction under New York law. An individual need not be a current resident of New York to have a marihuana-related conviction under State law. *See* Fagon Dec. at ¶ 55. Individuals may have been convicted of a New York marihuana-related offense while previously living in the State, attending college there, commuting to New York for work, visiting New York on vacation, or passing through one of New York's international airports or other transit facilities where people and bags are subjected to drug searches. *Id.*

To be sure, many individuals who have marihuana-related offenses under New York law will be current State residents. But the requirement does not discriminate because it does not apply "differential treatment" to "in-state and out-of-state economic interests that benefit the former." *Town of Southold*, 477 F.3d at 47 (quoting *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99 (1994)). Rather, the marihuana-related offense requirement at most places an incidental burden on interstate commerce. *See id.* at 49-50 (concluding that law prohibiting ferries from landing in town only incidentally burdened interstate commerce).

20

Second, the New York conviction requirement does not have a discriminatory purpose. Rather, New York's purpose in requiring a New York conviction is to ameliorate the harm done by New York's prior laws criminalizing marihuana, including their selective enforcement and the collateral consequences such as incarceration and lack of employment opportunities caused by a criminal marihuana conviction. N.Y. Canbs. § 2.  New York thus gave preference to individuals who had suffered harm because of its prior criminalization of marihuana, without regard to their residence, either now or at the time of their offense or conviction.  As such, the conviction requirement is narrowly tailored to the "legitimate local purpose" or remedying harms caused by *New York's* prior marihuana enforcement.  However, New York's licensing requirements achieve this legitimate local purpose without excluding others from the cannabis market: individuals not convicted of a New York marihuana offense are welcome to partner with those who have such convictions, with New York's requirements set up to ensure that extra priority consideration is given to those individuals with New York convictions. Or individuals can seek and obtain their own license without requesting extra priority consideration, like the majority of the applicants in the November Applications and December Applications.  This scheme comports with the dormant Commerce Clause. *Thomas*, 139 S. Ct. at 2461.

Under the *Pike* balancing test, the New York conviction requirement is constitutional because any incidental burden on interstate commerce does not clearly exceed local benefits. Indeed, it is not clear that there is any incidental burden on interstate commerce at all: an incidental burden on interstate commerce is a burden that "exceed[s] the burden on intrastate commerce," and thus, at a minimum, the challenged law "must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Town of Southold*, 477 F.3d at 50 (citations omitted). Here, the burden on a person who has not been

convicted of a New York marihuana offense is the same whether the person resides in New York or out of state: namely, the person must go into business with an individual who has such a conviction, if they want to receive extra priority consideration.  But even if some incidental burden on interstate commerce existed, it would be minor in comparison to the local public benefit of addressing the severe collateral consequences of New York's prior marihuana laws and enforcement.

Even if New York's conviction requirement were discriminatory, it nevertheless is narrowly tailored to advance a legitimate local purpose and thus satisfies the dormant Commerce Clause. *Thomas*, 139 S. Ct. at 2461. The requirement ensures that the opportunities from New York's new cannabis market flow to the people who have suffered the effects of marihuana criminalization and continue to provide affected individuals an ongoing source of revenue that State financial assistance alone could not offer.  The requirement also addresses the way in which New York marihuana convictions are continuous obstacles for affected individuals—potentially excluding them from career opportunities and federal assistance programs—by giving them a real economic opportunity to enter a new and growing market.

In sum, Plaintiffs are not likely to succeed on the merits of their dormant Commerce Clause claim because it does not discriminate on its face, in effect, or in purpose.  Further, any incidental burden on interstate commerce does not clearly exceed local benefits of the New York conviction requirement.

D. *The Board Considers Applicants from Out-of-State Communities Disproportionately Impacted by the Enforcement of Cannabis Laws*

Plaintiffs allege that the application process fails to provide applicants who reside in counties outside of New York the opportunity to prove that their majority owner lived in an area

disproportionately impacted by cannabis prohibition. ECF No. 1 at ¶ 51. This allegation is demonstrably false.

9 NYCRR § 121.1(e) provides that

[F]or the purposes of determining whether an area is a community disproportionately impacted, the office may review geographic areas, such as precincts, zip codes, neighborhoods, political subdivisions, and any other geographic area for:

(1) history of arrests;
(2) number of convictions;
(3) law enforcement procedures, protocols and practices;
(4) allocation of law enforcement resources; or
(5) children removed from the home by child protective services, or equivalent child protective services for out-of-state jurisdictions, due to:
(i) a parent/caretaker's marihuana use or arrest;
(ii) school suspension records;
(iii) high school attainment;
(6) deportation records for marihuana offenses; or
(7) any other impacts as determined by the office reflecting relative disparate enforcement of cannabis prohibition laws during a certain period of time in a certain geographic area.

Nothing in this regulation prohibits individuals who reside in out-of-state CDIs from being considered for licenses. Indeed, the Office published guidance on its website explaining that an applicant may use a community *in any state* that has experienced disproportionate law enforcement cannabis practices during cannabis prohibition. Fagon Dec. at ¶ 34 and Exhibit H.

On its website, the Office published responses to General Licensing Application Frequently Asked Questions ("FAQ"). *Id.* at ¶ 35. In response to Question 74 ("If I am an out-of-state applicant, can I establish SEE status if I lived in a community that was the equivalent of a New York CDI?"), the FAQ explains:

Residents *of any state* are eligible to apply for SEE status if they lived in a community *in a state other than New York* that experienced disproportionate law enforcement cannabis practices during cannabis prohibition for the requisite time period as described in Question 73. If the applicant's out-of-state community meets

23

the abovementioned requirements, the *Office will recognize such out-of-state community as an "Out-of-State CDI."*

*Id.* at Exhibit H, p. 32 (emphasis added).

Therefore, Plaintiffs' assertion that Defendants' application system "does not permit applicants to prove residence in a community disproportionately impacted by the enforcement of cannabis prohibition if that community is outside of New York" is false.  ECF No. 1. at ¶ 51. Further, the Office provides guidance on the specific information and methodology an applicant may use to establish that an out-of-state community is a CDI.  Fagon Dec. at ¶ 36 and Exhibit H, pp. 32-33.  The FAQ provides examples of the sort of documentation an applicant may use to prove residence in an out-of-state CDI.  *Id.* at ¶¶ 42-43 and Exhibit H, p. 32.  None of these documents, which include various forms of government records, are exclusive to New York. *Id.* Further, the online application form permits applicants to select counties outside of New York when presenting their CDI information.   Bryon Dec. at ¶ 7 and Exhibit A.   Finally, if, notwithstanding the above published guidance and instructions, Plaintiffs were still uncertain about how to submit documentation of an out-of-state CDI, they could have contacted the Office and requested assistance. At the very least, Plaintiffs' bare assertion that applicants will not be considered for extra priority if they resided outside of New York is insufficient to meet their burden of demonstrating by specific evidence that they are likely to succeed on the merits. *Cacchillo*, 638 F.3d at 404.

In sum, Plaintiffs are not likely to succeed on their claim that Defendants' application system discriminated against them by not permitting out-of-state CDI applicants.   Plaintiffs' baseless allegation is belied by the record and must be rejected.

24

## POINT II

## PLAINTIFFS FAIL TO ESTABLISH THEY WILL SUFFER IRREPARABLE HARM

Plaintiffs have not established that they will suffer irreparable harm in the absence of injunctive relief, which is "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction." *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (per curiam) (alteration in original) (quoting *Bell & Howell: Mamiya Co.* v. *Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)).  To meet their burden, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted).

Here, Plaintiffs cannot demonstrate that they would suffer *any* irreparable injury that a preliminary injunction could prevent, much less that such injury is *likely*. *Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir. 2002) ("[I]rreparable harm must be shown to be actual and imminent, not remote or speculative.").

First, Plaintiffs argue that Defendants' alleged violation of the dormant Commerce Clause is *per se* irreparable harm.  However, as discussed in Point I(C), *supra*, Plaintiffs' dormant Commerce Clause claim is meritless.  Thus, the alleged irreparable harm that arises from Plaintiff's flawed constitutional claim is nonexistent.

Second, Plaintiffs argue that they will suffer irreparable harm by being excluded from the New York retail cannabis market.  But, as discussed in Point I(A), *supra,* Plaintiffs cannot prove that with the requested injunction they would otherwise be qualified to obtain a license.  Indeed, it is far from likely, even if Plaintiffs' applications were given "extra priority," that Plaintiffs' applications would even be *reviewed* in the lottery process, much less that Plaintiffs would obtain

a license and enter the retail cannabis market.  Bryon Dec. at ¶ 34.  Moreover, Plaintiffs have not proven that their 51% owners meet the remaining criteria for "sole control" over the Plaintiffs. This means that, even if Plaintiffs' applications were reviewed, they do not qualify for priority consideration for reasons unrelated to the challenged New York conviction requirement.

Third, Plaintiffs' delay in bringing this action demonstrates that the alleged irreparable harm is not "actual and imminent," but merely "remote and speculative." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see also Oakland Trib., Inc. v. Chron. Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."). Any "emergency" claimed by Plaintiffs is entirely of their own creation.  In what can only be interpreted as an intentional litigation tactic, Plaintiffs delayed in commencing this action until mere days before the Office is scheduled to begin reviewing applications and issuing licenses.  McKeage Dec. at ¶ 34.  However, Plaintiffs, and in particular their member and counsel Jeffrey Jensen, unjustifiably delayed more than one year since the publication of the NY marihuana-related conviction requirement in the regulations; more than four months since the applications were announced and the guidance was published, and more than three months since the applications were available before bringing this supposed "emergency" action.  *Id.* at ¶ 33.

Indeed, this is not the first time Jensen has attempted such a tactic through one of his companies.  As the Washington State Liquor and Cannabis Control Board, wrote in its opposition in *Peridot*

> Nor is this the first challenge Peridot's members have brought to a marijuana Social Equity licensing law on this same legal theory. *See, e.g., Peridot Trees, Inc. et al., v. City of Sacramento*, No. 2-22-cv-00289_KJM-DB, 2022 WL 10629241 (E.D.Ca. Oct. 18, 2022); *Variscite NY One, Inc v. New York*, 640 F. Supp. 3d 232, 237 (N.D.N.Y. 2022); *Variscite, Inc. v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2023 WL 3493557, at *15-16 (C.D.Ca. April 11, 2023). Waiting until licensing agencies are on

the verge of issuing licenses before seeking injunctive relief—and thus threatening both the licensing schemes and the individuals who relied on their apparent award of licenses—appears to be a tactical choice made by these litigants. Courts considering those previous TRO motions have regularly rejected them. *Variscite NY One, Inc v. New York*, 640 F. Supp. 3d 232, 237 (N.D.N.Y. 2022); *Variscite, Inc. v. City of Los Angeles, et al.*, No. 22-cv-08685-SPG-SK, 2023 WL 3493557, at *15-16 (C.D.Ca. April 11, 2023). This Court should join those courts in refusing to countenance these tactics. *See Ozone Int'l, Inc.*, 2019 WL 3287081, at *3 ("The Court will not tolerate TRO engagement for the sole purpose of obtaining a tactical advantage.").

McKeage Dec. at ¶ 36.

Moreover, Jensen is aware of the existence of the New York conviction requirement as evidenced by the fact that nearly a year ago he brought and settled an action based on this same constitutional theory. *Variscite NY One, Inc v. New York*, 640 F. Supp. 3d 232, 237 (N.D.N.Y. 2022). The claims in the current litigation are asserted by limited liability companies who were formed by Jensen (after he settled and released the same claims as part of another Variscite entity), who is also their sole director, CEO, managing member, attorney, member with the authority to assign management, sole director with authority to make all decisions for the companies including "compromising, litigating, arbitrating or otherwise adjusting or settling any and all other claims of the companies." McKeage Dec. at ¶ 19. Like the Plaintiffs here, Jensen is a 49% owner of Variscite NY One, Inc. and exercises control over its operations in the same way he does Variscite Four and Variscite Five. *Id.* at ¶¶ 10, 12, 13. Jensen, this time acting through Variscite Four and Variscite Five, cannot claim the existence of actual and imminent harm when he, on behalf of Variscite NY One, Inc., its affiliates and attorneys, among other related entities released and discharged Defendants from the very same dormant Commerce Clause claims. *Id.* at ¶¶ 8, 18; and Exhibit B, p. 5; *Conopco Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996) (under the

doctrine of laches, "[a] defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim.").

Finally, Plaintiffs cannot show that any harm caused by their inability to obtain a license as an extra priority applicant is truly irreparable.  Indeed, Plaintiffs may be entitled to obtain a license as another prioritized group applicant or under no priority at all.  The December Application pool, like the November Application pool, was open to all retail cannabis application types, regardless of whether an applicant meets any priority requirements. Bryon Dec. at ¶ 26.  Thus, the probability that Plaintiffs may become eligible for a license, whether as part of another prioritized group, or non-prioritized group eviscerates the likelihood of *irreparable* harm.  Additionally, any arguments regarding an advantage being lost for not being an early entrant into the market ignores the reality that there are already over forty retail dispensaries who have already claimed access to customers and their loyalty. Kagia Dec. at ¶ 6.  As such, any harm that could possibly be incurred by Plaintiffs cannot be connected to a first mover advantage loss and, thus, cannot be claimed to be irreparable.

In sum, Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm in the absence of the requested preliminary injunction.  Plaintiffs' motion must be denied.

## POINT III

### THE EQUITIES BALANCE IN FAVOR OF THE DEFENDANTS, AND ISSUANCE OF A PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST

Plaintiffs' request for a preliminary injunction must be denied because the equities balance in favor of Defendants and the requested injunction is not in the public interest.  It is well-established that a "preliminary injunction may not issue unless the movant clearly shows that the balance of equities favors the movant." *Litwin v. OceanFreight, Inc.*, 865 F. Supp. 2d 385, 401–02 (S.D.N.Y. 2011) (citation omitted).

Here, the balance of the equites weighs in favor of the Defendants and a preliminary injunction is not in the public interest. The requested injunction will cause widespread and significant harm to New York's emerging retail cannabis industry.  First, the injunction will gravely harm hundreds of provisionally approved licensees who have invested significant capital in their aspiring businesses. Kagia Dec. at ¶¶ 6-11.  According to data collected by the Office in October 2023 provisionally licensed CAURDs attested to having payable expenses collectively *totaling $295 million*, of which $37 million had already been paid. *Id.* at ¶ 8.  Real estate was the single largest line-item, totaling $213 million.  *Id.*  Other key expense areas include $22 million on dispensary construction, $18 million on loan interest or capital repayment costs, $13 million on professional services, including consulting, legal, marketing, and recruitment, and $6.7 million on staff salaries and benefits.  *Id.*

An injunction would prevent Defendants from awarding final licenses to CAURD applicants and thereby prevent the opening of businesses that have been preparing for launch.  As such, the injunction would be financially ruinous for provisionally approved operators, who are unlikely to be able to access the capital to sustain their businesses without any source of revenue. *Id.* at ¶ 10.

Second, the requested injunction would seriously harm cannabis industry employees and would likely force licensees to lay off staff, or cause difficulty in recruiting and retention with the cloud of uncertainty of an injunction.  *Id.* at ¶ 12.

Third, the requested injunction would harm licensed cannabis growers, who are presently operating under the expectation that 463 Conditional Adult Use Retail Dispensary provisional licenses have been awarded, and the Office expects to issue at least 500 Adult Use licenses from the general application pool beginning in January 2024.  *Id.* at ¶¶ 13-14.  Cultivators and processors

29

have incurred significant expenses to ramp up production, purchase packaging, test their products, and engage prospective distribution partners. *Id.* Further, many licensed producers grow their cannabis outdoors, limiting them to a single harvest a year, compared to producers in greenhouses or indoors, whose control over the production environment allows them to produce multiple harvests in a calendar year. For New York's outdoor growers, a single harvest generally means that they only earn income from cannabis once each year, after their harvest, making it critically important to their livelihood to secure a return on their investment as quickly as possible once their product is ready for sale. *Id.* at ¶ 15.

With the outdoor harvest taking place between October and November, plus a few weeks to cure, test, and package the product, licensed growers are ready to sell their harvest at the close of 2023 going into 2024. *Id.* at ¶ 16. An injunction that prevents the Office from issuing retail licenses will have cascading implications across the supply chain. In a market poised for $1 billion to $2 billion in legal retail sales in 2024, the state's cannabis suppliers are sitting on hundreds of millions of dollars of product ready to ship to the retailers that are expected to come online beginning in early 2024. The carrying costs of that inventory, and the impact on growers who live off the once-a-year post-harvest sale of their product would prove a devastating financial blow to many of the state's suppliers. *Id.* at ¶ 17.

Fourth, the injunction will harm adult-use applicants. The Office received nearly 7,000 license applications during the adult use application window which ran from October 4 to December 18, 2023. *Id.* at ¶ 21. Of these, the Office received 4,324 applications for retail businesses, 1,349 applications for microbusinesses, 538 for processors, 372 for cultivators, and 351 for distributors. *Id.* The total applicant pool from October through December is comprised of approximately 55% social and economic equity (SEE) applicants, including service-disabled

veterans, distressed farmers, individuals from communities disproportionately impacted by cannabis prohibition, women- and minority-owned businesses, groups specifically designated for consideration under Cannabis law. *Id.* at ¶ 23.

Fifth, the injunction will harm New York's property owners and landlords. With over 1,000 retail storefronts expected to be licensed in 2024, plus several hundred producer licenses for cultivators, processors, distributors, and microbusinesses, prospective cannabis businesses have spent months scouting for properties and negotiating leases. *Id.* at ¶ 25. Any injunction that would keep these businesses from being able to operationalize would introduce uncertainty to these real estate agreements by making it more difficult for prospective operators to pay the rent on properties that are not operational. *Id.* at ¶ 26.

Sixth, an injunction prohibiting Defendants from licensing adult use dispensaries would enable the continued existence of illicit store operators and delay the rollout of a safe, regulated legal market for cannabis products. *Id.* at ¶¶ 27-32.

Finally, delaying the implementation of legal cannabis sales will deprive the State and localities of anticipated tax revenue, which are intended to be used for expenditures related to education, public health initiatives, and enforcement of unlicensed activities. *Id.* at ¶ 33.

In sum, issuance of the requested injunction will cause significant and lasting damage to the adult use cannabis industry. Such harm vastly outweighs any marginal benefit to Plaintiffs from potentially receiving a nominally increased chance of having their applications reviewed. The equities, and the public interest, require denial of Plaintiffs' motion.

## POINT IV

## THE COMPLAINT MUST BE DISMISSED

The Complaint must be dismissed pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) because: (1) Plaintiffs lack standing, and (2) the Complaint fails to state a claim upon which relief can be granted.

### A. *The Court must dismiss the Complaint because Plaintiffs lack standing*

As detailed in Point I(A), *supra*, Plaintiffs do not have standing.  It is Plaintiffs' burden, at the pleading stage, to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs lack standing for at least three reasons.  First, Plaintiffs seek an injunction that would allow them an opportunity for "extra priority" weighting in the review pool that they will already receive.  Second, the requested injunctive relief is based on a remote, speculative harm to Plaintiff's *opportunity to be reviewed* that falls well short of the showing required for standing. *R. Huff Asset Mgmt. Co.*, 549 F.3d at 106-07. Third, Plaintiffs are not otherwise qualified to receive extra priority because their 51% owners do not possess "sole control" over Plaintiffs.

### B. *The Complaint fails to state a claim under the dormant Commerce Clause*

As explained in Points I(B) and I(C), *supra*, the Complaint does not state a claim for relief under the dormant Commerce Clause.  The dormant Commerce Clause does not apply where, as here, there is no lawful interstate market at stake.  Even if the dormant Commerce Clause applied, the challenged licensing requirements do not violate it.  The requirement that extra priority applicants have a marihuana-related conviction under New York Law does not discriminate on its face, in effect, or in purpose.  Moreover, to the extent the New York conviction requirement imposes any burden on interstate commerce, such burden does not exceed the local benefit.

**CONCLUSION**

For the reasons discussed above, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be denied, and Defendants' cross-motion to dismiss the Complaint should be granted.

Dated: Albany, New York
January 16, 2024

LETITIA JAMES
Attorney General
State of New York
*Attorney for Defendants*
The Capitol
Albany, New York 12224

By: *s/ Ryan W. Hickey*
Ryan W. Hickey
Assistant Attorney General
Bar Roll No. 519020
Telephone: (518) 776-2616
Email: Ryan.Hickey@ag.ny.gov

TO:     Counsel of record (*Via ECF*)