**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

VARISCITE NY FOUR, LLC AND VARISCITE NY FIVE, LLC          Docket No. 23-1599

Plaintiff,

v.                                                                                    **DECLARATION OF CHIEF EQUITY OFFICER IN OPPOSITION TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

NEW YORK STATE CANNABIS CONTROL BOARD; NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT; TREMAINE WRIGHT; AND CHRIS ALEXANDER,

Defendants.

Damian Fagon, on the date noted below and pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under the penalty of perjury under the laws of the United States of America:

1.      I am currently employed by the New York State ("NYS") Office of Cannabis Management ("Office") and my position is Chief Equity Officer. In this position, my duties and responsibilities include, but are not limited to, developing and implementing the social and economic equity plan ("SEE Plan") required to be established by the Cannabis Law, and ensuring the Cannabis Control Board ("Board") and the Office comply with the SEE Plan.

2.      My statements herein are based on my personal knowledge, deriving from my position as Chief Equity Officer at the New York State Office of Cannabis Management, and relevant materials consisting of the exhibits and authorities cited herein.

3.      I submit this Declaration in support of the Defendants' opposition to Plaintiffs' request for a Temporary Restraining Order and Preliminary Injunction.

<u>Cannabis Law and Regulations for Social and Economic Equity</u>

4.     The Cannabis Law requires "the board, in consultation with the chief equity officer and executive director, and after receiving public input," to create the SEE Plan. Cannabis Law § 87(1).

5.     As discussed more fully below, the Cannabis Law provides the framework and the goals for the SEE Plan, but leaves the creation of the specifications, operation, and implementation of the SEE Plan to the Office and Board. Cannabis Law § 87.

6.     In this context of the SEE Plan, the Office and Board are required to "actively promote" certain applicants by, among other things:

> prioritizing consideration of applications by applicants who are from communities disproportionately impacted by the enforcement cannabis prohibition or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans.

Cannabis Law § 87(1).

7.     These five groups of applicants are referred to in the Cannabis Law as social and economic equity applicants ("SEE applicants"). Cannabis Law § 87(1)-(2).

8.     In addition, the SEE Plan must give extra priority to a SEE applicant if it:

> (a)  is a member of a community disproportionately impacted by the enforcement of cannabis prohibition;
> (b)  has an income lower than eighty percent of the median income of the county in which the applicant resides; and
> (c)  was convicted of a marihuana-related offense prior to the effective date of this chapter, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of this chapter, was convicted of a marihuana-related offense.

Cannabis Law § 87(3).

9.     The Cannabis Law leaves it to the Board to create regulations regarding the qualifications for each SEE applicant group (Cannabis Law § 87(1)), and the selection of

applications that should receive a license based on an applicant being a social and economic equity applicant (Cannabis Law § 64(a)).

10. To that end, the Board adopted regulations for the adult-use market (the "AU Regulations") which among other things, provide broad discretion to the Office and the Board (as Plaintiffs' themselves recognize (*See* ECF No. 11 pp 5-6)), with respect to how applications will be reviewed and selected for licenses (which include SEE applications and licenses):

| | |
|---|---|
| § 120.7(a)(1) | An applicant shall provide information in a form and manner **as prescribed by the Board** |
| § 120.7(b) | An applicant… shall be reviewed and evaluated in an order and manner **determined by the Board**, based on provisional, social and economic equity status **or any additional criteria to be set by the Board** |
| §120.7(c) | The ***Board may*** approve licenses using mechanisms, including, but not limited to, scoring, compliance-based evaluation, qualified lottery, randomized ordering, or any combination thereof." |
| 120.7(c)(2) | The **Board may** prioritize application submission, review, selection and issuance by region, license type, provisional status, social and economic equity status, **or any other criteria the Board may determine** |
| 120.7(c)(3) | Application submission, review, selection, and issuance **may be** prioritized by groupings |

11. The AU Regulations also detail how to describe, identify, and certify the five SEE applicant groups, including those eligible to receive extra priority as set forth in Cannabis Law § 87(3).[1] *See* Part 121.

12. Section 121.1(k) of the AU Regulations which lays out the qualifications for receiving extra priority provides as follows:

(k) Extra Priority

(1) A person who demonstrates that they are an individual from a community disproportionately impacted by the enforcement of cannabis prohibition may receive extra priority if:

---

[1] https://cannabis.ny.gov/system/files/documents/2023/09/exprs-trms-adopt-au-regs-9-12_0.pdf

3

(9) they have an income lower than eighty (80%) of the median income of the county in which the applicant resides; and

(ii) was convicted of a marihuana-related offense prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

Individual from a Community Disproportionately Impacted

13.     One of the requirements for receiving extra priority, as set forth in § 121.1(k), is being from a community disproportionately impacted by the enforcement of cannabis prohibition ("CDI").

14.     An applicant seeking to qualify as an individual from a CDI must meet the following requirements:

(1) ownership and sole control over the applicant by one (1) or more individuals from communities disproportionally impacted as set forth in subdivision (e) of this section; and

(2) one (1) or more individuals that have an ownership interest in the business have resided in a community disproportionately impacted for an aggregate of five (5) of the first eighteen (18) years of their life or an aggregate of seven (7) years of their life.

9 NYCRR §121.1(d).

15.     Based on the above, the individual that is from the CDI, must be an owner and have sole control over the applicant.

16.     "Sole control" means a person or persons who:

(i) has real, substantial, and continuing ownership of 51% equity share in the business;

(ii) has the right to execute any material contracts;

4

(iii) has the ability to exercise the authority to materially influence the day-to-day business decisions, operations, strategic priorities, capital allocations, acquisitions and divestments;

(iv) has no timed or triggered recusal provisions or side letters or side agreements related to their recusal; and

(v) has an ability to direct decisions, voting or otherwise, such that no other person may exercise or have the ability to control the majority of voting rights or appoint or remove the majority of director seats or their equivalent or corporate officers or their equivalent on the governing body.

17.     The purpose for requiring that the individual that is being used to satisfy the social and economic equity portion of the application has sole control over the applicant is that it is intended to "protect applicants and licensees from predatory arrangements and to guarantee that they have the necessary autonomy over their businesses." See SEE Plan, attached hereto as **Exhibit A**, p 54. This provision was informed by a wide range of predatory practices inflicted upon social equity licensees in other jurisdictions such as Los Angeles, and more recently, Arizona.[2]

18.     Dante Kinsey owns 51% of Variscite NY Four, LLC ("Variscite Four"); Jeffrey Jensen owns the other 49%. *See* Variscite Four Capitalization Chart attached hereto as **Exhibit B**; Recreated Version of Variscite Four NYBE Application ("Variscite Four Application") attached as **Exhibit C**, p 21.

19.     Jeffrey Jensen completed and submitted the Variscite Four Application. *See* Ex. C p 78. Only managing members can submit an application on behalf of limited liability companies. Cannabis Law §62(3).

---

[2] https://www.latimes.com/california/story/2020-06-23/cannabis-licenses-social-equity-4th-mvmt / https://azcir.org/news/2023/07/27/corporate-dispensaries-overtake-marijuana-social-equity-program/-

20.    Jeffrey Jensen is the sole director, chief executive officer, and managing member of Variscite Four. *See* Variscite NY Four, LLC, Limited Liability Company Agreement, attached hereto as **Exhibit D**, pp 6, 10, 27, 28.

21.    Jeffrey Jensen has the "sole right to assign a management agreement for the company" for Variscite Four. *Id.* p 6.

22.    The Board consists of one director which is Jeffrey Jensen. Currently, "there shall be one (1) designee on the Board (Board designees are referred to collectively herein as the "Directors" and each, as a "Director"). The initial Director shall be Jensen." *Id.* p 10. The Director has all "rights and powers of a "manager" under New York Law." *Id.* p 3.

23.    Further, with respect to the authority of the Board, and thus Jeffrey Jensen alone:

the "management and control of the business, affairs and properties of the Company shall … be and hereby are, delegated exclusively to a Board of Directors that shall possess all rights and powers of "managers" … including the right to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company and (ii) a Member may not act for or on behalf of the Company… The Board (and any Officer acting pursuant to the authority granted by the Board) may make all decisions and take all actions for the Company, including without limitation the following:
(a) Entering into, making, and performing contracts…
(b) Opening and maintaining back accounts
(c) Acquiring…or disposing of any real or personal property
(d) Establishing and maintaining reserves
(e) Indemnifying any person
(f) Borrowing money
(g) Paying, collecting, compromising, litigating, arbitrating or otherwise adjusting or settling any and all other claims
(m) approving the issuance of units
(n) authorizing distributions

*Id.* p 8.

24.    Based on Mr. Jensen's rights in Variscite Four, Dante Kinsey who is indicated as owning 51% of the Variscite Four, does not have sole control of Variscite Four. Nor can he have sole control given that Mr. Jensen is the sole director of the entity.

25.     Justin E Palmore owns 51% of Variscite NY Five, LLC ("Variscite Five"); Jeffrey Jensen owns the other 49%. *See* Variscite Five Capitalization Chart attached hereto as **Exhibit E**; Recreated Version of Variscite Five NYBE Application ("Variscite Five Application") attached hereto as **Exhibit F**, p 20.

26.     Jeffrey Jensen completed and submitted the Variscite Five Application. *See* Ex. F p 73.

27.     Jeffrey Jensen is the sole director, chief executive officer, and managing member of Variscite Five. *See* Variscite NY Five, LLC, Limited Liability Company Agreement, attached hereto as **Exhibit G**, pp 6, 10, 27, 28.

28.     Jeffrey Jensen has the "sole right to assign a management agreement for the company" for Variscite Five. *Id.* p 6.

29.     The Board consists of one director which is Jeffrey Jensen. Currently, "there shall be one (1) designee on the Board (Board designees are referred to collectively herein as the "Directors" and each, as a "Director"). The initial Director shall be Jensen." *Id.* p 10. The Director has all "rights and powers of a "manager" under New York Law." *Id.* p 3.

30.     Further, with respect to the authority of the Board, and thus Jeffrey Jensen alone, he has all of the same authority with respect to Variscite Five as he does in Variscite Four. *See* ¶ 23 above.

31.     Based on Mr. Jensen's rights in Variscite Five, Justin Palmore who is indicated as owning 51% of Variscite Five, does not have sole control of Variscite Five.

Community Disproportionately Impacted

32.     Regulation 121(e) provides that "For purposes of determining whether an area is a community disproportionately impacted, the Office may review geographic areas, such as precincts, zip codes, neighborhoods, political subdivisions, and any other geographic area for:

    (1)   history of arrests;
    (2)   number of convictions;
    (3)   law enforcement procedures, protocols and practices;
    (4)   allocation of law enforcement resources; or
    (5)   children removed from the home by Child Protective Services, or equivalent child protective services for out of state jurisdictions, due to:
        (i)   a parent/ caretaker's marihuana use or arrest;
        (ii)  school suspension records;
        (iii) high school attainment;
    (6)   deportation records for marihuana offenses; or
    (7)   any other impacts as determined by the Office reflecting relative disparate enforcement of cannabis prohibition laws during a certain period of time **in a certain geographic area**.

9 NYCRR §121(e) (emphasis added).

33.     None of the above identify an area in New York or considerations specific to only New York.

34.     Consistent therewith, the Office published guidance on its website explaining that an applicant may use a community ***in any state*** that has experienced disproportionate law enforcement cannabis practices during cannabis prohibition. *See* General Licensing Application Frequently Asked Questions ("FAQs"), attached hereto as **Exhibit H**, Question 74.[3]

35.     In that regard, the FAQ, at question 74, explains that:

Residents **of any state** are eligible to apply for SEE status if they lived in a community **in a state other than New York** that experienced disproportionate law enforcement cannabis practices during cannabis prohibition for the requisite time period as described in Question 73. If the applicant's out-of-state community meets the abovementioned requirements, the **Office will recognize such out-of-state community as an "Out-of-State CDI."** Note that where the individual resides in a state that legalized cannabis for medical, adult use, or both, the Office will only

---

[3] https://cannabis.ny.gov/system/files/documents/2023/12/current-public-universal-app-faq-12-5.pdf

consider disproportionate impacts of cannabis enforcement practices from a time prior to the date when that state ended prohibition, but no later than March 31, 2021.

36.     Further, the Office provided specific information and explained in detail the methodology an applicant can use to establish that such an out- of-state community is an Out-of-state CDI. *See* FAQ, Question 74.

> If you are an Out-of-State CDI applicant, you must submit documentation that demonstrates the census tract you resided in out of state was disproportionately impacted under prohibition as compared to the rest of that state. More specifically, you must establish the census tract you resided in out of state was disproportionately impacted under prohibition as compared to the rest of your state by demonstrating that the local arrest rate substantially exceeded the state's arrest rate. You can use decennial census population data and the number of arrests within your census tract during requisite time periods (1980 – 1985, 1986 – 1995, 1996 – 2005, 2006 – 2015, and 2016 – 2021) to establish arrest rates for each time period. If necessary data is unattainable by census track, you can provide data that correspond to similar geographic areas along with an explanation why census track data is unattainable.

37.     These online instructions are the same as the information and methodology the Office explained in detail in guidance on its website that it used for determining which communities in New York are CDIs. *See* NYS Communities Disproportionately Impacted (CDI), attached hereto as **Exhibit I**.[4]

38.     In addition to establishing that an area is a CDI, an applicant must also establish that it was part of that CDI.

39.     Section 121.1(d)(2) of the AU Regulations provides, in relevant part, that a CDI applicant must show that:

> (2)     One (1) or more individuals that have an ownership interest in the business have resided in a community disproportionately impacted for an aggregate of five (5) of the first eighteen (18) years of their life or an aggregate of seven (7) years of their life. The Office may take into consideration a break in residency in determining whether an

---

[4] https://cannabis.ny.gov/communities-disproportionately-impacted

applicant meets the residency requirement, due to the following factors, which include but are not limited to:

(i)   Incarceration,

(ii)   Education,

(iii)   Illness,

(iv)   Foster care,

(v)   Custodial matters, or

(vi)   Homelessness

40.     The AU Regulations also provide that "An applicant seeking to qualify for extra priority shall provide proof of residency … as prescribed by the Board." § 121.1(k)(3)

41.     Nothing in the above relevant regulations indicates that the length of membership in a CDI is somehow related to New York or that the factors that the Office will consider for an exception to the period of membership are related solely to a New York population.

42.     In its published guidance, the Office gave examples to applicants of some of the documents that can be used to demonstrate their membership.

43.     Question 73 provides as follows:

Some examples of proof of residence documentation are:

- Education Records
- Mortgage or Lease Documents
- Property Deeds
- Government Housing or Assistance Records
- Utility bills
- Employment Records
- Government issued ID with address on it
- DMV address history/lifetime abstract
- Vehicle Registrations
- State, Federal and Local Tax returns

*See* Ex. H, Question 73; *See* Ex I.

44.     None of these documents are specific to New York.

45.     Despite the clearly laid out information indicating that a CDI need not be in New York and, consistent therewith, that supporting documents do not need to be from New York, if

Plaintiffs were not sure about what documents can be used to show membership in a CDI, they could have had contacted the Office for clarification.

46.    Indeed, the Office encouraged applicants to contact the Office if they have questions about their eligibility, and application in general, by emailing the info, SEE, and licensing email addresses for the Office. *See* Ex H Question 46 and 56.

47.    Last, the Office advised that in case the documents that an applicant initially submitted with their application were not enough to establish the CDI factor, they would receive correspondence from the Office regarding such deficiencies and would then have a chance to submit further documents to supplement their application. *See* FAQ, Question 74, 113, and 63; *see also* 9 NYCRR § 121.5(a)(b).

48.    Plaintiff Variscite Four identified addresses in Bellflower, California and Los Angeles, California as proposed communities that were disproportionately impacted by cannabis prohibition. *See* Ex C p 47. Plaintiff Variscite Five identified addresses in Los Angeles as a proposed community that was disproportionately impacted by cannabis prohibition. *See* Ex F p 42.

49.    The City of Los Angeles, as part of its social equity licensing program for cannabis, had already identified reporting districts that it considered to be disproportionately impacted areas.[5]

50.    And Plaintiffs' member Mr. Jensen is more than familiar with such program and its areas having previously applied for such program and engaged in litigation regarding such program.

51.    Additionally, as Plaintiffs point out, other states that take communities disproportionately impacted into their licensing consideration have already compiled data and

---

[5] https://clkrep.lacity.org/onlinedocs/2017/17-0653_rpt_DCR_06-16-2020.pdf

designated areas in their states as such communities.[6] Indeed, there are at least eleven such states in varying stages of identifying such areas, including Arizona, Colorado, Massachusetts, Maryland, Washington, Connecticut, Illinois, Michigan (certain municipalities like Detroit), Virginia (working toward implementation), Minnesota (working toward implementation), California (certain municipalities like Sacramento, Los Angeles, Oakland, San Francisco, and more).

Marihuana-Related Offense

52.     In addition to establishing that the applicant was part of a CDI, an applicant seeking extra priority must also show that it:

> was convicted of a marihuana-related offense prior to the effective date of the Marihuana Regulation and Taxation Act, or had a parent, guardian, child, spouse, or dependent, or was a dependent of an individual who, prior to the effective date of the Marihuana Regulation and Taxation Act, was convicted of a marihuana-related offense.

9 NYCRR § 121.1(k)(1)(ii)

53.     Pursuant to section 118.1(a)(64), "a marihuana-related offense means an offense defined in:

(i)     former sections 220.03 and 220.06 of the Penal Law where the sole controlled substance involved was concentrated cannabis,

(ii)    former sections 221.05, 221.10, 221.15, 221.20, 221.35, or 221.40 of the Penal Law,

(iii)   section 105.05 of the Penal Law prior to the effective date of chapter ninety-two of the laws of two thousand twenty-one and the sole conduct involved was an offense defined in former sections 221.35 or 221.40 of the Penal Law,

(iv)    former section 3382 of the Public Health Law prior to the effective date as prescribed in subdivision nine of section 222.15 of the Penal Law, and the cultivation of such cannabis plants was solely for personal possession and use,

(v)     article two hundred twenty or section 240.36 of the Penal Law prior to the effective date of former article two hundred twenty-one of the

[6] https://mjbizdaily.com/wp-content/uploads/2022/02/National-Cannabis-Equity-Report-1.pdf

Penal Law and the sole controlled substance involved was marihuana and the conviction was only for a misdemeanor and/or violation, or

(vi) any offense identified by the Office to be a marihuana-related offense.

54.     While the AU Regulations require that one of the owners of the applicant, or a relative of one of the owners, have a marihuana conviction under New York law, neither the AU Regulations nor any other guidance or other document require that such an individual (or any other individual associated with an applicant) be a resident of New York.

55.     An individual need not be a current or past resident of New York to have a marihuana-related conviction under New York law. Individuals may have been convicted of a New York marihuana-related offense while previously living in the State, attending college there, commuting to New York for work, visiting New York on vacation, or passing through one of New York's international airports or other transit facilities where people and bags are subjected to drug searches. Moreover, the marihuana-related offense factor can be satisfied even if the business owner's **family members** have a marihuana conviction under New York law. In other words, a business may be owned by an individual who has never been to New York if that person's spouse, parent, child, guardian, or dependent was convicted of a marihuana-related offense under New York law.

56.     Requiring that the marihuana-related offense be an offense under New York's former marihuana laws is intended to recognize and ameliorate the harm done by New York's own prior laws criminalizing marihuana.

57.     The legislature made clear, in enacting the Marijuana Regulation and Taxation Act ("MRTA") which created the Cannabis Law, that "Existing laws … have resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that

13

inhibit ... the ability to access housing, employment opportunities, and other vital services." Cannabis Law § 2.

58.     The MRTA also significantly reformed criminal justice measures, such as removing marihuana from the definition of a controlled substance (Penal Law § 220.00) and repealing the criminal possession and sale of marihuana in the fourth degree (Penal Law§ 220.09, Penal Law§ 220.34). It also changed the requirements for a person to be guilty of criminal possession or sale in the first, second and third degrees and established new civil and misdemeanor penalties for unlawful acts. Penal Law§ 222.25 – 222.60.

59.     In this regard, there can be no question that one of the major goals of the Cannabis Law is stopping the harm of criminalization and restoring justice. Cannabis Law § 10(17)(c) (requiring the Office to report on the effectiveness of the restorative justice goals of the Cannabis Law). What is more, the New York State Legislature made it clear that it passed the MRTA "based on the recognition that New York's existing marihuana policies have failed to protect the welfare of our communities" and have "thrust thousands of New Yorkers into the criminal justice system for non-violent offenses, denying many the fundamental right to participate in the democratic process of voting and inhibiting otherwise law-abiding citizens' ability to access housing, student loans, employment opportunities, and other vital services." *See* Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 92 at 7.

60.     The SEE Plan advises that "between 1980 and 2021, cannabis offenses were the primary charge in over 1.3 million arrests, 245,000 convictions, and 345,000 violations in the state," that the "Marijuana Reform Act of 1977 was New York's first recognition that the collateral consequences of a cannabis conviction were too far reaching and were not proportionate to the crime of cannabis use," and that consequences of an arrest and conviction typically mean "loss of

employment, housing, access to education, difficulty maintaining a professional license, or even adopting a child." SEE Plan, Legacy of Cannabis Prohibition in New York, pp 31-32.

61. Further, during the community outreach in gathering input for the SEE Plan, a "significant number of participants described traumatic prior interactions with law enforcement and the long-term impacts of these interactions on their mental health, family cohesion, and professional advancement. Individuals who were directly criminalized due to cannabis explained how difficult reentry can be for the formerly incarcerated…" SEE Plan, p 26.

62. The MRTA, in its effort to stop the harm caused by cannabis prohibition, also addressed the direct harms to individuals. It mandated the automatic expungement of over ten cannabis-related convictions in New York. Over 400,000 records met the criteria for expungement. *See NYS Office of Cannabis Management Inaugural Annual Report 2022*, attached hereto as **Exhibit J**.

63. Given the foregoing, the State's focus on New York marihuana-related offenses ensures that the profits from New York's new cannabis market flow primarily to the people who have suffered the consequences of New York's marihuana criminalization and continue to provide affected individuals with an ongoing source of revenue that State financial assistance alone could not offer.

64. The New York State conviction requirement also addresses how New York marihuana convictions continue to be a barrier for affected individuals, potentially excluding them from economic opportunities, by providing them with a restorative opportunity in entering an emerging market. And the requirement accomplishes this goal without excluding others from the cannabis market: those who have not been convicted of a New York marihuana offense are

welcome to partner – in ownership or other business ventures - with those who have (or they can apply for their own license as the applications for non-priority licenses were also opened).

65.     Indeed, the Office closely studied social equity programs in other states that have legalized cannabis use to determine their efficacy. According to the SEE Plan, such programs typically focused on providing licenses, technical training and funding. Nevertheless, the SEE Plan noted that such programs "have been criticized for failing to provide adequate access to licensure and long-term support for those most adversely impacted by cannabis prohibition." SEE Plan p 13.

66.     Following consideration of various approaches for addressing the harm caused by New York's prior cannabis laws and their proven disproportionate enforcement, the Office determined that providing extra priority of review (as described below) to individuals convicted under such New York laws most effectively satisfied the MRTA's restorative justice goal by providing an economic opportunity to those who were denied many such opportunities on account of New York's penal code. This opportunity, as set forth below, is as narrowly tailored as practicable to achieve the legislature's goal.

67.     An applicant's extra priority eligibility does not guarantee it application review nor a license. Any argument that the Office could have taken another approach at satisfying the MRTA's extra priority mandate is not only speculative but deprives the Board and Office of its statutory discretion as well as its responsibility to balance these matters in a fair, equitable and workable manner.

SEE Plan – Providing Priority and Extra Priority

68.     As previously stated, the Cannabis Law tasks the Board and Chief Equity Officer to develop the SEE Plan; promote, prioritize and extra prioritize certain SEE applicants, draft

16

regulations outlining the qualifications for each such group, and promote certain goals within the SEE Plan. Cannabis Law § 87(1).[7]

69.     The Cannabis Law establishes specific objectives for the SEE Plan, such as to "promote applicants from communities disproportionately impacted by cannabis prohibition, and promote racial, ethnic, and gender diversity when issuing licenses." This goal can be achieved by "mentoring potential applicants" and "prioritizing consideration of applications" by SEE applicants. *Id.* The Cannabis Law also suggests granting microbusiness licenses (Cannabis Law § 73(3), delivery licenses (Cannabis law § 74(1)), and nursery licenses (Cannabis Law §75(1)) to promote SEE applicants.

70.     Another goal of the SEE Plan, according to the Cannabis Law, is to "promote diversity in commerce, ownership and employment, and opportunities for social and economic equity in the adult use industry." Cannabis Law § 87(2).

71.     To that end, a "goal shall be established to award fifty percent of adult-use cannabis licenses to social and economic equity applicants and ensure inclusion of" those seeking to participate as SEE licensees. *Id.*

72.     Furthermore, any SEE applicant who can satisfy the CDI requirement, the marihuana-related conviction requirement, and a specific income threshold must be given extra priority under the SEE Plan. Cannabis Law § 87(3).

---

[7] "The chief equity officer shall assist with the development and implementation of, and ensure the cannabis control board and the office of cannabis management's continued compliance with, the social and economic equity plan…" Cannabis Law § 12(1). The advisory board shall also make recommendations regarding the social and economic equity plan. § 14(5).

73.     While the Cannabis Law provided the above goals for the SEE Plan and some examples of how to achieve them, it left broad discretion to the Board to determine how to implement those goals.

74.     For example, the Cannabis Law contemplates that the Board will develop and implement "specific programs" to achieve the aforementioned goals because the law requires the Board to report on such programs. Cannabis Law § 10(17)(c).

75.     The Cannabis Law also contemplates that such programs and/or the means of achieving the SEE Plan goals may need to be revised, as the law requires that the Board make recommendations regarding changes to "improve registration, licensing and permitting" and "promoting and encouraging social and economic equity applicants." Cannabis Law § 10(17)(h).

76.     Another example of the Cannabis Law giving the Board the discretion to fill out the framework provided by the law for the SEE Plan and SEE applicants is the Board being given the "sole discretion to limit, or not to limit, the number of registrations, licenses and permits of each class to be issued within the state or any political subdivision thereof, in a manner that prioritizes social and economic equity applicants…" Cannabis Law §10(2).

77.     The SEE Plan summarizes the outside parameters set out in the Cannabis Law and intended subsequent work by the Board as follows:

> The design of this market was included in that bill. The MRTA laid out an approach that tried to incorporate lessons learned from other states who have ended prohibition in their own jurisdictions but left to this team the heavy work of filling out the true blueprint to making New York's cannabis market the most equitable, and successful, cannabis market in the nation. This living document represents the path forward for New York. It is a strategic plan to realize the goals of the MRTA, to bring economic activity to every corner of the State, and to set a new example of what intentional policymaking looks like. This Social and Economic Equity Plan does not run from New York's past relationship with cannabis. It contextualizes it and provides the State with achievable steps to repair the harm that has been done and prepare the State to be a national leader in the space.

18

SEE Plan, Letter from Executive Director, p 3.

78.    This SEE Plan and the goals therefore were not, however, the product of the ideas of the Board and Office alone. Section 87 requires that the SEE Plan be created with the input of the public. As such, the SEE Plan "was developed with stakeholder engagement. The Office consulted community partners in New York as well as industry experts with extensive experience supporting cannabis social equity initiatives across the country." SEE Plan, Acknowledgments, p 5.

79.    Specifically, the SEE Plan details the public engagement and input that informed the SEE Plan and the implementation of the goals stated for it as follows:

> In carrying out the responsibility to ensure relevant public input, the Office's NYSEE and External Affairs teams organized a series of equity community roundtables to gather information from the various community groups that are most likely representative of the CDIs, minority-owned businesses, women-owned businesses, distressed farmers, and service-disabled veterans. The team engaged with community stakeholders representing each SEE group in both upstate and downstate regions of the state. Community organizations recruited participants for roundtable sessions to ensure the integrity of the process. Roundtables consisted of discussions regarding representation, equity, and approaches the Office could use to increase cannabis industry participation from target populations.

SEE Plan, Equity Community Roundtables, p 20.

80.    With this input from the public, the SEE Plan explains that "Social and economic equity refers specifically to policies made by the Office to achieve the goals laid out in the Cannabis Law." SEE Plan, Applying an Equity Framework, p 10.

81.    Further, the SEE Plan explained its approach to achieving the goals in the SEE Plan, including promoting and prioritizing SEE applicants. In this regard, the SEE Plan states "The Board and the Office recognize that to truly achieve our social equity objectives, those objectives

19

must be directly connected to the ways in which we do our work. To ensure an equitable cannabis industry, the Board and the Office are committed to the following equity pillars:

- Bringing to life an industry that gives small, independent businesses an opportunity to compete.
- Building relationships and trust within the communities most impacted through educational and social    programming.
- Investing resources including grants, loans, and technical assistance to equip SEE groups with the    support needed to thrive in the New York State cannabis market.
- Educating communities on their rights in accordance with the Cannabis Law and regulations.
- Collecting data and evolving programming to adapt to the equity needs of the industry."

SEE Plan, Applying an Equity Framework, p 10.

82.     Based on the above, as well as the broad authority the Board and Office have pursuant to the AU Regulations regarding application and licensure, the Office and Board have prioritized consideration of SEE applications submitted between October 4, 2023 to December 18, 2023 in the following ways.

83.     As an initial matter, the SEE Plan recognized that the lack of access to information, excessive paperwork and documentation specifically required for SEE individuals to prove their SEE status when applying for licensure, and restrictions imposed solely on SEE licensees may discourage SEE individuals from participating in the cannabis marketplace as business owners. The SEE Team held community roundtable events with SEE stakeholders across New York State from October 2022 to December 2023 to encourage and increase submissions of SEE applications for the Office's consideration. The SEE Team also conducted significant outreach through educational events regarding applications and licensure. Specifically, the SEE team conducted several public facing SEE application sessions from October through December 2023. The team prepared online and print materials such as:

- the Adult-Use Social & Economic Equity Applicant Overview which provides an easy–to-understand overview of statutory provisions pertinent to SEE applicants; SEE qualifications, SEE benefits, application tips and other resources.[8]

- SEE application assistance documents such as guidance on obtaining proof of a conviction[9] or an address.[10]

84.     Furthermore, the SEE Plan recognized that cannabis licensing regimes that required applicants to submit various plans for evaluation, such as standard operating procedures, technical documents, financial plans, or personnel experience, are often prohibitively expensive and favor applicants who can afford to pay third-party consultants to produce top-scoring documents.    Such applications often result in inequitable outcomes for other applicants, particularly SEE applicants. SEE Plan, Reduce Barriers to Entry and Clear the Pathway to Licensure, p 58. As such, New York's adult-use application platform was designed to be accessible and easy for applicants to use, rather than requiring applicants to hire and pay consultants to draft numerous plans for an application to be able to be considered by the Office.

85.     Nevertheless, in the event that a current SEE applicant required additional help with an application, the SEE team collaborated with community-based organizations, municipalities, academic institutions and key community stakeholders to bring together over 75 technical assistance providers committed to streamlining the application process for SEE applicants through the Cannabis Hub & Incubator Program ("CHIP"). The program, together with grants, encouraged community organizations and academic institutions to provide application assistance. Over 700 potential SEE applicants for this current application window were connected with technical

---

[8] https://cannabis.ny.gov/system/files/documents/2023/12/ocm-seeapplicants.pdf
[9] https://cannabis.ny.gov/system/files/documents/2023/09/how-to-get-proof-of-conviction-documents_0.pdf
[10] https://cannabis.ny.gov/system/files/documents/2023/09/how-to-prove-address-to-qualify-as-a-member-of-a-community-disproportionately-impacted.pdf

assistance providers by the Office. This initiative increased the Office's ability to consider SEE applications by ensuring that SEE applicants can navigate and complete all application requirements.[11]

86.   To further assist interested SEE applicants in filing such applications, the Board reduced application fees for SEE applicants. Section 141 of the AU Regulations provides that "An applicant may pay a reduced, waived or deferred application or license fees …if the applicant qualifies as a social and economic equity applicant. 9 NYCRR 120.4(c).

87.   Further, when reviewing the current SEE applications, SEE Team members will be solely focused on assisting SEE applicants in correcting any deficiencies with their applications for such applicants to be licensed in a timely manner.

88.   In addition to the numerous ways stated above in which the SEE applications submitted from October 4 through December 18 are prioritized, the Office provided extra priority of consideration/review to those SEE applicants who indicated they were qualified for such treatment. With respect to such SEE applicants, extra priority applications were included three times in the pool of applications that are being randomly ordered for review purposes.

89.   Further, if an applicant who was ordered high enough for review could not satisfy the requirements for extra priority after review and cure, that applicant would be removed from the review queue as an extra priority applicant, although they may remain in the queue as a social and economic equity applicant should they so indicate as qualifying as such on their application.

90.   Thus, the application process grants extra priority applicants increased chances to qualify for application review and, therefore, increased chances at a licensure opportunity. Such a mechanism was a vital component to the architecture of the MRTA and regulations that seek to

---

[11] https://forms.office.com/pages/responsepage.aspx?id=6rhs9AB5EE2M64Dowcge52cRR6ozzytIv5Qw-p7Y9klUN1FSRFhTTzZFRVdMR1hMN0xTTlc3T0dNOC4u

realize the legislature and Governor's absolute commitment to include community members whose unjust convictions left them with significant collateral consequences such as getting a loan, buying a house, renting an apartment, attending school, and obtaining a job, among others. No person, including Plaintiffs, has denied the importance of the restorative justice goals described in this affidavit and in the MRTA and regulations.

91.     Extra priority, however, does not mean that Plaintiffs' applications are entitled to be reviewed and processed first ahead of others as Plaintiff suggests or a guarantee of a license. By way of example, with respect to the applications seeking a retail dispensary license that were also seeking extra priority and were submitted before November 17, 2023, only approximately one-third of such applications will be reviewed before all licenses for November applications are issued. Conversely, approximately two-thirds of these applications may never be reviewed by the Office due to their placement on the random lottery queue for such applications.

92.     Plaintiffs provide no basis for their interpretation of the Cannabis Law §87 and fail to refute the wide discretion afforded to the Board and Office by the Cannabis Law in drafting regulations relating to application and licensure, including the SEE Plan.

Dated:          Albany, New York
                January 16, 2024


                                        /s/
                                        Damian Fagon