## VARISCITE NY FOUR, LLC
## LIMITED LIABILITY COMPANY AGREEMENT

This **LIMITED LIABILITY COMPANY AGREEMENT** (the "**Agreement**") of Variscite NY Five, LLC, a New York limited liability company (the "**Company**"), is made effective as of December 6, 2023 (the "**Effective Date**") by and among the individuals and/or entities listed on Schedule 1 to this Agreement (the "**Members**").

### RECITALS:

A.      The initial Members of the Company are JEFFREY JENSEN ("**Jensen**") and Dante Kinsey ("**Social Equity Individual**"). Jensen and Social Equity Individual wish to apply for an adult use cannabis retail dispensary license (a "**License**") in New York.

B.      The New York Office of Cannabis Management ("**OCM**") selects applicants for Licenses based on a "random order queuing process" lottery.  New York provides extra priority in the License application program to applicants at least 51% owned by persons meeting defined social equity characteristics.  Social Equity Individual does not meet New York's current requirements for extra priority.  Jensen believes the requirements for extra priority may be susceptible to legal challenge in a lawsuit brought by the Company.

C.      Jensen will contribute the services of forming the Company and entering the Company's application for a New York License.  Social Equity Individual will contribute serving as the social equity individual.  In addition, Jensen may at his discretion loan money to the Company for company formation, License application, litigation, and other costs.

D.      If the Company receives a License, the Company will need significant additional capital for startup costs.  To obtain the startup capital, the existing members will likely need to transfer a portion of their equity to an investor and likely need to enter a management agreement with an investor as well.

E.      This Agreement sets forth the understanding and agreements of the Members with respect to the Company and amends, restates and supersedes any prior written or oral agreements or understandings among the Members with respect thereto.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises, covenants and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Members do hereby covenant and agree as follows:

### ARTICLE ONE
### Definitions

1.1     The defined terms used in this Agreement shall, unless the context otherwise requires, have the meanings specified in this Article One.

1.1.1   "**Adjusted Capital Account**" shall have the meaning set forth in Section 8.2.1.

1.1.2   "**Affiliate**" shall mean with respect to any Member, (i) a Person that directly or indirectly, through one or more intermediaries, has control of, is controlled by, or is under common control

with, such Member or (ii) a Member's spouse, former spouse, child, sibling, parent, or grandchild, or trust for the benefit of such Person or Persons, and any other entity in which the foregoing Persons own a controlling interest. For these purposes, control means the possession, directly or indirectly, of the power to direct or cause the direction of the management of any Person whether through the ownership of voting securities, by contract, as an officer or director of such Person, or otherwise.

1.1.3 "**Available Cash**" shall mean, at any time, that portion of the Company's cash on hand which the Board, in good faith, deems available for distribution to the Members, taking into account (a) the Company's working capital requirements pursuant to its then current business plan and budget, including anticipated investment activities; (b) the amount of cash required for the payment of all current expenses, liabilities and obligations of the Company (whether for expense items, capital expenditures, improvements, retirement of indebtedness or otherwise) and (c) the amount of cash which the Board deems in good faith necessary to establish prudent reserves for the payment of future contingencies.

1.1.4 "**Board**" shall have the meaning set forth in Section 4.5.1.

1.1.5 "**Business Day**" shall mean Monday through Friday of each week, except that a legal holiday recognized as such by the government of the United States or by banks located in the State of New York shall not be regarded as a Business Day.

1.1.6 "**Capital Account**" shall have the meaning set forth in Section 5.2.

1.1.7 "**Capital Contribution**" shall mean the amount of cash and the fair market value of any property that a Member contributes or is deemed to have contributed to the capital of the Company (net of liabilities secured by such property that the Company assumes or to which the Company's ownership of the property is subject). The amount of any Member's Capital Contribution shall be an amount credited to the Capital Account of such Member in connection with such contribution.

1.1.8 "**Capital Proceeds**" shall mean the gross proceeds of any casualty insurance recovery, condemnation award, any refinancing or sale of all or any portion of any property or any other asset and any other items or events that in accordance with generally accepted accounting principles are attributable to capital (except for Capital Contributions).

1.1.9 "**Certificate of Formation**" shall mean the Company's Certificate of Formation as filed with the Secretary of State, as may be amended, supplemented, or restated from time to time.

1.1.10 "**Chairman**" shall have the meaning set forth in Section 4.5.6.

1.1.11 "**Change of Control**" shall mean, in one transaction or series of related transactions, (i) the closing of the sale, transfer, exclusive license or other disposition of all or substantially all of the Company's assets, (ii) the consummation of the merger or consolidation of the Company with or into another entity (except a merger or consolidation in which the holders of Units immediately prior to such merger or consolidation continue to hold, by virtue of such Units, at least 50% of the voting power of the Company or the surviving or acquiring entity in substantially the same proportions as immediately prior to such transaction or related transactions), (iii) the closing of the transfer (whether by merger, consolidation or otherwise)

to a person or group of Affiliated persons of the Units if, after such closing, such person or group of affiliated persons would hold 50% or more of the outstanding Units of the Company (or the surviving or acquiring entity), other than a bona fide equity financing, or (iv) any Liquidation.

1.1.12 **"Code"** shall mean the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of any succeeding law).

1.1.13 **"Company"** shall have the meaning set forth in the Preamble to this Agreement.

1.1.14 **"Confidential and Proprietary Information"** shall mean all confidential, technical and proprietary information of the Company, regardless of the form such information is in, including, without limitation, all tangible and intangible property owned by, or licensed to, or otherwise used by the Company or its Affiliates including, without limitation, copyrights, trademarks, trade names, trade secrets, know-how, service names, service marks, logos and proprietary rights relating thereto; marketing, licensing and distribution strategies; client, customer, investor and business partner lists; business and financial plans or projections; investment and financial research, projections and other information related thereto; performance information; client, advisory and fee agreements; ideas, concepts, designs, graphics, text, methods, formulas, techniques, products, services, projects, programs, computer software, data bases, and all other business-related information disclosed to a Member by the Company either directly or indirectly  in writing, orally or by observation, and specifically including any information provided to a Member under this Agreement.  "Confidential and Proprietary Information" does not include any of the foregoing items which have become publicly disclosed by the Company or its Affiliates, or otherwise has become publicly known and made generally available through no wrongful act of a Member or of third parties who the Member knows to be under confidentiality obligations to the Company.

1.1.15 **"Covered Person"** means any Member, Director, member of the Board or Officer of the Company or their respective Affiliates, and any officer, director or equity holder of a Member.

1.1.16 **"Depreciation"** shall mean, with respect to each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to a Company asset for such year or other period for federal income tax purposes, except that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for such asset for such year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

1.1.17 **"Director(s)"** shall mean a member of the Board, as contemplated in Section 4.5.4, who shall possess, subject to any express limitations contained herein, all rights and powers of a "manager" under New York law.

1.1.18 **"Excluded Opportunity"** shall have the meaning set forth in Section 6.4.

1.1.19 **"Gross Asset Value"** shall mean the fair market value of each item of Company property on the date of its contribution to the capital of the Company, and the adjusted basis for federal income tax purposes of each other item of Company property acquired by the Company, except that the Gross Asset Value of each item referred to in this definition shall be adjusted to equal its fair market value at the time.  The Gross Asset Value of any asset that was contributed or whose gross asset value was adjusted shall be reduced by Depreciation in accordance with the definition of Depreciation herein.

1.1.20 **"Member" or "Members"** shall have the meaning set forth in the introductory paragraph to this Agreement.

1.1.21 **"Membership Interest"** means, with respect to any Member at any time, all of ownership interest of such Member in the Company (which shall be considered personal property), consisting of (a) such Member's Units and Percentage Interest, (b) such Member's interests in Net Income, Net Losses and Distributions of the Company, as such interests may be adjusted from time to time in accordance with the provisions hereof, (c) such Member's Capital Accounts, (d) such Member's right to participate in management as provided herein or under New York law and (e) such Member's other rights, privileges and obligations as provided herein.

1.1.22 **"Net Capital Proceeds"** shall mean, (A) with respect to any casualty insurance recovery or condemnation award, the Capital Proceeds of any casualty insurance recovery or condemnation, as the case may be, less (i) the costs of all repairs or restoration, if any, of the damage resulting from any such casualty, (ii) the costs of adjusting the loss and (iii) the principal and interest required to be paid as a result of such casualty under any mortgage or loan of the Company, and (B) with respect to all other transactions, the amount by which the Capital Proceeds from such transaction exceed the sum of (i) the amounts, if any, used to pay unpaid principal and interest and prepayment premiums under any mortgage or loan of the Company and (ii) transaction costs actually paid to third parties, including, without limitation, brokerage commissions, transfer taxes, documentary stamp taxes, closing costs, origination fees and counsel fees.

1.1.23  **"Net Income"** or **"Net Loss"** shall mean with respect to each fiscal year or other period, an amount equal to the Company's Taxable Income or Taxable Loss, as the case may be, for such year or period, together with the following adjustments:

(a)     any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition shall be added to such Taxable Income or Taxable Loss;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures and not otherwise taken into account in computing Net Income or Net Loss pursuant to this definition shall be subtracted from such Taxable Income or Taxable Loss in the year paid, and shall not be taken into account in any other year;

(c)     in the event the Gross Asset Value of any Company property is adjusted, the amount of such adjustment shall be taken into account as a gain or loss on the disposition of such property for purposes of computing and allocating Net Income and Net Loss;

4

(d)     If Company property is distributed to a Member, income or loss will be included in Net Income and Net Loss as if the property was sold for its fair market value;

(e)     in lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such Taxable Income or Taxable Loss, there shall be taken into account Depreciation for such fiscal year or other period, computed in accordance with the definition of Depreciation herein;

(f)     gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the property's Gross Asset Value notwithstanding that the adjusted tax basis of such property may differ from its Gross Asset Value; and

(g)     notwithstanding any other provision of this definition of Net Income and Net Loss, any items comprising the Company's Net Income or Net Loss that are allocated pursuant to Article Eight shall not be taken into account in computing Net Income or Net Loss.

1.1.24  **"Officers"** shall have the meaning set forth in Section 4.5.11.

1.1.25  "**Percentage Interest**" shall mean, as of any date, as to any Member, the percentage obtained by dividing the total Units of such Member by the total issued and outstanding Units of all Members (including such Member). The initial Percentage Interest for each Member as of the Effective Date is set forth as the "Initial Percentage Interest" opposite such Member's name on Schedule 1 hereto. The Company may update Schedule 1 and each Member's corresponding Percentage Interest from time to time to reflect admission of new Members.

1.1.26  **"Person"** shall mean any individual, partnership, corporation, limited liability company, unincorporated organization, association, trust or other entity

1.1.27  **"Regulations"** shall, unless the context indicates otherwise, mean the income tax regulations in force as final or temporary promulgated under the Code, as such regulations may be amended from time to time, including corresponding provisions of any succeeding regulations.

1.1.28  **"Secretary of State"** shall mean the New York Secretary of State.

1.1.29  **"Taxable Income"** or **"Taxable Loss"** shall mean with respect to each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss, or deduction required to be separately stated pursuant to Section 703(a)(1) of the Code shall be included in such taxable income or loss.

1.1.30  **"Units"** shall mean a unit of Membership Interest attributed to a Member pursuant to the terms of this Agreement as described in Section 4.4.1. The number of Units held by each Member shall be as set forth in Schedule 1 hereto, as such schedule can be updated by the Company from time to time to reflect issuance of additional Units or admission or substitution of new Members following the Effective Date.

1.1.31  **"Unreturned Capital Contributions"** shall mean, as of any date of determination, with respect to any Member, the aggregate Capital Contributions made by such Member on or

5

before such date of determination, as reduced (but not below zero) by the aggregate distributions received by such Member on or before such date of determination on account of the return of the Capital Contributions of such Member.

1.1.32 **"Voting Majority"** shall mean the vote or consent of Members holding a majority of the aggregate then outstanding Units held by all Members.

## ARTICLE TWO
### Cannabis and Social Equity Related Provisions

2.1 <u>**Startup Money**</u>.  If the Company receives a License, the Company will need significant additional capital from investors for startup costs.  In exchange for a startup money loan, investors typically require both (1) equity in the Company and (2) a management agreement paid as a percentage of net revenues (defined as gross receipts from sales minus discounts, sales tax, state, county, and city taxes).

2.2 <u>**Equity Transfer from Social Equity Individual**</u>.  <u>If the Company receives a general (not social equity) adult use retail dispensary license, in consideration of the of the time, money, and expertise Jensen will invested into the Company, Social Equity Individual agrees to transfer ownership of 26% of the Company's equity from Social Equity Individual to the investor at no cost as part of obtaining the startup money funds.  For the avoidance of doubt, this would result in Social Equity Individual owning 25% of the Company, Jensen owing 49% of the Company, and the investor owning 26%.  Social Equity Individual and Jensen acknowledge that investors typically require more than 26% equity (and a management agreement) in exchange for a startup money loan</u>.  If the investor requires additional equity, it will be provided pro-rata between Jensen and Social Equity Individual from their respective 49% and 25%.

2.3 <u>**No violation of New York Laws or Regulations**</u>.

2.3.1 Units held by Social Equity Individual or originating with Social Equity Individual (the "Social Equity Shares") may not be transferred in any way that violates the laws, ordinances, regulations, or rules of the State of New York, or any other governing body with jurisdiction over New York cannabis business licensing.  Any such transfer is null and void ab initio.  In interpreting this paragraph, no consideration shall be given to federal prohibitions on cannabis or cannabis businesses, which all parties acknowledge are in effect as of the date of this Operating Agreement.

2.4 <u>**Management Agreement.**</u>  Jensen shall have the sole right to assign a management agreement for the company, provided that the payment to the management company does not exceed 10% of net revenues (defined as gross receipts from sales minus discounts, sales tax, state and city taxes).  The Company may not assign a management agreement without Jensen's written consent.

## ARTICLE THREE
### Tax Treatment Election

3.1 <u>**Tax Election.**</u>  The Company has or will file with the Internal Revenue Service for treatment as a C-Corporation.  If 26 U.S.C. section 280E becomes inapplicable to cannabis, the Company may elect different tax treatment.

3.2      Except as otherwise required by law, no Member shall take any reporting position that is inconsistent in any respect with any tax reporting position taken by the Company.

**ARTICLE FOUR**
**Organization; Members; Units; Voting Rights; Management and Board of Directors**

4.1      **Formation; Qualification in Other Jurisdictions.** The Company was or will be organized as a limited liability company under the New York Limited Liability Company Law. The rights and obligations of the Members shall be governed by this Agreement and the New York Limited Liability Company Law. If there is a conflict between the provisions of this Agreement and the New York Limited Liability Company Law, the provisions of the New York Limited Liability Company Law (it being understood, however, that if the New York Limited Liability Company Law provides for a particular rule but allows the members of a limited liability company to provide to the contrary in their operating agreement, and if the parties hereto have so provided hereunder, then such provisions shall not be deemed to constitute a conflict for purposes of the foregoing). The Board or Officers (if authorized by the Board) shall cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company transacts business in which such qualification, formation or registration is required or desirable.

4.2      **Purposes; Powers.** The Company was formed to engage in any lawful act or activity for which limited liability companies may be organized under the laws of New York. The purposes include carrying on a cannabis business, which is lawful under New York law but not federal law. The Company shall have all the powers permitted to a limited liability company under the New York Limited Liability Company Law and which are necessary, convenient or advisable in order for it to conduct its business.

4.3      **Duration.** The term of the Company shall continue indefinitely until the date that the Company is dissolved as hereinafter provided.

4.4      **Members; Authorized Units; Voting Rights; Meetings and Other Action by Members.**

4.4.1      **Units.**

(a)      Membership Interests in the Company shall be denominated as "**Units**." The Company is authorized to issue up to 100,000 Units in the aggregate.

(b)      Each Member hereby confirms and agrees that such Member has previously made or will make immediately following the Effective Date the contributions set forth opposite such Member's name on Schedule 1 in exchange for the issuance to such Member of the Units set forth opposite such Member's name on Schedule 1. Each Member agrees to be bound by all of the terms and conditions of this Agreement. The respective contributions of the Members and their initial respective Percentage Interests are as set forth on Schedule 1, which Schedule 1 shall be updated by the Board upon any approved transfer of Units.

4.4.2      **Voting Rights of Members.** Members shall have one vote for each Unit owned.

4.4.3      **Meetings of Members; Action by Written Consent.** Meetings of the Members shall be held at such times and places as the Board fixes from time to time. No annual, regular or special

7

meetings of Members are required, but if such meetings are held, they shall be noticed, held and conducted pursuant to the New York Limited Liability Company Law. Members may participate in any meeting through the use of conference telephones, video conference, or similar communications equipment as long as all Members participating can hear one another or otherwise interactively communicate with each other. A Member so participating is deemed to be present in person at the meeting. Any action which may be taken by the Members at a meeting may also be taken without a meeting, if a consent in writing setting forth the action so taken is signed by Members having not less than the minimum votes that would be necessary to authorize that action at a meeting of the Members duly called and noticed.

4.5   **Management.**

4.5.1   **Delegation of Authority to the Board of Directors.**   Except as specifically provided in Section 4.5.3 below: (i) the management and control of the business, affairs and properties of the Company shall to the maximum extent permitted under the New York Limited Liability Company Law be, and hereby are, delegated exclusively to a Board of Directors (the "**Board**") that shall possess all rights and powers of "managers" as provided under the New York Limited Liability Company Law, including the right to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company, and (ii) a Member may not act for or on behalf of the Company, effect any act that would be binding on the Company, or incur any expenditures on behalf of the Company. Subject to Section 4.5.3 below or except as otherwise expressly set forth in this Agreement, the Board (and any Officer acting pursuant to the authority granted by the Board) may make all decisions and take all actions for the Company, including without limitation the following:

(a)   entering into, making, and performing contracts, agreements, instruments and documents, including checks, drafts, notes and other negotiable instruments, mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage or disposition of the Company's property; assignments, bills of sale, leases, partnership agreements, operating agreements of other limited liability companies and other undertakings that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company;

(b)   opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

(c)   acquiring by purchase, lease, contribution of property or otherwise, owning, holding, operating, maintaining, financing, improving, leasing, selling, conveying, transferring, demolishing or disposing of any real or personal property that may be necessary, convenient or incidental to the accomplishment of the purposes of the Company;

(d)   establishing and maintaining reserves in such amount and for such purposes as the Board may deem necessary or desirable, which monies shall not be considered in determining the available cash of the Company available for distribution;

(e)   indemnifying any Person to the maximum extent permitted by New York law;

DocuSign Envelope ID: 2373A9F5-BC66-401F-BA77-E50637EEB542

(f)     borrowing money and issuing evidences of indebtedness, and securing the same by a mortgage, pledge or other lien on the assets of the Company;

(g)     paying, collecting, compromising, litigating, arbitrating or otherwise adjusting or settling any and all other claims or demands of or against the Company;

(h)     maintaining the assets of the Company in good order;

(i)     collecting sums due the Company;

(j)     paying debts and other obligations of the Company;

(k)     selecting, removing, and changing the authority and responsibilities of lawyers, architects, engineers, contractors, builders, accountants, and other advisers, consultants and service providers;

(l)     obtaining insurance for the Company, including "Key Man" insurance, employees liability insurance, fiduciary insurance and errors and omissions insurance;

(m)     approving the issuance of Units, options or warrants to purchase Units or other securities, in each case, in accordance with the terms of this Agreement;

(n)     authorizing distributions in accordance with the terms of this Agreement;

(o)     hiring, terminating and changing the authority and responsibilities of employees of the Company and entering into employment agreements and indemnification agreements with Officers and other employees of the Company;

(p)     establishing compensation, bonus, profit sharing, incentive compensation and employee benefit plans for employees of the Company;

(q)     making, executing, acknowledging and filing any and all documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company; and

(r)     delegating any or all of the above actions required to operate the day to day business of the Company to one or more Officers or other employees of the Company or to third parties on such terms as the Board shall approve.

### 4.5.2   Consent of the Members to Delegation of Authority.

(a)     Except as otherwise expressly provided for herein, each Member hereby consents to the exercise by the Board of all such powers and rights conferred on it by New York law with respect to the management and control of the Company. No Member, acting in such Person's capacity as a Member, shall have any right to take part in the management, control or operation of the Company or its business and shall have no power or authority to act for or bind the Company as an agent of the Company.

9

(b)      Notwithstanding anything else in this Article or elsewhere in this Limited Liability Company Agreement, Jensen shall have the sole right to assign a management contract for the Company for the purposes of securing investment in the company or otherwise as described in Section 2.4.

4.5.3   **Limitations of Authority of the Board.**  Notwithstanding anything to the contrary in this Agreement, the Board shall not undertake, either directly or indirectly and whether by merger, consolidation or otherwise, without the vote or consent of a Voting Majority, the following:

(a)      make any allocations of Net Income or Net Loss to Members other than as set forth in Article Six below;

(b)      change the size or composition of the Board; or

(c)      sell all or substantially all of the assets of the Company, or enter into a merger, consolidation, reorganization or other business combination in which the Company is not the surviving entity, or effect a Dissolution, Liquidation or Change of Control of the Company.

(d)      amend the Certificate of Formation and/or this Agreement in any respect, if such amendment would adversely affect the interests, rights, preferences or privileges of a Member of any class under this Agreement in a manner disproportionate to Members of the another class.

4.5.4   **Number and Qualification of Directors; Election of Directors**.  While Jensen and Social Equity Individual are the only Members, there shall be one (1) designee on the Board (Board designees are referred to collectively herein as the "**Directors**" and each, as a "**Director**"). The initial Director shall be Jensen.  If the Company has three (3) or more Members, there shall be three (3) Directors.  One (1) Director shall be elected by Jensen and Social Equity Individual only, with one vote per Unit.  One (1) Director shall be elected by the Members other than Jensen and Social Equity Individual only, with one vote per Unit.  One (1) Director shall be elected by all the Members, with one vote per Unit.  Each Director shall serve as a manager of the Company until his earlier death, resignation, retirement or removal in accordance with this Agreement.  No Director need be a Member of the Company or a resident of the State of New York and entities may be Directors.

4.5.5   **Removal, Resignation, Death, Incapacity; Filling of Vacancies.**  Any Director may resign from office at any time by providing written notice of such resignation to the other Directors. Any Director may be removed from office at any time, with or without cause, by the Person or group of Members entitled to elect such Director as set forth in Section 4.5.4 above.  Upon the resignation or removal of a Director, or upon a Director's death or incapacity, a replacement Director shall be designated or elected in accordance with Section 4.5.4 above.

4.5.6   **Chairman**.  When there is more than one Director on the Board, one Director shall be designated as Chairman (such designated Director being referred to herein as the "**Chairman**").  The Chairman will preside over meetings of the Board and, except as provided in Section 4.5.7 below, shall otherwise have no greater authority than any other Director.  The initial Chairman shall be elected by vote of the Directors.  In the event of a tie, the tie shall be broken by vote of the Members.

DocuSign Envelope ID: 2373A9F5-8C66-491E-BA77-FE0037EEB642

4.5.7    **Voting by Directors; Action by Written Consent.**  Each Director shall have a single vote; provided that any Director (a) may give any other Director a proxy to represent such first Director in any matters that come before the Board or (b) may designate in writing an alternate Director to exercise such Director's proxy in any matters that come before the Board, in each case in such form and with such substance as shall be determined by Directors holding a majority of the voting rights on the Board; and provided further that the Chairman (i) may give any other Person a proxy to represent the Chairman in any matters that come before the Board or (ii) may designate in writing an alternate Person to exercise the Chairman's proxy in any matters that come before the Board, in each case in such form and with such substance as shall be determined by the Chairman. The majority vote of the Directors present at a meeting at which a quorum is present shall be the act of the Board. Any vote, consent or other action of the Board may be undertaken with the written consent (in lieu of meeting) of the Directors holding a majority of votes. In any instance in which the approval of the Board is required under this Agreement, such approval may be obtained in any manner permitted by New York law. All such waivers, consents and approvals shall be filed with the Company records or made a part of the minutes of the meeting.

4.5.8    **Quorum.**  Directors holding a majority of the voting rights on the Board shall be necessary to constitute a quorum of the Board for purposes of conducting business.

4.5.9    **Committees of the Board.**  The Board may from time to time designate committees of the Board, with such lawfully delegable powers and duties as it thereby confers, to serve at the pleasure of the Board and shall, for those committees, elect a Director or Directors to serve as the member or members, designating, if it desires, other Directors as alternate members who may replace any absent or disqualified member at any meeting of the committee. Any committee so designated may exercise the power and authority of the Board, subject to and in accordance with the other provisions of this Agreement, to declare a distribution of available cash or to authorize the issuance of Units if the resolution which designates the committee or a supplemental resolution of the Board shall so provide. In the absence or disqualification of any member of any committee and any alternate member in his or her place, the member or members of the committee present at the meeting and not disqualified from voting, whether or not he or she or they constitute a quorum, may by unanimous vote appoint another member of the Board to act at the meeting in the place of the absent or disqualified member. Each committee may determine the procedural rules for meeting and conducting its business and shall act in accordance therewith, except as otherwise provided herein or required by law. Adequate provision shall be made for notice to members of all meetings; one-third of the members shall constitute a quorum unless the committee shall consist of one or two members, in which event one member shall constitute a quorum; and all matters shall be determined by a majority vote of the members present. Action may be taken by any committee without a meeting if all members thereof consent thereto in writing, and the writing or writings are filed with the minutes of the proceedings of such committee.

4.5.10    **Payments to Directors; Reimbursements.**  No Director who is an Officer or otherwise employed by the Company shall be entitled to remuneration from the Company for services rendered in his or her capacity as a Director (other than for reimbursement of reasonable out-of-pocket expenses of such Director and in accordance with Company policy). All Directors will be entitled to reimbursement of their reasonable out-of-pocket expenses incurred in connection with their attendance at Board meetings and such Director fees as may be

authorized by the Board; provided that should the Board authorize the payment of any Director fees, each Director shall receive the same fee as each other Director.

4.5.11 **Officers.** The Board may, from time to time as it deems advisable, appoint officers of the Company (the "**Officers**") and assign in writing titles (including without limitation Chief Executive Officer, Chief Operating Officer, President, Vice President, Secretary and Treasurer) to any such person. Unless the Board decides otherwise, if the title is one commonly used for officers of a business corporation formed under the New York Limited Liability Company Law, the assignment of such title shall constitute the delegation to such person of the authorities and duties that are normally associated with that office. Any delegation pursuant to this Section 4.5.12 may be modified or revoked at any time by the Board. The current Officers are listed on Exhibit A attached hereto. The Board may revise Exhibit A at any time to reflect any changes in the titles or composition of the Officers. Any number of offices may be held by the same Person. In the Board's discretion, the Board may choose not to fill any office for any period as it may deem advisable. Officers need not be residents of the State of New York or Members. Each Officer shall hold office until such Officer's successor shall be duly designated and shall have qualified as an Officer or until such Officer's death or until such Officer shall resign or shall have been removed in the manner hereinafter provided. The salaries or other compensation, if any, of the Officers of the Company shall be fixed from time to time by the Board. Any Officer may resign as such at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Board. The acceptance by the Board of a resignation of any Officer shall not be necessary to make such resignation effective, unless otherwise specified in such resignation. Subject to any contractual arrangements, any Officer may be removed as such, either with or without cause, at any time by the Board. Designation of any Person as an Officer by the Board shall not in and of itself vest in such Person any contractual or employment rights with respect to the Company.

4.5.12 **Officer and Consultant Compensation.** The Board shall have the power and authority to determine and approve the compensation packages for each Officer and consultant of the Company. Officers of the Company may determine compensation for all other employees of the Company.

## ARTICLE FIVE
### Capital; Capital Accounts; Member Loans

5.1 **Capital Contributions.** As of the Effective Date, each Member has contributed to the capital of the Company the amounts set forth on Schedule 1 attached hereto. No Member shall have any obligation to make any additional Capital Contribution other than as set forth in Schedule 1. Members who are investors after the Company receives an entitlement for a cannabis license may have additional contribution obligations determined by agreement in an amended Limited Liability Company Agreement or in other agreements.

5.2 **Capital Accounts.** An individual capital account (the "**Capital Account**") shall be maintained for each Member in accordance with the following provisions.

5.2.1 The initial Capital Account of each Member shall be the amount contributed by that Member to the Company including the Gross Asset Value of any property contributed to the Company by such Member (net of liabilities secured by such contributed property that the Company is

considered to assume or take subject to under Section 752 of the Code).  Following the date hereof, each Member's Capital Account shall be credited with (1) the amount of any additional Capital Contributions made by such Member to the Company, and (2) the amount of such Member's allocable share of Net Income and any items of Company income and gain that are specially allocated to such Member pursuant to Section 5.2 hereof.

5.2.2   Each Member's Capital Account shall be charged with (1) the amount of cash distributed to such Member by the Company (other than cash distributed in repayment of any loan by such Member to the Company or as payment of interest thereon), (2) the amount of such Member's allocable share of Net Loss and any items of Company loss and deduction that are specially allocated to such Member pursuant to this Limited Liability Company Agreement, and (3) the Gross Asset Value of any property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Section 752 of the Code).

5.2.3   In the event of (1) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution, (2) the distribution by the Company to a Member of more than a de minimis amount of the assets of the Company as consideration for an interest in the Company, (3) the liquidation of the Company for federal income tax purposes pursuant to Regulation §1.704-1(b)(2)(ii)(g), or (4) an election under Code Sections 734(b) or 743(b), but only as provided in Regulation §1.704-1(b)(2)(iv)(m), the Gross Asset Values of the Company's properties shall be adjusted limited in the case of the events described in clauses (1) and (2), to adjustments that the Board determines are necessary or appropriate to reflect the relative economic interests of the Members to equal their then fair market values (as determined by the Board), and the Capital Accounts of each Member shall be credited or charged with such Member's share) of the Net Income or Net Loss resulting from such adjustments.

5.2.4   If any Units are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that such Capital Account relates to the transferred Units.

5.2.5   The foregoing provisions and the other provisions of this Agreement relating to the determination and maintenance of Capital Accounts are intended to comply with Regulation § 1.704-1 and -2, and shall be interpreted and applied in a manner consistent with such Regulation. In the event the Board shall determine that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases thereto, are determined and maintained in order to comply with such Regulation, the Board may make such modification upon the consent of a Voting Majority, such consent not to be unreasonably withheld or delayed.

5.3   Each Member may make loans in such amounts and on such terms to the Company as determined by the Board.

### ARTICLE SIX
### Liability, Exculpation and Indemnification

6.1   **Limitations on Liabilities.**  The liability of each Covered Person shall be limited to the fullest extent permitted by the New York Limited Liability Company Law and other applicable law,

whether arising in contract, tort or otherwise. No Covered Person is liable for any debts, obligations or liabilities of the Company or each other, whether arising in tort, contract or otherwise, solely by reason of being a Member, Director, Covered Person or agent of the Company, or acting (or omitting to act) in such capacities or participating (as an employee, consultant, contractor or otherwise) in the conduct of the business of the Company. This shall not limit any Member's liability for any breach of this Agreement.

6.2 **Exculpation and Indemnification; Fiduciary Duty Disclaimer.** No Covered Person (each, an "**Indemnitee**"), shall be liable, responsible or accountable in damages or otherwise to the Company, or to any Member or Covered Person for any act or failure to act by such Indemnitee in connection with the conduct of the business of the Company, so long as such Indemnitee acted in the good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Covered Person by this Agreement. No Member, Director (acting in a capacity of "manager") or Officer of the Company shall be liable, responsible or accountable in damages or otherwise, to the Company or to another Member, Director or other Person that is party to or is otherwise bound by the terms of this Agreement for breach of any fiduciary duties, or for any failure to take any action or the taking of any action within the scope of authority conferred on them or any one of them by this Agreement, and such fiduciary duties are hereby eliminated to the fullest extent permitted by the New York Limited Liability Company Law, except with respect to any liability of a Director for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing. Nothing in this paragraph shall be deemed to make the Directors or any one of them liable, responsible or accountable to Persons other than the Company or the Members.

6.2.1    The Company shall indemnify and hold harmless each Indemnitee and each Director to the fullest extent permitted by the New York Limited Liability Company Law and applicable law against losses, damages, liabilities, costs or expenses (including reasonable attorneys' fees and expenses and amounts paid in settlement) incurred by such Indemnitee or Director in connection with any action, suit or proceeding to which such Indemnitee or Director may be made a party or otherwise involved or with which it shall be threatened by reason of its being a Covered Person, or while acting as (or on behalf of) a Member on behalf of the Company or in the Company's interest. Such attorneys' fees and expenses shall be paid by the Company as they are incurred upon receipt, in each case, of an undertaking by or on behalf of the Indemnitee or Director to repay such amounts if it is ultimately determined that such Indemnitee or Director is not entitled to indemnification with respect thereto.

6.2.2    The right of an Indemnitee or Director to indemnification hereunder shall not be exclusive of any other right or remedy that such Indemnitee or Director may have pursuant to the New York Limited Liability Company Law or this Limited Liability Company Agreement.

6.2.3    An Indemnitee or Director shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Indemnitee or Director reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

6.2.4   To the extent that, at law or in equity, an Indemnitee has duties (other than fiduciary duties, which are hereby eliminated to the fullest extent permitted by the New York Limited Liability Company Law and liabilities relating thereto to the Company or to any other Indemnitee, an Indemnitee acting under this Agreement shall not be liable to the Company or to any other Indemnitee for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or any other Indemnitee.  The provisions of this Agreement, to the extent that they restrict or eliminate the duties and liabilities of an Indemnitee or Director otherwise existing at law or in equity (including any fiduciary duties), are agreed by the Members to replace such other duties and liabilities of such Indemnitee.

6.2.5   Indemnification under this Article shall continue as to an Indemnitee or Director who has ceased to serve in the capacity which initially entitled such Indemnitee or Director to indemnity hereunder.  The rights granted pursuant to this Article shall be deemed contract rights, and no amendment, modification or repeal of this Article shall have the effect of limiting or denying any such rights with respect to actions taken or proceedings arising prior to any such amendment, modification or repeal.  To the extent provided in this Article, each Indemnitee and Director shall be a third party beneficiary of this Agreement.

6.3   **Insurance.**  The Company may purchase and maintain insurance, at its expense, to protect itself and any Indemnitee against any expense, liability or loss.

6.4   **Outside Business and Excluded Opportunities.**  The Members acknowledge that certain of the Members and Directors are engaged in the cannabis business and may pursue a variety of business and investment opportunities outside of the Company.  Except as otherwise specifically provided herein or in a written agreement with the Company, any Covered Person may engage in or possess an interest in other business or investment ventures of any nature or description, independently or with others without obligation to the Company or the other investor, except that a Covered Person may not have involvement with a cannabis retailer/dispensary (including delivery only) with its physical retailer/dispensary location within a five-mile radius of the location of the retailer/dispensary of the Company.  The Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture shall not be deemed wrongful or improper or in breach of any Member or Director's duties hereunder.  The Company and the Members expressly renounce any interest or expectancy of the Company or any other Member in, or in the Company or any Member being offered an opportunity to participate in, any Excluded Opportunity.  An "**Excluded Opportunity**" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of any Covered Person except to the extent that such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person specifically in such Covered Person's capacity as a director, Member or Affiliate of the Company.

6.4.1   The Board in its discretion may cause the Company to exercise, waive or assign any preemptive or similar investment rights it may have or obtain.  Under no circumstances shall any Director be deemed to have breached any duty to the Company or the Members solely by virtue of waiving or assigning preemptive or similar investment rights.

6.4.2   The Members acknowledge that any service of the Board is not exclusive and the Directors are obligated to devote only such time and effort to the Company as is reasonably necessary to diligently manage the Company's affairs, as reasonably determined by such Directors.

**ARTICLE SEVEN**
**Distributions**

7.1   **Distributions Generally.**

7.1.1   Subject to Sections 7.1.2 and 7.1.3, the time and amount of any distributions of funds of the Company and any Available Cash to Members shall be determined by the Board, in its sole discretion.

7.1.2   Distributions shall be made in proportion to the Units owned by each Member.  In other words, each Member shall receive a percentage of the total distribution that matches that Member's percentage ownership of the Company.

7.1.3   The Company shall retain funds necessary to cover its reasonable business needs, which shall include reserves against possible losses and the payment and making provision for the payment, when due, of obligations of the Company, including obligations owed to Members, and may retain funds for any other Company purposes.  The amounts of such funds and the purposes for which such funds are retained shall be determined by the Board, in its sole discretion.

7.2   **Withholding.**  Each Member hereby authorizes the Company (or the Board, acting on behalf of the Company) to withhold from or pay on behalf of or with respect to, such Member, any amount of federal, state, local or foreign taxes that the Board reasonably determines that the Company is required to withhold or pay with respect to any amount distributable or allocable to such Member pursuant to this Agreement.  Any amounts withheld pursuant to the foregoing shall be treated as having been distributed to such Member pursuant to this Agreement.  In the event the amount required to be paid by the Company exceeds the amount then otherwise distributable to such Member, such excess shall constitute a loan by the Company to such Member, which loan shall be repaid by such Member on demand from the Company In the event that a Member fails to pay any amounts owed to the Company pursuant to this Section when due, the Company shall have the right to withhold distributions that would otherwise be distributed to such defaulting Member until such time as such loan has been paid in full, and any such distributions so withheld shall be treated as having been distributed to the defaulting Member and immediately paid by the defaulting Member to the Company in repayment of such loan.

**ARTICLE EIGHT**
**Allocations**

8.1   **Allocations of Net Income and Net Loss.**  After making all allocations required by Section 8.2, Net Income and Net Loss for each fiscal year (or portion thereof) shall be allocated among the Members in such manner that, at the end of such fiscal year (or portion thereof), the Adjusted Capital Account balance of each Member shall, to the extent possible, equal the amount which would have been distributed to such Member pursuant to a Hypothetical Liquidation as of the end of the last day of such fiscal year.   For this purpose, a "**Hypothetical Liquidation**" means that all assets of the Company are disposed of in a taxable disposition

16

for the Gross Asset Value of such assets, the debts of the Company are paid, and the remaining amounts are distributed to the Members.  If for any fiscal year, such an allocation of Net Income or Net Loss does not permit the Adjusted Capital Accounts of the Members to be made to equal the amount which would have been distributed to the Members pursuant to a Hypothetical Liquidation as of the end of the last day of such fiscal year, individual items of gross income, gain, loss or deduction (which were the components of Net Income or Net Loss) shall be allocated among the Members in such a manner that, at the end of such fiscal year, the Adjusted Capital Account of each Member shall, to the extent possible, equal the amount which would have been distributed to such Member pursuant to a Hypothetical Liquidation as of the end of the last day of such fiscal year.

8.2    **Regulatory Allocations.**    In the event the Company elects to be taxed as a partnership in accordance with Article Three, these provisions shall apply.

8.2.1    Notwithstanding any other provision of this Agreement, Net Loss (or items of deduction as computed for book purposes) shall not be allocated to a Member to the extent that the Member has or would have, as a result of such allocation, a deficit balance in such Member's Adjusted Capital Account.  As used herein, a Member's "**Adjusted Capital Account**" shall mean and refer to such Member's Capital Account, increased by any amounts which such Member is obligated to restore pursuant to the terms of this Agreement or is deemed to be obligated to restore pursuant to New York Regulations.  Any Net Loss (or items of deduction as computed for book purposes) that otherwise would be allocated to a Member, but which cannot be allocated to such Member because of the application of the first sentence of this Section, shall instead be allocated to the other Members, in accordance with their respective Percentage Interests, subject to the limitation imposed by the immediately preceding sentence.  Nothing in this Section 8.2.1 or in the Regulations shall be construed as requiring any Member to restore any deficit balance in such Member's Capital Account, or otherwise affect the limited liability of the Members as provided by law and in this Limited Liability Company Agreement.

8.2.2    Any Member who unexpectedly receives an adjustment, allocation or distribution described in subparagraphs (4), (5) or (6) of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations, which adjustment, allocation or distribution creates or increases a deficit balance in that Member's Adjusted Capital Account, such Member shall be allocated items of income and book gain in an amount and manner sufficient to eliminate the deficit balance in such Member's Adjusted Capital Account as quickly as possible, provided that an allocation pursuant to this Section 8.2.2 shall be made if and only to the extent that such Member would have a deficit balance in the Member's Adjusted Capital Account after all other allocations provided in this Article Eight have been tentatively made as if this Section were not in the Agreement.  This Section is intended to constitute a "qualified income offset" as provided by Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

8.2.3    In order to comply with the "minimum gain chargeback" requirements of Regulations §1.704-2(f)(1) and §1.704-2(i)(4), and notwithstanding any other provision of this Agreement to the contrary, in the event there is a net decrease in a Member's share of Company minimum gain (as defined in Regulation §1.704-2(d)(1)) and/or Member nonrecourse debt minimum gain (as defined in Regulation §1.704-2(i)(2)) during a Company taxable year, such Member shall be allocated items of income and gain for that year (and if necessary, for other years) as required

by and in accordance with Regulations §1.704-2(f)(1) and §1.704-2(i)(4) before any other allocation is made.

8.2.4    Notwithstanding any other provision of this Agreement, all items of deduction and loss that, pursuant to Regulation §1.704-2(i), are attributable to a nonrecourse debt for which a Member (or a Person related to such Member under Regulation §1.752-4(b)) bears the economic risk of loss (within the meaning of Regulation §1.752-2), shall be allocated to such Member as required by Regulation §1.704-2(i)(1).

8.2.5    Nonrecourse deductions (within the meaning of Regulation §1.704-2(b)(1)) shall be allocated among the Members in accordance with their then current Percentage Interests.

8.2.6    The allocations set forth in this Section 8.2 (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent permitted under Regulation §1.704-1(b), the Regulatory Allocations shall be taken into account in allocating Net Income, Net Loss and other items among the Members so that the net amount of such allocations and the Regulatory Allocations to each Member shall equal the net amount that would have been allocated to each Member if the applicable Regulatory Allocations had not been made.

8.3      **Code Section 704(c) Allocations.**  Notwithstanding any other provision in this Article Six, in accordance with Code Section 704(c) and the Regulations promulgated thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company, or with respect to which an adjustment has been made, shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Gross Asset Value.  Allocations pursuant to this Section 8.3 are solely for purposes of federal, state and local taxes.  As such, such allocations shall not affect or in any way be taken into account in computing a Member's Capital Account or share of profits, losses, or other items of distributions pursuant to any provision of this Agreement.

8.4      **Other Allocation Rules.**

8.4.1    Except as set forth in Section 8.3, each separate item of income, deduction, gain and loss of the Company shall be allocated among the Members in the same proportion as the portion of the total Net Income or Net Loss for the period that is credited or charged to the Capital Account of each Member bears to the total Net Income or Net Loss for such period.

8.4.2    If the Units held by the Members change during a year, then, unless otherwise determined by the Board, Net Income or Net Loss for such year shall be allocated among the Members for the periods before and after the date such change (an "**Ownership Change**") became effective, based on an interim closing of the books.  For purposes of this Section, an Ownership Change shall be effective (1) on the last day of the calendar month immediately preceding the calendar month in which the Ownership Change occurred, if the Ownership Change occurred on or before the 15th day of such calendar month, or (2) on the last day of the calendar month in which the Ownership Change occurred, if the Ownership Change occurred after the 15th day of such calendar month.  This Section shall apply both for purposes of allocations and distributions.

DocuSign Envelope ID: 2373A9F5-8C66-491E-BA77-FE0037FEB642

## ARTICLE NINE
### Confidentiality

9.1 **Confidentiality.**  Each of the Members shall use its best efforts to safeguard the secrecy and confidentiality of all Confidential and Proprietary Information of the Company and shall not disclose, directly or indirectly, any of the foregoing to any third party nor use Confidential and Proprietary Information for any purpose except for the benefit of the Company except: (i) information which at the time of disclosure is part of the public knowledge or literature and is readily accessible to such third party through no act of a Member; provided that any combination of features shall not be deemed within this exception merely because individual features are part of the public knowledge or literature and readily accessible to such third party, but only if the combination itself and its principle of operation are part of the public knowledge or literature and are readily accessible to such third party; (ii) information known to a Member at the time such information is disclosed to such Member or such Member becomes aware of such information other than through its relationship with the Company; (iii) information required by law to be disclosed, provided that the Members will use reasonable best efforts to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded such disclosed information; or (iv) as otherwise may be permitted by the terms of this Agreement.

## ARTICLE TEN
### Transfers of Membership Interests;
### Admission of Additional Members

10.1 **Transfers of Units.**  Except as provided in this Article, no Member shall have the right to transfer or otherwise dispose of all or any portion of its Units in the Company without the Board's consent, which may be withheld in the Board's sole discretion except as provided hereunder.

10.2 **Substitute Members; Permitted Transfers.**  Anything to the contrary contained in this Agreement notwithstanding, an assignee of Units shall have the right to become a substituted Member in the Company only if the assignee agrees in writing to be bound by the terms of this Limited Liability Company Agreement and the Certificate of Formation.

10.2.1 No Member may transfer Units in any way that violates the laws, ordinances, regulations, or rules of the State of New York, or any other governing body with jurisdiction over New York cannabis business licensing, or in any manner that could cause the Company to be ineligible for a cannabis license or permission to operate a cannabis business or to lose a cannabis license or permission to operate a cannabis business.  Any such transfer is null and void ab initio.  In interpreting this paragraph, no consideration shall be given to federal prohibitions on cannabis or cannabis businesses, which all parties acknowledge are in effect as of the date of this Operating Agreement.

10.2.2 A Member may transfer, without the consent required in this Article, all or any of such Member's Units to Affiliates, partners, shareholders, officers, directors or members of the transferring Member or entities controlled by one of the foregoing.  Each of the assignees in this Section shall be a "**Permitted Transferee.**"

10.2.3   Notwithstanding anything in this Agreement to the contrary, no transfer of Units shall be made if such transfer, or the transferee's ownership of such Units, would:

(a)     result by itself, or in combination with any other previous transfers, result in an unfavorable reclassification of the Company's tax designation;

(b)     in the good faith determination of the Board result in the violation of the Securities Act of 1933, as amended (the "**Securities Act**"), or any other applicable federal or state law or, cause the Company to lose the benefit of any exemption under, or become subject the Company to any increased regulatory burden pursuant to, any applicable securities law, tax law or other applicable federal or state law, rule or regulation;

(c)     be a violation of or a default (or an event that, with notice or the lapse of time or both, would constitute a default) under, or result in an acceleration of any indebtedness under, any note, mortgage, loan agreement or similar instrument or document to which the Company is a party; or

10.2.4   The Company shall not transfer on its books any Unit unless, in the reasonable opinion of the Company, there has been compliance with all of the material conditions hereof affecting such Unit and any such attempted transfer in violation of this Agreement shall be void and of no effect.

10.2.5   **Rights of Refusal**.

(a)     If a Member offers to sell Units, the remaining then-existing Members shall have a right of first refusal, but not the obligation, to purchase the Units on terms no less favorable than any competing bona fide offer obtained by the selling Member. The selling Member, upon receiving a bona fide offer for the purchase of any or all Units (including a transfer of the Units for no consideration), shall give notice thereof to the remaining Members. The notice shall be given in writing. The notice shall specify: (1) the identity of the proposed transferee; (2) the consideration to be received for the proposed transfer; and (3) the terms and conditions upon which the transferring Member intends to make such transfer. The notice shall be accompanied by a true and complete copy of the proposed transferee's written offer and shall constitute an offer by the transferring Member to transfer the shares to the remaining Members on the terms set forth therein. The remaining Members shall have thirty (30) days to accept the offer to purchase the Units and shall close the transaction within an additional thirty (30) days. If more than one remaining Member exists, the Units available under the first right of refusal shall be offered to each Member in proportion to each person's ownership of the Company at the time of the offer. If any remaining Member declines to purchase Units, those units will be offered to the other remaining Members in proportion to their ownership.

(b)     No-Consideration Transfer. If a Member intends to transfer Units for no consideration, the consideration for the first right of refusal shall be fair market value of the Units.

(c)     Non-Monetary Consideration. If a Member intends to transfer Units for non-monetary consideration, the consideration for the first right of refusal shall be fair market value of the Units.

DocuSign Envelope ID: 2373A9F5-8C66-401E-BA77-FE0037EB642

(d)       Fair Market Value.  In the event an agreement as to the fair market value of the Units cannot be reached, the selling Member and the remaining Members interested in purchasing the Units shall promptly submit such issue to the American Arbitration Association for a determination in accordance with its rules. The parties shall use their best efforts to obtain an expedient determination of Fair Market Value. The fees of the arbitrator(s) and the costs to be paid to the American Arbitration Association shall he paid fifty percent (50%) by the selling Member(s) and fifty percent (50%) by the remaining Member(s) interested in purchasing the Units.

## ARTICLE ELEVEN
### Dissolution, Liquidation, and Termination

11.1   **Dissolution of the Company**.

11.1.1   Dissolution of the Company will occur only upon (a) a majority vote of the Membership Units, (b) the entry of a decree of judicial dissolution under New York law, or (c) as soon as reasonably practicable promptly following a sale of all or substantially all of the Company's assets.

11.1.2   The death, retirement, resignation, expulsion, bankruptcy or dissolution of any Member shall not result in the dissolution of the Company and each Member hereby consents to the continuation of the Company in the event of the death, retirement, resignation, expulsion, bankruptcy or dissolution of any Member.

11.1.3   Upon Dissolution of the Company, the Company shall immediately commence to wind up its affairs and the Board shall proceed with reasonable promptness to liquidate the business of the Company (a "**Liquidation**").

11.1.4   During the period of the winding up of the affairs of the Company, the rights and obligations of the Members shall continue.

11.1.5   Until the filing of the certificate of cancellation and without affecting the liability of Members and without imposing liability on the liquidating trustee or the Officers, any Officer may settle and close the Company's business, prosecute and defend suits, dispose of its property, discharge or make provision for its liabilities, and make distributions in accordance with the priorities set forth in this Limited Liability Company Agreement.

11.2   **Liquidation and Termination.**  The Company shall terminate after its affairs have been wound up and its assets have been fully distributed in Liquidation, or upon a distribution in connection with a Change of Control other than a Liquidation, in each case in the following priority:

11.2.1   First, to the payment of the debts and liabilities of the Company (other than loans made by a Member to the Company) and the expenses of liquidation;

11.2.2   Second, to the setting up of any reserves that the Board may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company provided that any reserves not necessary to satisfy such liabilities or obligations are distributed as soon as practicable;

DocuSign Envelope ID: 2373A9F5-8C66-491E-BA77-FE0037FEB642

11.2.3   Third, to the Members,  to the extent such Member has made loans to the Company, an amount equal to any unpaid accrued interest on, and then the principal balance of, such loans; provided, however, that in the event the liquidation proceeds shall be insufficient to pay all such interest and principal, payments shall be made pro rata to the loaning Members; and

11.2.4   Thereafter, to the Members in accordance with this Limited Liability Company Agreement.

11.3   **Cancellation of Certificate of Formation**.   Upon the completion of the liquidation of the Company's property, the Board shall cause the cancellation of the Certificate of Formation in New York and all other qualifications of the Company as a foreign limited liability company in jurisdictions other than the State of New York.

## ARTICLE TWELVE
### Company Property

12.1   **Company Property**.   The Company's property shall consist of all Company assets and all Company funds.  Title to the property and assets of the Company may be taken and held only in the name of the Company or in such other name or names as shall be determined by the Board. All property now or hereafter owned by the Company shall be deemed owned by the Company as an entity and no Member, individually, shall have any ownership of such property.  Title to the assets and properties, real and personal, now or hereafter owned by or leased to the Company, shall be held in the name of the Company or in such other name or names as the Board shall determine; provided, however, that if title is held other than in the name of the Company, the Person or Persons that hold title shall certify by instrument duly executed and acknowledged, in form for recording or filing, that title is held as nominee and/or trustee for the benefit of the Company pursuant to the terms of this Agreement and an executed copy of such instrument shall be delivered to each Member.

## ARTICLE THIRTEEN
### Records and Accounting, Fiscal Affairs

13.1   **Fiscal Year**.   The fiscal year of the Company shall be the calendar year.

13.2   **Bank Accounts**.   All funds of the Company shall be deposited in such bank or savings and loan account or accounts as shall be designated by the Board.  Withdrawals from any such bank account shall be made upon such signature or signatures as the Board may designate, and shall be made only for the purposes of the Company.

13.3   **Book and Records**.   The Board shall maintain full and accurate books of the Company in accordance with the Company's accounting policies consistently applied.  The Members shall have the right during normal business hours to request access to and copy such books and records, upon at least ten (10) business days' prior written notice to the Company, in person or by their authorized attorney or agent, but only if the request to access and/or copy:  (i) is for a purpose reasonably related to the Company's business and the Member's interest in the Company (as determined by the Board in its sole discretion), is not for any commercial purpose, is not detrimental to the best interest of the Company, is not damaging to the Company or its business, and the Company is not required by law or by agreement with third parties to keep such books and records confidential (as reasonably determined by the Board in good faith); (ii) only if the Member agrees (in form and substance satisfactory to the Board) to use such

information only for Company purposes and to maintain such information in strict confidence; and (iii) only if reasonable reproduction and distribution costs are paid by such Member. The Company shall maintain its accounting records at its principal place of business and shall report for income tax purposes on the cash or accrual method of accounting, as determined by the Board. As soon as reasonably practicable after the end of each taxable year and at the expense of the Company, the Officers shall cause to be prepared whatever information is required by each Member for the purpose of preparing such Member's income tax return for that year. This information shall be furnished to each Member.

13.4  **Tax Returns; Elections.**

13.4.1  The Board shall use all reasonable efforts to cause the Company's accountants to prepare and make timely filings of all tax returns and statements which the accountants determine must be filed on behalf of the Company and/or the Members with any taxing authority. Copies of such tax and information returns shall be kept at the principal office of the Company or at such other place as the Board shall determine. The Board shall cause to be prepared at least annually, at the Company's expense, information necessary for the preparation of each Member's federal and state income tax returns. The Board shall send or cause to be sent to each Member within ninety (90) calendar days after the end of each taxable year, or as soon as reasonably practical thereafter, such information as is necessary to complete federal and state income tax or information returns.

13.4.2  The Board shall determine what income tax elections, if any, the Company shall make.

## ARTICLE FOURTEEN
### Amendments

14.1  **Amendments.**  This Agreement represents the entire agreement between the Members and the Company with respect to the subject matter hereof, and amends, restates and supersedes the Initial Agreement in its entirety. This Agreement may be amended only by a written instrument approved by a Supermajority Vote. A Supermajority Vote shall be 70% or more of the total Units.

14.2  **Amendment of Certificate of Formation**.  Upon amendment of this Agreement, the Certificate of Formation shall also be amended, if required, by New York Law, to reflect such change.

## ARTICLE FIFTEEN
### Expenses of the Company

The Company will bear all (i) expenses in connection with the organization of the Company and the offering of Units, which, at the option of the Board, may be advanced by the Member(s), in which event the Company will reimburse or otherwise compensate the Member(s) for these expenses over such period as the Member(s) shall reasonably determine, (ii) routine legal, bookkeeping, accounting, auditing, and tax preparation fees, and related fees and expenses, (iii) expenses associated with the continued offering of Units, which include but are not limited to marketing, travel and other solicitation expenses, (iv) transaction and investment related expenses, (v) all operational and overhead expenses of the Company including but not limited to photocopying, postage, and telephone expenses, as well as the expenses of governmental registrations, licensing and filing fees, and (vi) extraordinary expenses.

23

## ARTICLE SIXTEEN
### Miscellaneous

16.1 **Notices.**  All notices, requests, demands and other communications hereunder shall be made in writing and shall be deemed to have been given if delivered personally, by overnight delivery service or by registered or certified mail, return receipt requested, postage and registry fees prepaid, to the Members at the addresses set forth on the signature pages hereto.  Any address may be changed by notice given to the Members, as aforesaid, by the party whose address for notice is to be changed.  Each notice, request, demand and other communication required or permitted to be given under this Agreement shall be in writing, shall be effective upon receipt and shall be delivered personally, by overnight delivery service or by registered or certified mail, return receipt requested.

16.2 **Reparability.**  The invalidity or unenforceability of any provision in this Agreement shall not affect the other provisions hereof and this Agreement shall be construed in all respects as if such invalid or unenforceable provision were omitted.

16.3 **Interpretation; Jurisdiction.**  This Agreement shall be interpreted and construed in accordance with the laws of the State of New York, without reference to the rules governing conflicts of laws.  The parties hereto consent to personal jurisdiction and venue in the State of California, Los Angeles County, with respect to any action or proceeding brought in connection with this Agreement.

16.4 **Entire Agreement.**  The parties hereto agree that all understandings and agreements heretofore made among them are merged in this Agreement, which alone fully and completely expresses their agreement with respect to the subject matter hereof.  There are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, among the parties hereto, other than as set forth in this Agreement and the Certificate of Formation.  All prior agreements among the parties are superseded by this Agreement, which integrates all promises, agreements, conditions and understandings among the parties with respect to the Company and its properties.

16.5 **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall constitute an original.  This Agreement, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects and for all purposes as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

16.6 **Binding Effect.**  This Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors, permitted assigns, heirs, executors, administrators and legal representatives.

16.7 **Further Assurances.**  Each of the parties hereto agrees to execute, acknowledge, deliver, file, record and publish such further certificates, instruments, agreements and other documents, and to take all such further action as may be required by law or deemed by the Members to be necessary or useful in furtherance of the Company's purposes and the objectives and intentions underlying this Agreement and not inconsistent with the terms hereof.

16.8 **Waiver.**  No consent or waiver, express or implied, by any Member or the Board or of any breach or default by any other Member or the Board shall be deemed or construed to be a consent to or waiver of any other breach or default by such other Member or the Board.  Failure on the part of a Member or the Board to complain of any act or failure to act of any other Member or the Board or to declare such other Member or the Board in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member or the Board of its rights hereunder.

16.9 **Additional Remedies.**  The rights and remedies of any Member or the Board hereunder shall not be mutually exclusive.  The respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it limit or affect, any other rights in equity or any rights at law or by statute or otherwise of any party aggrieved as against the other for breach or threatened breach of any provision hereof, it being the intention of this paragraph to make clear the agreement of the parties hereto that their respective rights and obligations hereunder shall be enforceable in equity as well as at law.

16.10 **Headings**.  All pronouns shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the context in which they are used may require.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the interpretation of any provision of this Agreement.  In the event any claim is made by any Member relating to any conflict, omission or ambiguity in this Agreement, no presumption or burden of proof or persuasion shall be implied by virtue of the fact that this Agreement was prepared by or at the request of a particular Member or such Member's counsel.

16.11 **Drafting**.  Each party hereto acknowledges that each party hereto and its respective counsel reviewed and revised this Agreement, and each party hereto agrees that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement.

16.12 **Consideration of Members' Separate Interests.**  The Members acknowledge that the Members may have different financial, regulatory, tax and other status and circumstances that may give rise to differing interests among the Members with respect the selection or timing of Company investments or business activities, the acquisition or disposition of assets, making of tax elections or other matters relating to the Company.  The Board, when making decisions or taking action with respect to the Company or such matters, shall not be required to take into consideration the separate status or circumstances of any particular Member or group of Members.

16.13 **Representation and Warranties.**  Each Member hereby represents and warrants to the Company and each other Member that: (a) if that Member is an organization, it is duly organized, validly existing, and in good standing under the law of its state of organization and it has full organizational power to execute and agree to this Agreement and to perform its obligations hereunder and this Agreement is a valid and binding obligation of such Member, enforceable against such Member in accordance with its terms, except as the enforceability thereof may be limited by bankruptcy, insolvency, fraudulent conveyance, fraudulent transfer, reorganization, moratorium or other similar laws relating to the enforcement of creditors' rights generally and by general principles of equity; (b) the Member is acquiring its Units for the Member's own account as an investment and without an intent to distribute the Units in violation of applicable

25

DocuSign Envelope ID: 2373A9F5-8C66-491E-BA77-FE0037FEB642

securities laws; (c) the Member acknowledges that the Units have not been, and may never be, registered under the Securities Act or any state securities laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements; (d) the Member acknowledges and understands that the Company is an early stage Company with a unproven and developing business model, there is a substantial risk of loss and there can be no assurance as to what return, if any, may result from purchasing, acquiring or holding the Units; and (e) such Member has, to the extent it deems necessary or advisable, consulted with its own legal counsel and tax advisors with respect to this Agreement. Member further acknowledges that it is acquiring Units and entering into this transaction without the benefit of any prospectus, private placement memorandum or other written disclosure of the types of information customarily furnished to purchasers of securities, and no such disclosure has been requested of the Company or the Board.

16.14 **No Third Party Beneficiaries**.  Except with respect to the rights of any Covered Persons, which shall be deemed intended third party beneficiaries hereunder, the provisions of this Agreement are intended only to govern the obligations of the Members *inter se*, and shall not be enforceable against the Members by any creditor of the Company or of the Members or of any Member, or by any party claiming by or through any such creditor or any Member, or by any other Person that is not a Member.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement effective as of the Effective Date.

**<u>MEMBERS</u>**

By: _____

JEFFREY JENSEN

Date: 12/15/2023

<u>Address</u>:
9903 Santa Monica Blvd. #890
Beverly Hills, CA 90212
jeff@jensen2.com

By: _____

Dante Kinsey

Date: _____
12/16/2023

<u>Address</u>:
16616 Woodruff Ave Apt. 5
Bellflower, CA 90706

_____

27

## EXHIBIT A
## OFFICERS OF THE COMPANY

<u>Name</u>                                                              <u>Title</u>

Jeffrey Jensen                                                      Director, Chief Executive Officer

**SCHEDULE 1**

**INITIAL MEMBERS; CAPITAL CONTRIBUTIONS; PERCENTAGE INTERESTS**

**Class B Members**

| **Name and Address** | **Contribution prior to or on Effective Date** | **Additional Contribution committed after the Effective Date** | **Company Membership Units** | **Percentage Ownership of Company** |
|---|---|---|---|---|
| Jeffrey Jensen | Company formation and business services valued at $10,000. | | 49,000 | 49% |
| Dante Kinsey | Serving as Social Equity Individual | | 51,000 | 51% |
| | | | | |
| | | | | |
| **Total:** | | | 100,000 | 100% |