**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| VARISCITE NY FOUR, LLC AND VARISCITE NY FIVE, LLC<br><br>Plaintiff,<br><br>v.<br><br>NEW YORK STATE CANNABIS CONTROL BOARD; NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT; TREMAINE WRIGHT; AND CHRIS ALEXANDER,<br><br>Defendants. | Docket No. 23-1599<br><br>**DECLARATION OF DIRECTOR OF POLICY IN OPPOSITION TO PLAINTIFFS' REQUEST FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

John Kagia, on the date noted below and pursuant to § 1746 of Title 28 of the United States Code, declares the following to be true and correct under the penalty of perjury under the laws of the United States of America:

1. I am currently employed by the New York State ("NYS") Office of Cannabis Management ("Office") and my position is Director of Policy. In this position, my duties and responsibilities include, but are not limited to, identifying and defining the strategic priorities for New York's legal cannabis industry, working closely with industry stakeholders to address issues impacting market efficiency and public health outcomes, and developing data-driven insights into the growth, performance, and evolution of the state's cannabis market to inform future program decisions.

2. Prior to joining the Office, I was the Chief Knowledge Officer of New Frontier Data, the leading cannabis industry research and business intelligence company, where I spent a decade leading research into all aspects of the global cannabis economy. During my tenure, New Frontier Data delivered groundbreaking insights into a wide range of issues, including but not

limited to the drivers of legalization, the market dynamics in the medical, adult use, and hemp sectors, the evolution in consumer preferences and behavior, the state of cannabis finance and investment, trends in product innovation, the interplay between legal and illicit markets, and the regulatory factors that influence the performance of legal markets.

3. Prior to joining New Frontier Data, I worked as a market analyst and management consultant to high-performing clients in the technology, federal civil and defense, and not-for-profit sectors. Working closely with clients to address their driving strategic priorities, I delivered insights to inform new product development, strengthen competitive market positioning, adapting to disruptive innovation, and strategies for improving client engagement and retention.

4. My statements herein are based on my personal knowledge, derived from my position as Directory of Policy at the Office, and relevant materials consisting of the exhibits and authorities cited herein.

5. I submit this Declaration in support the Defendants' opposition to Plaintiffs' request for a Temporary Restraining Order and Preliminary Injunction.

Harm to CAURD Provisional Licensees

6. As of the date of this declaration, 463 Conditional Adult Use Retail Dispensary (CAURD) licenses have been awarded, of which 41 CAURD licensees are approved on a final basis with authority to operate. The remaining 422 are provisionally approved and Plaintiffs are seeking to enjoin the Office from issuing any more final licenses to such applicants when they are ready, in contravention of the Office's current process.

7. Over 250 of the provisionally approved applicants already have leased premises on which they are currently paying rent. Others are undergoing renovations and thus incurring constructions costs in addition to paying rent. Still others are obtaining required municipality

notifications, certificates of occupancy, insurance policies, entering into labor peace agreements, hiring staff, installing security systems, executing purchase orders for product, and submitting any additional required operating plans and disclosure statements to the Office. Others have left their employment and taken personal loans so they can focus on negotiating leases or purchases of locations and working each day with the various professionals they engaged to assist them in getting closer to final licensure. Many of these aspiring licensees have executed binding contracts for real estate and other services, which are payable regardless of whether their businesses are operational, and which would incur costly fees to cancel.

8. Based on data collected by the Office in October 2023, provisionally licensed CAURDs attested to having payable expenses collectively **totaling $295 million**, of which $37 million had already been paid. Real estate was the single largest line-item, totaling $213 million. Other key expense areas include $22 million on dispensary construction, $18 million on loan interest or capital repayment costs, $13 million on professional services, including consulting, legal, marketing, and recruitment, and $6.7 million on staff salaries and benefits.

9. An injunction that would prevent the continued awarding of final licenses and the opening of businesses that have been preparing for launch would be financially ruinous for prospective operators, many of whom have committed all the resources at their disposal to prepare for their launch. The nature of cannabis capital markets makes it especially challenging for pre-operational cannabis business to access capital to build their businesses. The classification of cannabis as a Schedule I drug under federal law creates especially challenging barriers to accessing capital.

10. Due to the federal ban on cannabis, many national banks and financial institutions do not invest in or work with the cannabis industry. This means most cannabis businesses are

unable to access conventional loans or lines of credit, forcing them to rely on their own savings or capital from private sources which has borrowing rates far higher than the market rates for capital in other industries. Given the challenges with sourcing capital, prospective licensees do not have the capital runway to sustain thousands of dollars in monthly costs without being able to offset those expenses with revenue from their cannabis businesses. Many provisional licensees left their former jobs and other sources of revenue to focus on building their cannabis businesses, and, therefore, do not have supplemental income streams on which they can rely to cover their significant expense obligations during this litigation.

11. Any injunction in this lawsuit would most certainly create an extremely high risk of financial loss and bankruptcy for many CAURD provisional licensees, in particular because any injunction in this lawsuit would be following another lawsuit which raised some of the same claims as pointed out by Plaintiffs but which Plaintiffs waited to raise here.

Harm to Industry Employees

12. Provisionally licensed retailers have already spent $7 million on staff salaries as they build the industry's workforce. The complexity of running a cannabis business, which includes mandated workforce training to ensure staff operate in a regulatorily compliant manner, means business often hire key staff well in advance of opening their doors. During this pre-operational period, licensees train their staff on the industry, on the products, and on the requirements for selling regulated cannabis, including purchase limits, identifying cannabis intoxication and impairment, and preventing access to cannabis by minors. A protracted injunction would require the licensees to lay off staff, jeopardizing their retention of trained staff and increasing their human capital costs as they would be forced to recruit and retrain new candidates. An injunction would also create significant uncertainty and risk for the employees who will have no assurance of when

the injunction may be lifted, allowing them to resume their training and employment. Any such uncertainty would force new employees to choose whether to leave and seek alternative employment or hold out hope that the lawsuit will be quickly and affirmatively resolved, enabling them to proceed with the roles they aspired to in the industry.

Harm to Farmers

13. There are currently 277 Adult Use Conditional Cultivators. These licensed cannabis growers produced over 200,000 pounds of cannabis biomass in 2022 and an estimated additional 100,000 pounds in 2023. These producers, who laid the foundation of the adult use program, have built their operations with the capacity to serve the hundreds of retailers expected to be licensed and operational in the first half of 2024.

14. Operating with the knowledge that 463 Conditional Adult Use Retail Dispensary provisional licenses have been awarded, and the Office expects to issue at least 500 Adult Use licenses from the general application pool beginning in January 2024. Cultivators and processors have incurred significant expenses to ramp up production, purchase packaging, test their products, and engage prospective distribution partners.

15. Many licensed producers grew their cannabis outdoors, limiting them to a single harvest a year, compared to producers in greenhouses or indoors, whose control over the production environment allows them to produce multiple harvests in a calendar year. For New York's outdoor growers, a single harvest generally means that they only earn income from cannabis once each year, after their harvest, making it critically important to their livelihood to secure a return on their investment as quickly as possible once their product is ready for sale.

16. With the outdoor harvest taking place between October and November, plus a few weeks to cure, test, and package the product, licensed growers are ready to sell their harvest at the close of 2023 going into 2024.

17. An injunction that prevents the Office from issuing retail licenses will have cascading implications across the supply chain. In a market poised for $1 billion to $2 billion in legal retail sales in 2024, the state's cannabis suppliers are sitting on hundreds of millions of dollars of product ready to ship to the retailers that are expected to come online beginning in early 2024. The carrying costs of that inventory, and the impact on growers who live off the once-a-year post-harvest sale of their product would prove a devastating financial blow to many of the state's suppliers.

18. Any delays to producers' ability to sell the product can also impact product quality and value. As a botanical, the quality of cannabis flower products degrades over time, impacting the value of their product. The longer the product remains unsold after its peak ripening, the less valuable it becomes. For example, a cannabis harvest valued at $1,000 per pound at harvest, may lose 25% or more of the value if it remains unsold within six months, and 50% or more of its value if unsold within 12 months. For growers who are unable to invest in the highest quality product storage solutions, the degradation in product quality can be even more acute.

19. An injunction would not just impact the ability for the growers to monetize their harvest, it will also lower the earnings because their products will be less valuable over time. Furthermore, the lack of capital will make it harder for these producers to invest in the 2024 growing season, the planning for which begins in the first quarter of the year, potentially impacting product availability in late 2024 going into 2025.

20. Finally, the illegality of cannabis under federal law means legal cannabis cannot be transported or sold outside of the state where it was produced. Consequently, for New York's licensed producers, it means the only outlet for their cannabis products is licensed retailers in New York. An injunction preventing the advancement of retail stores would leave these producers with no alternative places to sell their products.

Harm to Adult-Use Applicants

21. The Office received nearly 7,000 license applications during the adult use application window which ran from October 4 to December 18, 2023. Of these, the Office received 4,324 applications for retail businesses, 1,349 applications for microbusinesses, 538 for processors, 372 for cultivators, and 351 for distributors. Among those who applied, approximately 1,400 retailers and 350 microbusiness applied with a storefront location secured by either a lease or deed. Applying with a property secured with a lease or deed was a condition for being included in the drawing for a non-provisional, or final license, while those without properties will be included in a drawing for a provisional license.

22. The requirement that applicants for final licensure have a property secured by lease or deed was intended to identify prospective licensees who are most likely to operationalize quickly, in order to meet the Office's priority goal to expand retail access as fast as possible given the supply issues discussed above and illicit market issues discussed below. The nearly 2,000 retail and microbusiness applicants who applied for these final licenses are paying rent or mortgages (or retaining fees for leases conditioned on the award of a license) would be acutely harmed by an injunction as they do not yet know if they have been selected for licensure. An injunction precluding the processing and awarding of licensees would keep this group of applicants in limbo

as they wait to hear if they can move forward with preparing the location for cannabis operations, or if they will need to cancel their leases or find a different use for the property.

23. The total applicant pool from October through December is comprised of approximately 55% social and economic equity (SEE) applicants, including service-disabled veterans, distressed farmers, individuals from communities disproportionately impacted by cannabis prohibition, women- and minority-owned businesses, groups specifically designated for consideration under cannabis law. The harm of an injunction to the SEE population would be especially unfortunate as these are the groups the law was specifically trying to help given the economic challenges they have historically faced.

Harm Related to Property Owners and Landlords

24. New York's commercial real estate market was acutely disrupted by the COVID-19 pandemic. Researchers estimate the pandemic and subsequent work-from-home trend stimulated an estimated "52% decline the value of New York City's office stocks, since the start of 2022," a trend that is "likely to persist and result in long-run office valuations that are 49.2% below pre-pandemic levels." *See* Gupta, Arpit, "Work From Home and the Office Real Estate Apocalypse," Dec. 2, 2023, attached hereto as **Exhibit A**.[1] This trend equates to $664.1 billion of value destruction in the sector.

25. As the real estate industry works to adapt to these dramatic changes to the market, the legal cannabis industry presents a bright opportunity. With over 1,000 retail storefronts expected to be licensed in 2024, plus several hundred producer licenses for cultivators, processors,

---

[1] https://deliverypdf.ssrn.com/delivery.php?ID=8091170691010250930801001200930230740000850370590210241240660980300080250900890121100600970370590600260201030041260271141121090250860300140470090251230730050001240040050330090931051230641160281150901271030681230251040970750700310860671050300990680001088&EXT=pdf&INDEX=TRUE

distributors, and microbusinesses, prospective cannabis businesses have spent months scouting for properties and negotiating leases. Additionally, due to zoning restrictions for retail businesses, including mandated distances from schools, houses of worship, and public youth facilities, prospective licensees have been willing to pay significant premiums on the subset of properties that are appropriately zoned for cannabis retail. 9 NYCRR § 119.1.

26. Any injunction that would keep these businesses from being able to operationalize would introduce uncertainty to these real estate agreements by making it more difficult for prospective operators to pay the rent on properties that are not operational. Landlords would then have to decide whether to keep the tenant and defer rent, or incur the costs of removing the tenant and risk the property sitting vacant as they try to find a replacement.  The expansion of the legal cannabis market was poised to be a bright spot in a commercial real estate sector facing acute headwinds. However, an injunction will create uncertainty and risk for lessors, and may fuel hesitance to lease to the cannabis industry, thereby making it more challenging for prospective licenses to secure qualifying retail properties moving forward.

Harm From the Unchecked Illicit Market

27. Licensed dispensaries displace the illegal stores that have risen to take advantage of the absence of legal supply since the traditional penalties related to possession and sale had been eliminated or reduced. New York State is already faced with an illicit market growing and thriving since the passage of the Marijuana Regulation and Taxation Act ("MRTA"), with unlicensed businesses posing as licensed businesses.

28. Through a coordinated effort along with several agencies and local police departments, the State has been working diligently to enforce against a growing number of illicit

cannabis dispensaries. The illicit cannabis market is serious concern for New Yorkers, as these businesses are not adhering to the strict public health and safety regulations outlined in the legal adult-use cannabis program. These businesses often sell cannabis product that has not been tested by third-party Office licensed laboratories for potential contaminants, may contain harmful additives, have potentially unknown potency levels, and often target their marketing and advertising in a manner that is appealing to children. The sale of cannabis outside of a licensed and regulated framework creates a public health and safety problem for the communities where these illicit cannabis businesses operate.

29. In the period following the passage of the Cannabis Law, the number of unlicensed dispensaries in New York City alone has grown to an estimated 1,500, with many more across the rest of the state. The proliferation of unlicensed dispensaries was recognized as major problem during the FY2023-24 budget cycle, in the context of which the Legislature and Governor amended the Cannabis Law and Tax Law to give the Office of Cannabis Management and the Department of Taxation and Finance additional enforcement authority over unlicensed dispensaries and to increase the penalties against those businesses as well. *See* Chapter 56 of Laws of 2023. Since the expanded enforcement powers were granted by the legislature, the Office's Enforcement unit has conducted 369 inspections of unlicensed operations and seized over $50 million worth of product. *See NYS Office of Cannabis Management Inaugural Enforcement Report 2023*, attached hereto as **Exhibit B**.[2]

30. These actions have played a critical role in asserting the state's commitment to addressing the illicit market. However, enforcement alone cannot combat the illicit market. A widely accessible, cost-competitive legal market is the most effective antidote to the illicit market.

---

[2] https://cannabis.ny.gov/system/files/documents/2023/12/2023-enforcement-report-final.pdf

Indeed, research has shown that, all else being equal, consumers will show a strong preference for the legal market when they have access to both legal and illicit options. *See* Amlung, Michael, "Availability of Legalized Cannabis Reduces Demand for Illegal Cannabis Among Canadian Cannabis Users: Evidence from a Behavioural Economic Substitution Paradigm." December 6, 2018, attached hereto as **Exhibit C**.[3]

31. A delay to the rollout of the legal retail stores will enable these illicit store operators to become more entrenched, further putting public health and safety at risk. The products sold within these stores are not produced in New York's legal market and not tested to the state's product quality standards. The illicit shops do not collect cannabis excise or retail taxes, undermining a key source of tax revenue for investment in education and community-based programs. Additionally, these illicit retailers often sell to minors, a group who are at acute risk of negative health and life outcomes from early onset cannabis use.

32. Any injunction which delays the retail rollout would undermine the state's urgent public health priority of combatting the storefront-based illicit market. These effects would not only be felt during the injunction, but would also extend well after because consumers will routinize purchases from the unlicensed storefronts. This increases the cost of consumer capture for legal businesses and slows the rate at which consumers transition from unlicensed to licensed retailers compared to markets which do not have well-established illicit storefronts.

Harm Related to Tax Revenue

33. Also, with each passing day, the slowdown in legal sales of cannabis is depriving the State and localities of anticipated tax revenue from sales of legal and tested cannabis, which is

---

[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6964395/pdf/41997_2018_Article_160.pdf

intended to be used for expenditures related to education, public health initiatives, and enforcement of unlicensed activities. One of the major justifications for the legalization of cannabis was to use the cannabis tax revenue generated from sales to further public policy goals. The MRTA earmarked cannabis tax revenue to three broad buckets: 1) 40% to the New York State Community Grants Reinvestment Fund to be used to reinvest in communities harmed by cannabis prohibition, 2) 40% to be directed to the state's lottery fund for public school funding, and 3) 20% to the New York State Drug Treatment and Public Education Fund to be used for substance use treatment and education programs.

34. The State has already collected millions of dollars in cannabis tax revenue from the limited number of CAURD dispensaries which opened in 2023, collecting approximately $1.5 million in the first quarter of 2023 and approximately 3.5 million in the second quarter of 2023. Additionally, local governments receive a 4% local tax from cannabis sales that occur in their jurisdictions and can be used at the discretion of the local municipalities. Further delays in the rollout of CAURD program will bolster the existing illicit cannabis market where no tax is collected and reduce the State's opportunity to use the cannabis tax revenue for the public policy goals set forth in the MRTA.

Not in the Public Interest

35. Based on the above, an injunction is not in the public interest. Rather it is in the interest of one individual who is known to have used litigation in the past as a means of obtaining a license at the expense of the public.

36. The harm to the public must be weighed against the fact that Plaintiffs cannot show how they would be harmed if an injunction is not granted. They are not seeking to enjoin the

already existing cannabis retailers in the market but are instead seeking to restrain potential future competitors. *See* ECF No. 11 p 19. As such, Plaintiffs appear to be seeking to advance their own interests over the interests of others, who also are competing for an opportunity to enter into the new, legal cannabis market.

Dated: Albany, New York
       January 16, 2024

/s/ _____
John Kagia

13