**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────

VARISCITE NY FOUR, LLC AND VARISCITE
NY FIVE, LLC,

                          Plaintiffs,

          v.

NEW YORK STATE CANNABIS CONTROL
BOARD; NEW YORK STATE OFFICE OF
CANNABIS MANAGEMENT; TREMAINE
WRIGHT; AND CHRIS ALEXANDER,

                      Defendants.
─────────────────────────────────

           1:23-cv-01599 (AMN/CFH)

**APPEARANCES:**                               **OF COUNSEL:**

**JEFFREY M. JENSEN**                  **JEFFREY M. JENSEN, ESQ.**
9903 Santa Monica Blvd. # 890          *Pro Hac Vice*
Beverly Hills, CA 90212
*Attorney for Plaintiffs*

**E. STEWART JONES HACKER MURPHY, LLP**    **THOMAS J. HIGGS, ESQ.**
28 Second Street-Suite 203
Troy, NY 12180
*Attorneys for Plaintiffs*

**HON. LETITIA JAMES**                  **RYAN W. HICKEY, ESQ.**
New York State Attorney General        Assistant Attorney General
The Capitol
Albany, NY 12224
*Attorney for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

      Plaintiffs Variscite NY Four, LLC and Variscite NY Five, LLC ("Plaintiffs") commenced

this action on December 18, 2023 against Defendants New York State Cannabis Control Board

(the "Board"), New York State Office of Cannabis Management ("OCM" or the "Office"), Tremaine Wright, and Chris Alexander (collectively "Defendants"), pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1[1] (the "Complaint").[2]  Plaintiffs allege that New York's Adult Use Application Program, which accepted applications for adult use retail dispensary cannabis licenses ("Adult Use Licenses") from October 4, 2023 through December 18, 2023 (the "Adult Use Application Program"), violates the dormant Commerce Clause.  *See generally id*.

On December 21, 2023, Plaintiffs filed a motion by order to show cause for a temporary restraining order and preliminary injunction seeking to enjoin Defendants from issuing Adult Use Licenses or issuing any additional licenses under the CAURD Application Program.  *See* Dkt. Nos. 10-12 (the "Motion").  On December 28, 2023, Defendants submitted a Letter Brief opposing the Motion.  Dkt. No. 16.[3]  On January 9, 2024, the Court directed expedited briefing on the Motion, and on January 16, 2024, Defendants filed an Opposition, Dkt. Nos. 25-29.[4]  On January 26, 2024, the Court held a hearing on the Motion (the "Motion Hearing").[5]

---

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system.

[2] The Complaint also alleges that Defendants violated Section 10(19) of New York's Marihuana Regulation & Taxation Act ("Cannabis Law"), which provides that "the initial adult-use cannabis retail dispensary license application period shall be opened for all applicants at the same time," *see* NY CANBS. § 10(19), when Defendants opened "applications only from a certain subcategory of applicants called Conditional Adult Use Retail Dispensary ("CAURD") applicants from August 25, 2022, through September 26, 2022" (the "CAURD Application Program") before opening the Adult Use Application Program.  Dkt. No. 1 at ¶¶ 34-47.  Plaintiffs do not assert a cause of action related to the CAURD Application Program.  *Id*. at ¶¶ 48-57.

[3] On January 3, 2024, this matter was reassigned from United States District Judge David N. Hurd to the undersigned.  *See* Dkt. No. 19.

[4] At that time, Defendants also filed a Motion to Dismiss for failure to state a claim and for lack of subject matter jurisdiction, *see* Dkt. No. 30, which is not ripe for review because it has not been fully briefed by the parties.

[5] On February 1, 2024, Defendants submitted a Supplemental Declaration in Support of Defendants' Opposition, Dkt. No. 34, and on February 2, 2024, Plaintiffs filed a Response, Dkt.

For the reasons set forth herein, the Court denies Plaintiffs' Motion for a temporary restraining order and a preliminary injunction.

## II.        BACKGROUND

### A.  Legality of Cannabis under Federal Law

Under the Controlled Substances Act ("CSA"), it is unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," including cannabis.  21 U.S.C. § 841(a)(1); *see* 21 U.S.C. § 812(c) (classifying cannabis as a Schedule I controlled substance).  However, as to the use of cannabis for certain medical conditions, Congress has prohibited the Department of Justice ("DOJ") from using funds "to prevent any [state] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."  *See* Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, § 530 (2022) (the "Rohrabacher-Farr Amendment"); *see also Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173, at *2 (W.D. Wash. Feb. 7, 2023) (noting that in "each fiscal year since fiscal year 2015, Congress has prohibited the [DOJ] from using its appropriated funds to take legal action against states that have implemented laws legalizing medicinal marijuana"), *appeal dismissed*, No. 23-35162, 2023 WL 3884102 (9th Cir. Apr. 11, 2023).[6]  On the other hand, Congress "has not amended the CSA to legalize marijuana for either medical or recreational use."  *Ne. Patients Grp. v. Me. Dep't of Admin.*

_____

No. 35.

[6] In 2013, U.S. Deputy Attorney General James Cole issued a memorandum entitled "Guidance Regarding Marijuana Enforcement" (the "Cole Memo"), encouraging "prosecutorial discretion in enforcing federal marijuana laws in states where [medicinal marijuana] had been legalized" and which have a "strong and effective state regulatory system."  *Brinkmeyer*, 2023 WL 1798173, at *2; *Peridot Tree WA Inc. v. Wash. State Liquor & Cannabis Control Bd.*, No. 3:23-CV-06111-TMC, 2024 WL 69733, at *1 (W.D. Wash. Jan. 5, 2024).  The Cole Memo was rescinded in 2018 by Attorney General Jeff Sessions.  *Brinkmeyer*, 2023 WL 1798173, at *2.

*& Fin. Servs.,* 554 F. Supp. 3d 177, 182 (D. Me. 2021), *aff'd sub nom. Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542 (1st Cir. 2022).

**B.  New York Cannabis Law**

In 2021, the New York Legislature determined that existing marihuana laws had "resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise law-abiding citizen's ability to access housing, employment opportunities, and other vital services."  N.Y. CANBS. § 2.  To address these collateral consequences and for various other purposes, on March 31, 2021, New York enacted the Marihuana Regulation & Taxation Act ("MRTA"), with the short title of "Cannabis Law."  N.Y. CANBS. § 1.[7]  Article II of the Cannabis Law establishes the OCM[8] and the Board,[9] which are responsible for implementing and enforcing the Cannabis Law in New York.  N.Y. CANBS. §§ 7-11.  Additionally, the Cannabis Law legalizes adult use cannabis and regulates its production, manufacturing, distribution, and sale in New York.  *See* N.Y. CANBS. §§ 3, 61-89; *see also* N.Y.

---

[7] "The intent of [the MRTA] is to regulate, control, and tax marihuana. . . generate significant new revenue, make substantial investments in communities and people most impacted by cannabis criminalization to address the collateral consequences of such criminalization, prevent access to cannabis by those under the age of twenty-one years, reduce the illegal drug market and reduce violent crime, reduce participation of otherwise law-abiding citizens in the illicit market, end the racially disparate impact of existing cannabis laws, create new industries, protect the environment, improve the state's resiliency to climate change, protect the public health, safety and welfare of the people of the state, increase employment and strengthen New York's agriculture sector."  NY CANBS. § 2.

[8] The Cannabis Law gives the OCM and its executive director the power to "prescribe forms of applications for licenses and permits under this chapter."  N.Y. CANBS. § 11(4).

[9] The Cannabis Law gives the Board broad authority, including to "perform such acts, prescribe such forms and propose such rules, regulations and orders as it may deem necessary or proper to fully effectuate the provisions" of the Cannabis Law, "draft and provide for public comment and issue regulations, declaratory rulings, guidance and industry advisories" without limitation, and "promulgate any and all necessary rules and regulations governing the cultivation, manufacture, processing, transportation, distribution, testing, delivery, and sale of . . . adult-use cannabis."  N.Y. CANBS. §§ 10(16), 13(1)-(2).

CANBS. § 72 (authorizing the licensing of adult use retail dispensaries).

### 1.   CAURD Application Program

The Adult Use Application Program was preceded by the CAURD Application Program.[10]

"On or about August 25, 2022, through September 26, 2022, the Office accepted applications for"

CAURD licenses.  Dkt. No. 29 at ¶ 3.  To be eligible for a CAURD license, an applicant had to

establish, among other things, that an individual "(a) was convicted of a marihuana-related offense

in New York State prior to [March 31, 2021]; (b) had a parent, legal guardian, child, spouse, or

dependent who was convicted of a marihuana-related offense in New York State prior to [March

31, 2021]; or (c) was a dependent of an individual who was convicted of a marihuana-related

offense in New York State prior to [March 31, 2021]."  N.Y. Comp. Codes R&R tit. 9 ("NYCRR")

§ 116.4(a)(2)(i).[11]

On August 2, 2023, four individual plaintiffs filed a complaint in New York State court

challenging the validity and constitutionality of the CAURD program.  *Carmine Fiore, et al. v.*

*New York State Cannabis Control Board*, *et. al*, No. 907282-23 (Sup. Ct., Albany Cnty., 2023).

---

[10] *See Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232, 234-37 (N.D.N.Y. 2022), *reconsideration denied*, No. 1:22-CV-1013 (GLS) (DJS), 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023), for a detailed summary of the cannabis regulations related to the CAURD Application Program.

[11] On September 26, 2022, Variscite NY One, Inc. sued the State of New York, OCM, and Christopher Alexander, the Executive Director of OCM, pursuant to 42 U.S.C. § 1983, alleging a violation of the dormant Commerce Clause as to the CAURD Application Program.  *See Variscite NY One*, 640 F. Supp. 3d at 234.  On November 10, 2022, the court issued an Order granting Variscite's motion for a Preliminary Injunction "restrain[ing defendants] from issuing any CAURD licenses under the application program held from August 25 to September 26, 2022, for five geographic regions in New York State."  *Id.* at 244.  The defendants appealed the preliminary injunction, and on March 28, 2023, the Second Circuit issued an Order narrowing the Preliminary Injunction, pending appeal, to prohibit the defendants from issuing CAURD licenses in only one region.  *See* Dkt. No. 12-1; Dkt. No. 29-2 at 2.  On or about May 25, 2023, the court approved a settlement between Variscite NY One, Inc. and the defendants dismissing that action with prejudice subject to the terms set forth in the settlement agreement.  Dkt. No. 29 at ¶ 7; Dkt. No. 29-2.

The defendants subsequently entered into a settlement of the state lawsuit, pursuant to which they agreed not to issue any "new or additional provisional CAURD licenses until April 1, 2024." *See* Dkt. No. 12-4 at 7 (the "*Fiore* Settlement").  However, the settlement permitted the defendants to proceed with issuing licenses for already-processed CAURD applications.  *Id.*[12]  To date, Defendants have awarded 463 CAURD licenses, Dkt. No. 28 at ¶ 6, and represented at the Motion Hearing that approximately 70 of these CAURD licenses have been finally approved while the remaining 393 licenses have been provisionally approved.

### 2.  New York's Social and Economic Equity Plan

The Cannabis Law requires the Board "in consultation with the chief equity officer and executive director, [] after receiving public input" to "create and implement a social and economic equity plan" ("SEE Plan") which "prioritize[es] consideration of applications by applicants who are from communities disproportionately impacted by the enforcement of cannabis prohibition [("CDI")] or who qualify as a minority or women-owned business, distressed farmers, or service-disabled veterans" ("SEE Applicants").  N.Y. CANBS. § 87(1).

On September 27, 2023, the OCM adopted and/or amended regulations for the adult use market ("the Adult Use Regulations") as to how applications, including SEE applications, will be reviewed and selected.  Dkt. No. 1 at ¶ 13 (citing 9 NYCRR §§ 118-21, 123-25, 131).[13]  The Adult

---

[12] Plaintiffs are not asking "the Court to enjoin Defendants from permitting the CAURD Applicants who are fully licensed and operational as of the date of the Complaint from operating." Dkt. No. 11 at 20.

[13] The Adult Use Regulations provide, as to an applicant's eligibility, that "[a]n applicant shall provide information in a form and manner as prescribed by the Board." 9 NYCRR § 120.7(a)(1). Additionally, as to the application review process, the Regulations provide that an applicant "shall be reviewed and evaluated in an order and manner determined by the Board, based on provisional, social and economic equity status or any additional criteria to be set by the Board." *Id.* at § 120.7(b).  As to the approval process, the Board "may approve licenses using mechanisms, including, but not limited to, scoring, compliance-based evaluation, qualified lottery, randomized ordering, or any combination thereof." *Id.* at § 120.7(c).  Finally, as to prioritization, the Board

Use Regulations prioritize applications from individuals from CDIs.  9 NYCRR § 121.1(d).  An

applicant qualifies as an individual from a CDI if the applicant can show: (1) ownership and sole

control[14] over the applicant by one or more individuals from communities disproportionally

impacted; and (2) one or more individuals that have an ownership interest in the business have

resided in a community disproportionately impacted for an aggregate of five of the first 18 years

of their life or an aggregate of seven years of their life.  *Id.*  An individual from a CDI does not

need to be from New York to qualify for priority as a SEE Applicant.  Dkt. No. 27 at ¶¶ 32-33

(citing 9 NYCRR § 121.1(e)); *see also id.* at ¶¶ 34-37 (noting that the Office provides guidance

on its website that residents of any state are eligible to apply for SEE status if they lived in a CDI).

Additionally, under the Adult Use Regulations the Board must give "extra priority" to a

SEE Applicant if a majority owner:

> (i) [has] an income lower than eighty percent (80%) of the median income of the
> county in which the applicant resides; and (ii) was ***convicted of a marihuana-
> related offense*** [under New York law] prior to the effective date of the Marihuana
> Regulation and Taxation Act [March 31, 2021], or had a parent, guardian, child,
> spouse, or dependent, or was a dependent of an individual who, prior to the effective
> date of the Marihuana Regulation and Taxation Act, was ***convicted of a
> marihuana-related offense*** [under New York Law].

---

"may prioritize application submission, review, selection and issuance by region, license type,
provisional status, social and economic equity status, or any other criteria the Board may
determine" and "[a]pplication submission, review, selection, and issuance may be prioritized by
groupings consistent with Section 87 of the Cannabis Law."  *Id.* at §§ 120.7(c)(2)-(3).

[14] "Sole control" is defined as "a person or persons who: (i) has real, substantial, and continuing
ownership of 51% equity share in the business; (ii) has the right to execute any material contracts;
(iii) has the ability to exercise the authority to materially influence the day-to-day business
decisions, operations, strategic priorities, capital allocations, acquisitions and divestments; (iv) has
no timed or triggered recusal provisions or side letters or side agreements related to their recusal;
and (v) has an ability to direct decisions, voting or otherwise, such that no other person may
exercise or have the ability to control the majority of voting rights or appoint or remove the
majority of director seats or their equivalent or corporate officers or their equivalent on the
governing body."  9 NYCRR § 118.1(101).

9 NYCRR § 121.1(k) (emphasis added).[15]  While the Adult Use Regulations require that an owner or their relative have a marihuana-related conviction under New York law, they do not require that the applicant or their relative be a New York resident.  Dkt. No. 27 at ¶ 55.[16]

### 3.  The November and December 2023 Adult Use Application Process

The application window for Adult Use Licenses for all types of applications (i.e., non-priority, priority, and extra priority) opened on October 4, 2023.  Dkt. No. 26 at ¶ 26.  The application window "for applicants seeking a retail dispensary license with proof of control over a proposed premises from which they intend to operate" closed on November 17, 2023 (the "November Applications").  *Id.*[17]  The application window for applicants seeking "a provisional license without proof of control over a premises" closed on December 18, 2023 (the "December Applications").  *Id.*[18]

On "December 7, 2023, the Office randomly ordered the November Applications . . . using

---

[15] Under the Adult Use Regulations, "a marihuana-related offense" means "an offense defined in: (i) former sections 220.03 and 220.06 of the Penal Law where the sole controlled substance involved was concentrated cannabis, (ii) former sections 221.05, 221.10, 221.15, 221.20, 221.35, or 221.40 of the Penal Law, (iii) section 105.05 of the Penal Law prior to the effective date of chapter ninety-two of the laws of two thousand twenty-one and the sole conduct involved was an offense defined in former sections 221.35 or 221.40 of the Penal Law, (iv) former section 3382 of the Public Health Law prior to the effective date as prescribed in subdivision nine of section 222.15 of the Penal Law, and the cultivation of such cannabis plants was solely for personal possession and use, (v) article two hundred twenty or section 240.36 of the Penal Law prior to the effective date of former article two hundred twenty-one of the Penal Law and the sole controlled substance involved was marihuana and the conviction was only for a misdemeanor and/or violation, or (vi) any offense identified by the Office to be a marihuana-related offense."  9 NYCRR § 118.1(a)(64).

[16] Defendants assert that "[r]equiring that the marihuana-related offense be an offense under New York's former marihuana laws is intended to recognize and ameliorate the harm done by New York's own prior laws criminalizing marihuana."  Dkt. No. 27 at ¶ 56.

[17] Plaintiffs have not challenged the requirement of "proof of control over a proposed premises" for the November Applications.

[18] An applicant seeking a retail dispensary license with "proof of control over a proposed premises" who applied between November 18, 2023 and December 18, 2023 is considered part of the December Applications.  Dkt. No. at ¶ 26.

a random number generator.  Each application was assigned a number that will determine the order in which applications would be reviewed."  *Id*. at ¶ 27.  The November Applications "which indicated they were seeking extra priority were each counted three times in the random ordering process," which increased the chances those applications would be reviewed.  *Id.* at ¶ 29. Defendants state that "[t]he November Applications will be reviewed in the order they were assigned in the queue until the number of licenses that the Office intends to issue is reached," which is anticipated to be two hundred and fifty licenses.  *Id.* at ¶ 28.[19]

There were 2,853 December Applications submitted.  *Id.* at ¶ 32.  On January 30, 2024, the December Applications were queued and "randomly ordered."  Dkt. No. 34-1 at ¶ 4.  Defendants represent that Plaintiffs' Applications each received three entries since they had indicated they sought "extra priority" status, and as a result, "Plaintiff Variscite Four's application appears at 816, 2121, and 3812 in the review queue" and "Plaintiff Variscite Five's application appears at 949, 2153, and 4147 in the review queue."  *Id*. at ¶¶ 5-7.  The Office intends to issue 450 retail licenses from the December Applications.  *Id*. at ¶ 8.

### C.  Plaintiffs' Formation and Adult Use Applications

Plaintiffs Variscite NY Four, LLC and Variscite NY Five, LLC are limited liability companies ("LLCs") organized under New York State law.  Dkt. No. 1 at ¶¶ 1-2.  Plaintiffs represented at the Motion Hearing that each of the LLCs was formed in or about November 2023. *See also* Dkt. No. 27-4 at 1 (Variscite NY Four's LLC Agreement stating that its "Effective Date" is December 6, 2023); Dkt. No. 27-7 at 1 (Variscite NY Five's LLC Agreement stating that its "Effective Date" is December 6, 2023).  Variscite NY Four is forty-nine percent owned by Jeffrey

---

[19] Defendants represented at the Motion Hearing that the review of the November Applications is underway, and they expect that the Office will begin issuing licenses for the November Applications in the first quarter of 2024.

Jensen and fifty-one percent owned by Dante Kinsey who Plaintiffs allege was convicted of a cannabis crime under California law, has an income lower than eighty percent of the median income of Los Angeles County, where he resides, and lived in a CDI for more than seven years. Dkt. No. 1 at ¶ 32; Dkt. No. 27 at ¶ 18.  Variscite NY Five is forty-nine percent owned by Jeffrey Jensen and fifty-one percent owned by Justin E. Palmore who Plaintiffs allege was convicted of a cannabis crime under California law, has an income lower than eighty percent of the median income of Los Angeles County, where he resides, and lived in a CDI for more than seven years. Dkt. No. 1 at ¶ 33; Dkt. No. 27 at ¶ 25.

Under Plaintiffs' LLC Agreements, Jensen was appointed as the "Initial Director" and has the ability to appoint the majority of director seats.  Dkt. No. 27 at ¶¶ 22, 29 (citing Dkt. No. 27-4 at 3, 10; Dkt. No. 27-7 at 3, 10).  The LLC Agreements also provide Jensen with the "sole right to assign a management agreement for the company." *Id.* at ¶¶ 21, 28 (citing Dkt. No. 27-4 at 6, 10; Dkt. No. 27-7 at 6, 10).  Additionally, the board of directors of each LLC, which currently consists of only Jensen, has the power to make management decisions including entering into, making, and performing contracts; opening and maintaining back accounts; acquiring or disposing of real or personal property; and borrowing money.  *Id.* at ¶¶ 23, 30 (citing Dkt. Nos. 27-4 at 8; 27-7 at 8). If Plaintiffs' applications fail to prove that they qualify for SEE status, they have 30 days to remedy any defects.  Dkt. No. 12-5 at ¶ 63.[20]

On December 18, 2023, Plaintiffs applied through Defendants' New York Business Express application website as SEE Applicants and requested extra priority ("Applications").[21]

---

[20] The OCM's "General Licensing Application Frequently Asked Questions" states that "[i]f an applicant fails to prove qualification for SEE status, the Office will initiate a 30-day cure period in which applicants must submit additional documentation required by the Office to correct any deficiencies in their SEE status."  Dkt. No. 12-5 at ¶ 63.

[21] Defendants assert that Plaintiffs' Applications received weighted entry, each appearing "three

Dkt. No. 1 at ¶ 23; Dkt. No. 26 at ¶¶ 11-12, 16-17. [22]  Plaintiffs allege that they satisfy all requirements for "extra priority" except for the New York conviction requirement.  Dkt. No. 1 at ¶¶ 32-33; Dkt. No. 12 at ¶¶ 5-6.

## III.   STANDARD OF REVIEW

"In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction." *Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom.*, 557 F. App'x 53 (2d Cir. 2014).  A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

"Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).  Further, a preliminary injunction is "never awarded as of right," *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 200 (N.D.N.Y. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and the decision to grant such relief "rests in the sound discretion of the district court," *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990).  In addition, preliminary "relief should be 'narrowly tailored to fit specific legal violations' and to avoid 'unnecessary burdens on lawful commercial activity.'" *Faiveley Transp.*

---

times in the review queue."  Dkt. No. 34-1 at ¶ 5.  If Plaintiffs' Applications are "selected and reviewed by the Board and it is determined that [Plaintiffs do] not have the required convictions under New York law, they will be returned to the normal pool without the extra priority weighting."  Dkt. No. 26 at ¶ 29.

[22] Plaintiffs represented at the Motion Hearing that they did not apply for a CAURD license under the CAURD Application Program or an Adult Use License under the November Applications.

*Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 119 (2d Cir. 2009) (quoting *Waldman Pub. Corp. v. Landoll, Inc.,* 43 F.3d 775, 785 (2d Cir. 1994)).

> When seeking a preliminary injunction, a plaintiff must show:
>
> (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff[s]'[] favor; and (4) that the public interest would not be disserved by the issuance of an injunction."

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks and citation omitted).  Where, as here, "the government is a party to the suit, the final two factors merge."  *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58-59 (2d Cir. 2020).

While a "[p]rohibitory injunction[] [that] maintain[s] the status quo pending resolution of the case" requires an applicant to show "a likelihood of success on the merits," *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc*., 883 F.3d 32, 36-37 (2d Cir. 2018), a "mandatory injunction" that "alter[s] the status quo by commanding some positive act," requires an applicant to show "a clear or substantial likelihood of success on the merits" rather than simply a likelihood of success on the merits.  *N.Y. Civil Liberties Union v. N.Y.C. Trans. Auth*., 684 F.3d 286, 294 (2d Cir. 2012).

## IV.       DISCUSSION

### A.  Nature of the Injunctive Relief Sought

The parties dispute whether the higher burden of proof for injunctive relief that alters the status quo applies to Plaintiffs' application for a temporary restraining order and preliminary injunction.  *Compare* Dkt. No. 25 at 14 n.3 (Defendants contend that "[t]he requested temporary restraining order and preliminary injunction are mandatory in nature because Plaintiffs seek to alter the status quo by enjoining Defendants' ongoing review of applications and issuance of

licenses to CAURD and adult use retail dispensary applicants"), *with* Dkt. No. 31 at 3-4 (Plaintiffs are seeking a "prohibitive injunction" to prohibit "Defendants from issuing any new licenses"). The Court agrees with Plaintiffs that the relief sought is "prohibitory" in nature because Defendants have not issued licenses for the November or December Applications. *See Variscite NY One, Inc.*, 640 F. Supp. 3d at 238-39 (finding the preliminary injunction for CAURD was prohibitory because the licensing process had not yet begun). Additionally, even though Defendants represented at the Motion Hearing that 70 CAURD licenses have been finally approved, the requested injunction is still classified as prohibitory because Plaintiffs are seeking to enjoin Defendants from issuing any further CAURD licenses. *See id.* at 239 n.5 (stating that "[e]ven if the licensing process had begun sometime after the filing of [plaintiff's] complaint, the injunction would still be classified as prohibitory").

### B. Standing

Defendants argue that Plaintiffs lack Article III standing to challenge New York's conviction requirement. Dkt. No. 25 at 16-19. Article III of the U.S. Constitution limits federal jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. In order to have standing to sue, Article III requires the plaintiff to show the following three elements: "(1) [The plaintiff] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted).

Injury in fact is the "[f]irst and foremost" of the three elements. *Id.* (quoting *Steel Co. v. Citizens for Better Env.*, 523 U.S. 83, 103 (1998)). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). As to the

second element, to "be fairly traceable to the challenged conduct, 'there must be a causal connection between the injury and the conduct complained of.'" *Peridot Tree WA Inc.*, 2024 WL 69733, at *6 (quoting *Lujan*, 504 U.S. at 560).  Finally, as to the third element, for an alleged injury to be redressable, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Coal. of Watershed Towns v. U.S. E.P.A.*, 552 F.3d 216, 218 (2d Cir. 2008) (*per curiam*) (quoting *Lujan*, 504 U.S. at 561).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561.  "[T]o establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts that establish the three familiar elements of standing: injury in fact, causation, and redressability." *Dep't of Homeland Sec.*, 969 F.3d at 59 (internal quotation marks and citation omitted).

### 1.  The December Applications

Because Plaintiffs applied for a retail dispensary license on December 18, 2023, and their applications will only be reviewed in the December Applications group, *see* Dkt. No. 26 at ¶¶ 11, 26, 30, the Court will first evaluate whether Plaintiffs have Article III standing to challenge the December Applications.  Defendants argue that Plaintiffs lack standing because their alleged injury is "speculative," not "concrete and particularized." Dkt. No. 25 at 17-18.  Specifically, Defendants argue that even if Plaintiffs qualify for "extra priority," "it would only give them a slightly increased probability of being selected for review" and obtaining a license.  *Id.*[23]  Defendants further assert that Plaintiffs' Applications, which were submitted as "extra priority," received weighted entry in the review queue for the December Applications, and therefore as "a practical

---

[23] Defendants' Supplemental Declaration asserts that "[b]ased on the position of the Plaintiffs' applications [in the review queue] it is unclear at this time whether . . . Plaintiffs' applications will be reviewed by the Office."  Dkt. No. 31 at ¶ 9.

matter [Plaintiffs] will receive what they attempt to achieve through this preliminary injunction." Dkt. No. 25 at 17; Dkt. No. 34 at ¶ 5.  These arguments are insufficient to show that Plaintiffs lack an injury in fact as to the December Applications.

Even though Plaintiffs' Applications have not yet been reviewed or formally denied, if the Applications are reviewed and it is determined that they do not meet the New York conviction requirement, the Applications will be returned to the normal pool without the extra priority weighting.  *See* Dkt. No. 26 at ¶ 29.  Plaintiffs' allegation that they will be deprived of the ability to compete evenly for "extra priority" with applicants who satisfy the New York conviction requirement in the December Applications, *see* Dkt. No. 1 at ¶¶ 32-33, 52, is sufficient to establish an injury in fact.  *See Variscite NY One,* 2023 WL 1420662, at *3 ("While Variscite has not had its application formally denied, its alleged injury is not the denial itself but the disadvantage it faces in obtaining a license due to the allegedly unconstitutional licensing scheme.") (quotation omitted); *NPG, LLC v. City of Portland, Me.*, No. 2:20-cv-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("Although the Plaintiffs have not been denied a license, their alleged injury is not the denial itself but the disadvantage they face in obtaining a license due to the City's [program].");  *Finch v. Treto*, 606 F. Supp. 3d 811, 827 (N.D. Ill. 2022) (finding that Plaintiffs "adequately alleged an injury in fact—the inability to compete on equal footing" for a cannabis license as compared to Illinois residents), *aff'd in relevant part, dismissed in part*, 82 F.4th 572 (7th Cir. 2023).

Plaintiffs also satisfy the other elements of standing.  They satisfy the traceability element because the New York conviction requirement will cause Plaintiffs to be unable to qualify as "extra priority" applicants.  Dkt. No. 26 at ¶ 29.  Finally, Plaintiffs' alleged injury is redressable, because Plaintiffs are "not seeking a license from the court, but, rather, judgement restraining defendants

from enforcing any portions of the Cannabis Law or Cannabis Regulations that favor New York residents over out-of-state residents, and a declaration that certain portions of the law and regulations violate the dormant Commerce Clause, relief which the court can provide." *Variscite NY One*, 2023 WL 1420662, at *3 (quotation omitted); *see also Peridot Tree, Inc. v. City of Sacramento,* No. 2:22-CV-00289 (KJM) (DB), 2022 WL 10629241, at *3 (E.D. Cal. Oct. 18, 2022) (finding that plaintiffs' requested equitable relief was redressable because it would prevent the city from giving preference to California residents).

Plaintiffs have therefore established standing to seek a temporary restraining order and preliminary injunction as to the December Applications.[24]

### 2.   November Applications

At the Motion Hearing, Defendants argued that Plaintiffs do not have standing as to the November Applications because they do not have a "concrete and particularized injury" since they only applied in the December Application pool.  In response, Plaintiffs argued that they have standing as to both the November and December Applications, even though they are reviewed at different times, because both programs require a New York conviction to qualify for "extra priority."

The Court finds, however, that Plaintiffs have not satisfied their burden of establishing an injury as to the November Applications.  Plaintiffs represented at the Motion Hearing that they did not apply as part of the November Applications.  Therefore, Plaintiffs have not shown that they

---

[24] Defendants also argue that separate from the New York conviction requirement, Plaintiffs could not qualify for "extra priority" as a SEE Applicant because Plaintiffs' LLC Agreements demonstrate that Plaintiffs' majority owners do not possess "sole control" over Plaintiffs pursuant to 9 NYCRR § 118.1(101).  Dkt. No. 25 at 18.  However, because Plaintiffs are entitled to a 30-day cure period, they would have the opportunity to cure any deficiencies which could disqualify them other than the New York conviction requirement.  *See* Dkt. No. 12-5 at ¶ 63.

have a "concrete and particularized injury" as to the November Applications. *See Spokeo*, 578 U.S. at 339 (for "an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way'") (quoting *Lujan*, 504 U.S. at 560 n.1, and collecting cases).

Further, plaintiffs lack standing because they are unable to demonstrate that they were "able and ready" to apply for a license in the November Applications window if the allegedly unconstitutional restriction had been removed. *See Finch*, 606 F. Supp. 3d at 825 (noting that in "a long line of cases, the Supreme Court has made clear that to establish such an injury, a plaintiff need only show that he is 'able and ready' to compete for the benefit") (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993), and collecting cases).

Here, at the time of the November Applications, it appears that the Plaintiff LLCs were not yet formed. *See* Dkt. No. 27-4 at 1; Dkt. No. 27-7 at 1 (Plaintiffs' LLC Agreements state that their "Effective Date" is December 6, 2023). Moreover, Plaintiffs did not represent at the Motion Hearing that they had sought to obtain "proof of control over a proposed premises," which was a requirement to be considered in the November Applications. *See* Dkt. No. 26 at ¶ 26. Therefore, Plaintiffs have not established that they were "able and ready" to apply for the November Applications as an "extra priority" applicant if the allegedly unconstitutional New York conviction requirement had been removed. *Compare Carney v. Adams*, 592 U.S. 53, 60 (2020) (finding that the plaintiff lacked standing because he was not "able and ready" to apply to become a judge "in the reasonably foreseeable future if Delaware did not bar him because of his political affiliation"), *with Finch*, 606 F. Supp. 3d at 825 (finding that plaintiffs alleged an injury in fact, in part because they "adequately pleaded that they [were] 'ready and able' to apply for a conditional [cannabis] license, should the court enjoin the enforcement of the allegedly unconstitutional residency

criteria").

Accordingly, the Court finds that Plaintiffs do not have standing to seek the requested relief as to the November Applications.

### 3.  CAURD Application Program

At the Motion Hearing, Plaintiffs confirmed that they did not apply for a CAURD License because the Plaintiff LLCs were not formed until approximately November 2023, and conceded that they do not have the ability to challenge the requirements of the CAURD Application Program under the dormant Commerce Clause.  However, Plaintiffs argue that they have standing to challenge the CAURD Application Program because Defendants violated the Cannabis Law, NY CANBS. § 10(19), by proceeding with the CAURD Applications before the Adult Use Applications.

The Court finds that Plaintiffs have not satisfied their burden of establishing a "concrete and particularized injury" sufficient to challenge the CAURD Application Program.  *See Spokeo*, 578 U.S. at 339.  As Plaintiffs concede, they did not apply for a CAURD license.  Moreover, while the Complaint alleges that Defendants violated NY CANBS. § 10(19), Plaintiffs do not assert any cause of action related to the CAURD Application Program.  *See* Dkt. No. 1 at ¶¶ 48-57 (asserting causes of action for violation of the dormant Commerce Clause as to the Adult Use Application Program).  Accordingly, the Court finds that Plaintiffs do not have standing to seek the requested relief as to the CAURD Application Program.[25]

### C.  Likelihood of Success on the Merits

"To establish a likelihood of success on the merits, a plaintiff must show that he is more

---

[25] While the Court finds that Plaintiffs do not have standing to challenge the CAURD Application Program or the November Applications, the Court will nevertheless consider whether Plaintiffs would likely succeed on the merits as to those programs.

likely than not to prevail on his claims, or, in other words, that the probability of prevailing is better than fifty percent." *Chestnut Hill NY, Inc. v. City of Kingston*, No. 1:23-cv-01024 (BKS/DJS), 2023 WL 6796622, at *15 (N.D.N.Y. Oct. 13, 2023) (internal quotation marks and citation omitted). "However, even if a plaintiff has not demonstrated a likelihood of success on the merits, a preliminary injunction may still be granted if the plaintiff shows 'a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor.'" *Doe v. Vassar Coll.*, No. 19-cv-9601 (NSR), 2019 WL 6222918, at *7 (S.D.N.Y. Nov. 21, 2019) (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). Because the "moving party must not only show that there are 'serious questions' going to the merits[ ] but must additionally establish that 'the balance of hardships tips *decidedly* in its favor,' its overall burden is no lighter than the one it bears under the 'likelihood of success' standard." *Doe v. Siena Coll.*, No. 1:22-cv-1115 (BKS/TWD), 2023 WL 197461, at *13 (N.D.N.Y. Jan. 17, 2023) (quoting *Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010)).

Plaintiffs argue that they are likely to succeed on the merits of their dormant Commerce Clause challenge. Dkt. No. 11 at 10-18; Dkt. No. 31 at 6-11. The Commerce Clause of the U.S. Constitution provides Congress with the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. "Although the [Commerce] Clause is framed as a positive grant of power to Congress, [the Supreme Court] ha[s] long held that this Clause also prohibits state laws that unduly restrict interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. ___, 139 S. Ct. 2449, 2459 (2019) (internal quotation marks and citation omitted) (collecting cases). Courts therefore refer to "[t]his 'negative' aspect of the Commerce Clause" as the "dormant Commerce Clause." *Id.* (quoting *New Energy Co. of Ind. v. Limbach*,

486 U.S. 269, 273 (1988)).

"Because the dormant Commerce Clause is a judicially created doctrine that is implied from the intent of the Commerce Clause rather than found in its text, the Supreme Court has long focused on the purpose of the doctrine to interpret its limits." *Peridot Tree WA Inc*., 2024 WL 69733, at \*7.  The Supreme Court has stated that the "dormant Commerce Clause's fundamental objective [is to] preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors," *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997), and thus to "prevent[ ] the States from adopting protectionist measures and thus preserve[] a national market for goods and services," *Tenn. Wine & Spirits Retailers Ass'n,* 139 S. Ct. at 2459 (citing *New Energy Co.*, 486 U.S. at 273); *see also Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008) (The "dormant Commerce Clause is driven by concern about economic protectionism that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors . . . . The point is to effectuate the Framers' purpose to prevent a State from retreating into [ ] economic isolation . . . .") (internal quotation marks and citations omitted).

Courts have adopted a two-tiered approach to determine whether a state statute violates the dormant Commerce Clause:

> (1) When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [the Court has] generally struck down the statute without further inquiry. (2) When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [the Court has] examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth*., 476 U.S. 573, 578-79 (1986); *see also Variscite NY One,* 640 F. Supp. 3d at 239 (applying this two-tiered approach to determine

plaintiff's likelihood of success in challenging New York's CAURD licensing program).   "A discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."   *Dep't of Revenue of Ky.*, 553 U.S. at 338 (internal citations and quotation marks omitted).

Plaintiffs argue that the New York Adult Use Application Program's requirement that an applicant's majority owner or their relative must have a New York conviction in order to receive "extra priority" violates the dormant Commerce Clause.   Dkt. No. 11 at 10-18; Dkt. No. 31 at 6-11.   Defendants contend, *inter alia*, that the dormant Commerce Clause does not apply to New York's cannabis licensing program because cannabis remains federally illegal and, as a result, "there is no interstate market for legalized cannabis."   Dkt. No. 25 at 19-21.   Defendants further assert that regardless of whether the dormant Commerce Clause applies, the New York conviction requirement does not violate it because applicants are not required to be current or former residents of New York in order to apply as an "extra priority" applicant.   Dkt. No. 25 at 5.

Because as Defendants admit, "many individuals who have marihuana-related offenses under New York law will be current State residents," *see* Dkt. No. 25 at 22,  the Court will first analyze whether the dormant Commerce Clause applies.   There is a split of authority in the federal courts as to whether the dormant Commerce Clause applies to state cannabis licensing requirements.   Several federal district courts have held that a state residency requirement to obtain either a medicinal or recreational cannabis license (or both) violates or likely violates the dormant Commerce Clause.   *See, e.g.*, *NPG, LLC*, 2020 WL 4741913, at *8-12; *Variscite NY One,* 2022 WL 17257900, at *5-9; *Toigo v. Dep't of Health and Senior Servs.*, 549 F. Supp. 3d 985, 990-96 (W.D. Mo. 2021); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 812-16 (E.D. Mich. 2021); *Finch*, 606 F. Supp. 3d at 830-35.  However, these courts performed a dormant Commerce Clause analysis

without directly addressing the threshold question of whether the dormant Commerce Clause applies to a state licensing program for cannabis.

The First Circuit, the only court of appeals to directly address whether the dormant Commerce Clause applies to a state's licensing program for cannabis, affirmed the district court's ruling that Maine's residency requirement for officers and directors of medical cannabis dispensaries violated the dormant Commerce Clause. *Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 543-50, 554 (1st Cir. 2022) (finding, *inter alia*, that "in the wake of the CSA . . . Congress contemplate[d] that an interstate market in medical marijuana may exist that is free from federal criminal enforcement" and the Court could "not conclude that Congress has consented [through its affirmative exercise of its commerce power] to the kind of state protectionism in which Maine has engaged"). Judge Gelpí dissented, arguing that the dormant Commerce Clause does not apply to the federally illegal market for marihuana because it is "constitutionally different in kind" and "it makes little sense to retain the presumption that [the public interest is best served by maintaining an unencumbered national market for competition] when Congress has explicitly acted to make the market in question illegal." *Id.* at 559 (Gelpí, J., dissenting).

On the other hand, two district courts in the Ninth Circuit have held that the dormant Commerce Clause does not apply to cannabis licensing. *See Brinkmeyer*, 2023 WL 1798173; *Peridot Tree WA Inc.*, 2024 WL 69733. In *Brinkmeyer*, the court held that "[t]he dormant Commerce Clause does not apply to federally illegal markets . . . and, thus, it does not apply to Washington's residency requirements." 2023 WL 1798173, at *11. The court noted that Congress's Commerce Clause power includes "the ability to deem certain substances federally illegal," and that despite some states legalizing cannabis, it "remains federally illegal." *Id.* at *10.

The court concluded that citizens do not "have a federal statutory or constitutional property right to cannabis while it remains federally illegal" nor a "legal interest in participating in a federally illegal market," and that "the dormant Commerce Clause [cannot] be read to protect *illegal* interstate commerce." *Id.* at *10-11.

Additionally, the court in *Peridot Tree WA Inc.* agreed with the reasoning in *Brinkmeyer* and Judge Gelpí's dissent in *Northeast Patients Group*, and found that the plaintiff was "unlikely to succeed on the merits because the dormant Commerce Clause does not protect a right to participate in an interstate market that Congress has declared illegal." 2024 WL 69733, at *1, 9 (finding that "it makes little sense why the dormant Commerce Clause would protect an interstate market that Congress affirmatively prohibited, given that protecting this market would facilitate illegal interstate activity. [Plaintiff] cannot use the dormant Commerce Clause to demand a constitutional right to participate in an illegal interstate market.").[26]

The Second Circuit has not yet addressed the question of whether the dormant Commerce Clause applies to state cannabis licensing programs, given the federally illegal cannabis market.[27] This Court is persuaded by the reasoning of the courts in *Brinkmeyer* and *Peridot Tree WA Inc.*,

---

[26] The Court also notes that some courts have declined to take a position on whether the dormant Commerce Clause applies to state cannabis licensing programs. *See, e.g.*, *City of Sacramento*, 2022 WL 10629241, at *11 (declining to reach the merits of the dormant Commerce Clause challenge by invoking general abstention); *Variscite, Inc. v. City of Los Angeles*, No. 2:22-CV-08685 (SPG) (SK), 2022 WL 18397510, at *11 (C.D. Cal. Dec. 8, 2022) (stating that the court would likely abstain from deciding whether the dormant Commerce Clause applies to certain "municipal code provisions enacted by the City of Los Angeles . . . that govern the award of storefront retail cannabis business licenses" or stay the proceedings pending a decision from the Ninth Circuit); *Original Invs., LLC v. State of Okla.*, 542 F. Supp. 3d 1230, 1235 (W.D. Okla. 2021) (dismissing case, in the context of a challenge to the residency requirement in Oklahoma's Medical Marijuana and Patient Protection Act, because to hold otherwise would facilitate plaintiff's participation in federally criminal activities).

[27] The Second Circuit's March 28, 2023 Order in *Variscite NY One, Inc.*, did not address whether the dormant Commerce Clause applied to cannabis licensing. *See* Dkt. No. 12-1.

and Judge Gelpí's dissent in *Northeast Patients Group*, and therefore finds that Plaintiffs are unlikely to succeed on the merits of their dormant Commerce Clause challenge.[28]   Congress exercised its Commerce Clause power to pass the CSA and thereby prohibited a national market for cannabis.  Given that the national market for cannabis is illegal, it would make little sense to apply the dormant Commerce Clause to New York's cannabis licensing scheme.  Doing so would only encourage out-of-state participation in the New York cannabis market, which would be contrary to Congress's exercise of Commerce Clause power in enacting the CSA.[29]   *See Ne. Patients Grp.*, 45 F.4th at 558-60 (Gelpí, J., dissenting); *Brinkmeyer*, 2023 WL 1798173, at *10-12; *Peridot Tree WA Inc.*, 2024 WL 69733, at *8-9.

The Court also agrees with the court in *Peridot Tree WA Inc.*, that at most, the split decisions among the courts that have considered the issue "show 'serious questions'" on the merits. 2024 WL 69733, at *9-10 (finding that plaintiff is "unlikely to prevail on the merits of its dormant Commerce Clause claim" but due to "conflicting decisions outside" the Ninth Circuit, plaintiff had "at best" raised serious questions on the merits of its constitutional claim).  However, as discussed below, because the balance of hardships tips towards Defendants, Plaintiffs also do not satisfy the

---

[28] The Court also notes that in *Northeast Patients Group* only state medical cannabis licensing was at issue, and not state recreational cannabis licensing.  *See Peridot Tree WA Inc.*, 2024 WL 69733, at *8 (stating that "*Northeast Patients Group* dealt solely with medical cannabis, and the court based its holding in part on the impact of Congress's action through the Rohrabacher-Farr Amendment, which prohibits the Department of Justice from using its appropriated funds to prevent states from implementing laws legalizing medical cannabis").

[29] At the hearing, Plaintiffs argued that the Court should follow the reasoning of the First Circuit, which found that the dormant Commerce Clause does not apply to Maine's residency requirement because Congress has not made an "unmistakably clear statement" to adopt protectionist legislation in the medical marijuana market.  *See Ne. Patients Grp.*, 45 F.4th at 551, 554 (finding that "Congress must be unmistakably clear . . . about its intent and policy to sustain state legislation from attack under the Commerce Clause" and "[n]othing on the face of the CSA purports to bless interstate discrimination in the market for medical marijuana.").  This Court finds the reasoning in Judge Gelpí's dissent more persuasive, particularly as applied to the instant recreational cannabis licensing program.  *See id.* at 559 (Gelpí, J., dissenting).

"sufficiently serious questions" standard.  *See Citigroup Glob. Markets, Inc.*, 598 F.3d at 35

(noting that "the moving party must not only show that there are 'serious questions' going to the

merits, but must *additionally establish* that 'the balance of hardships tips *decidedly*' in its favor . .

. .") (citation omitted and emphasis added).[30]

### D.  Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance

of a preliminary injunction."  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d

Cir. 2009) (internal quotation marks and citation omitted).  "Irreparable harm is that injury which

is so serious that a monetary award cannot adequately compensate the injured party."  *325

Bleecker, Inc. v. Local Union No. 747*, 500 F. Supp. 2d 110, 123-24 (N.D.N.Y. 2007) (citing

*Citibank N.A. v. Citytrust*, 756 F.2d 273, 275 (2d Cir. 1985)).  Additionally, such harm cannot be

merely remote or speculative.  *Faiveley Transp.*, 559 F.3d at 118.  The movant bears the burden

of proof and persuasion to show that it is entitled to a preliminary injunction because irreparable

harm is likely.  *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 34 (2d Cir. 2015).

Plaintiffs argue that they will face irreparable harm if the Court does not enjoin Defendants

from issuing licenses under the Adult Use and CAURD Application Programs.  Dkt. No. 11 at 16-

---

[30] Plaintiffs also argue that because the Adult Use Application Program burdens "out-of-state
business interests on its face, in effect, and by its purpose" it "falls within the first tier [of the]
dormant Commerce Clause test and is invalid *per se*," and that New York's conviction requirement
is not narrowly tailored to advance a legitimate local purpose, which Defendants could achieve
through other non-discriminatory means.  *See* Dkt. No. 11 at 14-16; Dkt. No. 31 at 9-10.  However,
because these arguments "all rest on the assumption that the traditional dormant Commerce Clause
analysis applies to the cannabis [retail and medical licenses] market despite that market remaining
illegal under federal law," *see Peridot Tree WA Inc.*, 2024 WL 69733, at *8, the Court will not
address them.  *See Brinkmeyer*, 2023 WL 1798173, at *13 (finding that because the "dormant
Commerce Clause does not apply" to cannabis licenses, the court "need not review [defendant's]
justifications for the residency requirements").

18.[31]  However, a "mere assertion of a constitutional injury is insufficient to automatically trigger

a finding of irreparable harm," without a showing by plaintiff that there is a likelihood of success

on the merits of its constitutional claim.  *Conn. State Police Union v. Rovella*, 494 F. Supp. 3d

210, 220 (D. Conn. 2020) (internal quotation marks and citation omitted), *aff'd*, 36 F.4th 54 (2d

Cir. 2022).  Because the Court finds that Plaintiffs are unlikely to succeed on the merits of their

dormant Commerce Clause claim, *see supra* § IV.C, Plaintiffs have not demonstrated irreparable

harm on this basis.  *See Peridot Tree WA Inc.*, 2024 WL 69733, at *10 (finding that because

plaintiff was "unlikely to prevail on the merits of its dormant Commerce Clause claim, or at best

has raised serious questions based on conflicting decisions outside [the Ninth Circuit] . . . there

[was] a possibility, but not a likelihood, of irreparable harm from the alleged constitutional

violation.").[32]

Plaintiffs also argue that they will suffer irreparable harm if they do not receive "extra

priority" status and thus the benefits of early entrants in the New York storefront retail cannabis

market, including access to customers, due to delay in entering the market.  Dkt No. 11 at 17.  The

Court disagrees.  While Plaintiffs may suffer some harm from not being considered as an "extra

priority" applicant, that harm is not "irreparable."  Defendants explain that even if Plaintiffs qualify

for "extra priority" in the December Applications, based on Plaintiffs' positions in the review

queue it is unclear that Plaintiffs' Applications will be reviewed by the Office.  Dkt. No. 25 at 27-

---

[31] Plaintiffs assert that "[i]f the Court does not grant injunctive relief, Plaintiffs cannot obtain money damages at the end of the case because the Eleventh Amendment prohibits monetary awards against a state or officials acting in their official capacity."  Dkt. No. 11 at 5.

[32] Even if the split of authority as to Plaintiffs' dormant Commerce Clause claim raises a "serious question" on the merits of their constitutional claim, Plaintiffs have not shown an "irreparable harm beyond the risk of a possible-but-unlikely constitutional violation."  *See Peridot Tree WA Inc.*, 2024 WL 69733, at *10.  Therefore, at most Plaintiffs could establish a "possibility, but not a likelihood, of irreparable harm."  *Id.*

28; Dkt. No. 34-1 at ¶ 9; *see also City of Los Angeles*, 2022 WL 18397510, at *12 (finding that plaintiffs did not establish "irreparable harm" in part because plaintiffs' argument "that they will suffer irreparable harm [is] based on their speculation that they would be able to successfully enter the commercial retail cannabis market, establish a loyal customer base, and make a profit" while "their chances of obtaining a license . . . [were] not guaranteed").  Additionally, Defendants represented at the Motion Hearing that approximately 70 CAURD licenses had been approved with authority to operate, which further lessens Plaintiffs' harm from a delay in entering the New York Adult Use market.  *See* Dkt. No. 25 at 30 (stating that Plaintiffs' argument of losing an advantage from "not being an early entrant" ignores that dozens of retail dispensaries are already operating).

Courts have also found that a plaintiff's harm was not "irreparable" when the plaintiff had other opportunities to obtain a retail cannabis license.  *See, e.g.*, *Peridot Tree WA Inc.*, 2024 WL 69733, at *10 (finding that plaintiff did not show "irreparable harm" when defendants asserted there will be future application rounds for cannabis retail licenses); *City of Los Angeles*, 2022 WL 18397510, at *12 (finding that plaintiffs had another opportunity to apply as a social equity applicant, and that after January 1, 2025, "all commercial cannabis application types will be available to all applicants," which "eviscerate[d] the likelihood of *irreparable* harm").  Here, if Plaintiffs' Applications are reviewed by the Board, the Applications will be returned to the normal pool "for another opportunity to be reviewed under [a] different set of criteria applicable for the other prioritized groups or as a non-prioritized applicant," and therefore Plaintiffs could still receive a license as "part of another prioritized group, or non-prioritized group."  Dkt. No. 25 at 17, 30; *see also* Dkt. No. 26 at ¶ 29.

Finally, Plaintiffs delayed bringing this action for more than one year after the publication

27

of the New York marihuana-related conviction requirement,[33] and more than four months since Defendants announced the Adult Use Application Program and published guidance which explained the New York marihuana-related conviction requirement, and instead brought this action "mere days before the Office [was] scheduled to begin reviewing applications and issuing licenses." *See* Dkt. No. 25 at 28; *see also* Dkt. No. 29 at ¶¶ 24-36; Dkt. No. 32-4.

Plaintiffs contend that they did not delay, and instead brought this action "with remarkable speed" after Defendants' Adult Use Application Program was approved and announced on September 12, 2023. Dkt. No. 31 at 11. Even though Plaintiffs offer some justification for their delay, a "delay in bringing the action implies a lack of urgency, and thus, a lack of irreparable harm." *Peridot Tree WA Inc.*, 2024 WL 69733, at *10; *see also Citibank, N.A.*, 756 F.2d at 276 (a delay in seeking a preliminary injunction "tends to indicate at least a reduced need" for a preliminary injunction).

Accordingly, Plaintiffs have failed to establish a likelihood of irreparable harm.

**E. The Balance of Equities and the Public Interest**[34]

The Court must determine in its final inquiry whether the "balance of equities tips in favor of granting the injunction and whether that injunction is in the public interest." *Dep't of Homeland Sec.*, 969 F.3d at 86; *see also Nken v. Holder,* 556 U.S. 418, 435 (2009) (considering the final two preliminary injunction factors together when the government is a party). "In exercising their sound

---

[33] In November 2022, the OCM "released for public comment its draft of the proposed adult-use regulations," which included the New York marihuana-related conviction requirement, and in September 2023, the Revised Regulations were adopted as Final Regulations which still included the New York marihuana-related conviction requirement. Dkt. No. 29 at ¶¶ 25, 27.

[34] Because the Court finds that Plaintiffs are unlikely to succeed on the merits, the Court "need not decide whether the balance of equities tips in [Plaintiffs'] favor and whether an injunction would be in the public interest." *Conn. State Police Union*, 494 F. Supp. 3d at 230. Nonetheless, in consideration of the split of authority as to whether the dormant Commerce Clause applies to cannabis licensing, the Court will address the balance of equities and the public interest.

discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).

Plaintiffs argue that a preliminary injunction will not harm Defendants because they have not begun issuing Adult Use Licenses, and that Defendants, as part of the *Fiore* Settlement, have agreed not to issue new or additional provisional CAURD licenses until April 1, 2024. *See* Dkt. No. 11 at 18. Plaintiffs further argue that both the CAURD and the December Applications did not require any "properties for their business premises," so the only cost to those applicants thus far is the $1,000 application fee. *Id*. Plaintiffs also contend that applicants were aware from prior litigation that the CAURD and Adult Use Application Programs were "subject to challenge." *Id*. Finally, Plaintiffs argue that an injunction is in the public interest because the public is best served by not enforcing an unconstitutional regulation and by protecting "interstate participation in a cannabis market." *Id*. at 19.

The Court disagrees. Courts have found that the balance of equities tips in favor of a defendant when a plaintiff seeks an injunction after applicants and third parties have invested significant resources in a cannabis business. *See, e.g.*, *Finch*, 82 F.4th at 579 (affirming the district court's finding that the balance of equities tipped in defendants' favor in part because the harm of enjoining issuing licenses and "restarting the process—through a corrective lottery or otherwise" was "vastly outweighed by the severe harm to the reliance interests of the license holders"); *Peridot Tree WA Inc.*, 2024 WL 69733, at *11 (finding that plaintiff's "requested injunction would harm successful Social Equity Program applicants who have secured storefronts, purchased equipment, or incurred other costs"); *City of Los Angeles*, 2022 WL 18397510, at *12 (finding that the balance of equities tipped "sharply" in favor of defendants when plaintiff sought to enjoin a lottery because it would harm the 508 registered social equity applicants that "invested significant

29

resources into getting their cannabis businesses running as soon as possible").

Here, the balance of equities tips in Defendants' favor.  Defendants have laid out the significant harm Plaintiffs' requested injunction would cause to New York's adult use cannabis industry.  Specifically, an injunction as to the CAURD Application Program would harm the approximately 400 CAURD applicants with provisionally approved licenses who have invested substantial capital into their businesses, including leasing property, and would harm their employees. Dkt. No. 25 at 31; Dkt. No. 28 at ¶¶ 6-11.  Additionally, an injunction as to the Adult Use Application Program would harm the approximately 7,000 applicants who applied to the program, including the SEE applicants who encompass approximately 55 percent of the applicants. Dkt. No. 25 at 32-33.  Moreover, the requested injunction would harm cannabis growers and producers who have incurred significant expense operating under the expectation that several hundred CAURD and Adult Use Licenses would be issued without delay.  *Id.* at 31-32.  Defendants further assert that the requested injunction would harm New York's property owners and landlords, with "over 1,000 retail storefronts expected to be licensed in 2024."  *Id.* at 33.[35]

As to the public interest, "the general public would not benefit from an injunction because the primary purpose of the dormant Commerce Clause does not apply to [the] federally illegal cannabis market[]."  *City of Los Angeles*, 2022 WL 18397510, at *12; *see also Ne. Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting).[36]

---

[35] The Court also notes that Plaintiffs' requested relief would prevent Defendants from issuing Adult Use Licenses or additional licenses under the CAURD Application Program state-wide.  *Cf. Variscite NY One*, 640 F. Supp. 3d at 244 (noting that "all of defendants' arguments are undercut, to some degree, by the fact that Variscite only seeks to enjoin the application process in five of the thirteen geographical regions . . . and defendants could proceed with the licensing process in the other eight regions"); Dkt. No. 12-1 (modifying the *Variscite NY One* injunction to a single region).

[36] Also, as Defendants contend, the requested injunction would "enable the continued existence of illicit store operators and delay the rollout of a safe, regulated legal market for cannabis products," as well as "deprive the State and localities of anticipated tax revenue, which [is] intended to be

Accordingly, the Court finds that enjoining Defendants from issuing licenses under the Adult Use or CAURD Application Programs would not serve the public interest, and that the balance of equities tips in favor of Defendants.

## V.   CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Dkt. No. 10, is **DENIED**; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: <u>February 2, 2024</u>
      Albany, New York

Anne M. Nardacci
U.S. District Judge

---

used for expenditures related to education, public health initiatives, and enforcement of unlicensed activities."  Dkt. No. 25 at 33.