UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VARISCITE NY FOUR, LLC AND VARISCITE NY FIVE, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>NEW YORK STATE CANNABIS CONTROL BOARD; NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT; TREMAINE WRIGHT; AND CHRIS ALEXANDER,<br><br>*Defendants.* | Civil Action No.: 1:23-cv-01599 (AMN/CFH) |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS**

Jeffrey M. Jensen, Esq.
*Pro Hac Vice*
New York Reg. No.: 5375704
*Attorney for Plaintiffs – Lead Counsel*
9903 Santa Monica Blvd. #890
Beverly Hills, CA 90212
(310) 909-7043
Email: jeff@jensen2.com

1

## **TABLE OF CONTENTS**

| | | |
|---|---|---|
| I. | INTRODUCTION | 3 |
| II. | FACTUAL BACKGROUND | 3 |
| III. | ANALYSIS | 3 |
| | A. Standing – the Second Batch of Licenses | 3 |
| | B. Standing – the First Batch of Licenses | 3 |
| | C. Standing – CAURD | 4 |
| | D. The Dormant Commerce Clause Applies to Cannabis | 4 |
| IV. | CONCLUSION | 17 |

## I. INTRODUCTION

Defendants move to dismiss Plaintiffs' Complaint for two reasons. First, Defendants argue that Plaintiffs lack standing to challenge the Adult Use Retail Dispensary Application Program ("Application Program"). Second Defendants argue the dormant Commerce Clause does not apply to cannabis because of the Controlled Substances Act.

## II. FACTUAL BACKGROUND

The Court is familiar with the facts from the briefing on the Motion for Preliminary Injunction.

## III. ANALYSIS

### A. Standing – the Second Batch of Licenses

The Court found that Plaintiffs have standing to challenge the second batch of Licenses Defendants intend to issue under the Application Program. (Order [Dkt. #36] at 14-16.) Defendants will issue those Licenses to applicants who applied between October 4 and December 18, 2023 and did not have a business location identified at that time. (*Id.*)

### B. Standing – the First Batch of Licenses

The Court found that Plaintiffs do not have standing to challenge the first batch of Licenses Defendants intend to issue. (Order at 16-18.) Defendants will issue those Licenses to applicants that applied between October 4 and November 17, 2023 and had a business location identified at that time. (*Id.*)

Plaintiffs have standing to challenge both batches of Licenses because Defendants held only one Application Program, which opened on October 4, 2023 and closed on December 18, 2023. (Compl. ¶ 23.)

Defendants state in declarations, which the Court cannot consider on a motion to dismiss, that Defendants consider only applications submitted on or before November 17 with properties for the first batch of Licenses, and will consider the remaining applications for the second batch of Licenses.

However, all applicants applied in the same Application Program using the same online system. The difference was only whether the applicant selected the response that indicated the applicant leased or owned a business location and submitted the application by November 17.

Thus, the first and second batches of Licenses Defendants will issue from the Application Program both suffer from the same constitutional defect by favoring New York residents over out-of-state business interests.

Plaintiffs acknowledge that both Plaintiffs were formed on November 30, 2023 and the majority owners first became aware of the Application Program in December 2023. (Affirmation Jensen ¶¶ 12-13, Decl. Palmore ¶ 3, Decl. Kinsey ¶ 3.) However, a plaintiff need not have applied in an application program to have standing to challenge it, even years after the application program closed. *See Finch v. Treto*, 606 F. Supp. 3d 811, 826 (N.D. Ill. 2022), *aff'd in part, dismissed in part*, 82 F.4th 572 (7th Cir. 2023).

C. **Standing – CAURD**

Plaintiffs did not challenge the CAURD Application Program. Rather, Plaintiffs asked the Court to enjoin Defendants from issuing licenses under the CAURD Application Program until this litigation is resolved. Plaintiffs do not challenge Defendants' ability to issue licenses under the CAURD program after this litigation is resolved.

Under section 10(19) of the Cannabis Law, "the initial adult-use cannabis retail dispensary license application period shall be opened for ***all applicants at the same time***." NY CANBS § 10(19) (emphasis added).

Notwithstanding that the Cannabis Law requires Defendants to open applications for all applicants at the same time, Defendants accepted applications only from Conditional Adult Use Retail Dispensary ("CAURD") applicants from August 25, 2022, through September 26, 2022. *See, Variscite NY One, Inc.*, 640 F. Supp. 3d 232 .

Because the Cannabis Law does not permit Defendants to open the CAURD Application Program before the Adult Use Application Program, Plaintiff asks the Court to issue an injunction to prevent Defendants from issuing any Licenses under the CAURD program as of the date Plaintiffs filed the Complaint.

D. **The Dormant Commerce Clause Applies to Cannabis**

Defendants ask this Court to dismiss the action based on their argument that the dormant

4

Commerce Clause does not apply to Cannabis. In the Order denying a preliminary injunction, the Court concluded that Plaintiffs did not show a likelihood of success on the merits because the court concluded the dormant Commerce Clause does not apply to cannabis licenses because the Controlled Substances Act makes cannabis federally illegal. The Court concluded that the dormant Commerce Clause's purpose is to preserve a national market for competition undisturbed by preferential advantages conferred by a state upon its residents, and the dormant Commerce Clause does not have an interest in promoting a competitive market in illegal goods.

The Order conflicts with the only circuit court to address the issue, the First Circuit, and the majority of district court decisions from around the country. It also conflicts with the implications of decisions from the Seventh Circuit and Second Circuit.

*First Circuit*. The First Circuit held that the dormant Commerce Clause applies to cannabis licenses in *Northeast Patients Group. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542 (1st Cir. 2022). There, a Maine law required all officers or directors of a medical marijuana dispensary (directors and officers were defined to include owners) to be residents of Maine. *Id*. at 544. The district court granted a permanent injunction against the law. *Id*. at 545.

The state appealed, arguing that the dormant Commerce Clause does not apply to cannabis licenses because participating in the cannabis market is federally illegal under the Controlled Substances Act. *Id*. at 546. The state brought three variations of this argument.

*First*, Maine argued there cannot be an interstate market in a good that is federally illegal. *Id*. at 547. The First Circuit noted it is clear an interstate market for cannabis exists, and the Supreme Court even made a finding to that effect in *Gonzales v. Raich*, 545 U.S. 1, 22 (2005). In fact, Maine's prohibition on out-of-state persons owning Maine cannabis businesses "reflects the reality that the [interstate cannabis] market continues to operate." *Ne. Patients Grp.*, 45 F.4th 547.

Moreover, Maine actively encouraged out-of-state persons to participate in the interstate medical cannabis market as customers, because Maine allowed medical cannabis patients from other states to purchase cannabis while in Maine if those patients had prescriptions from the other states. (The same is true in New York for the adult use Licenses at issue: New York does not prohibit out of

state residents from purchasing cannabis while in New York.)

**Second**, Maine argued the dormant Commerce Clause does not apply to cannabis because Congress exercised its affirmative Commerce Clause power to regulate cannabis via the Controlled Substances Act. *Id*. at 548. That question is not whether the Controlled Substances Act preempts a state residency requirement for cannabis, but rather whether a state residency requirement violates the dormant Commerce Clause by burdening interstate commerce. *Id*.

"This distinction [between federal preemption and the dormant Commerce Clause] matters because preemption by a federal statute and prohibition by the dormant Commerce Clause are distinct rather than coterminous means by which federal law may limit state lawmaking that substantially burdens interstate commerce. Thus, the negative implication of the commerce power may pose an independent bar to a state regulation of an interstate commercial market even when Congress chooses to exercise its affirmative commerce power with respect to that same market without also preempting that state regulation." *Id*. The First Circuit then reviewed Supreme Court and First Circuit precedents to support their conclusion that a state law can violate the dormant Commerce Clause even if the federal government has acted in an area but the federal statute does not preempt the state law. *Id*. at 548-49.

In light of that, the First Circuit rejected the state's argument that the dormant Commerce Clause is a nullity with respect to medical marijuana because Congress affirmatively exercised its Commerce Clause power to regulate under the Controlled Substances Act. *Id*. at 548. The First Circuit stated, "we are not persuaded." *Id*.

As additional support, the First Circuit noted that Congress enacted the Rohrabacher-Farr Amendment after Congress passed the Controlled Substances Act. *Id*. at 549. That Amendment prohibits the Department of Justice from using any funds to prevent states from implementing laws for medical marijuana. "This congressional action in the wake of the CSA reflects that Congress contemplates both that an interstate market in medical marijuana may exist that is free from federal criminal enforcement and that, if so, this interstate market may be subject to state regulation." *Id*. at 549.

6

Congress's questioning and approval of Merrick Garland as Attorney General shows that Congress contemplates an interstate market in adult use cannabis free from federal criminal enforcement. During that confirmation process, the Attorney General assured Congress that the Department of Justice would not prosecute people who comply with state cannabis programs:

46. The Justice Department, as part of the federal government, must enforce federal laws. An area where this has led to confusion is the enforcement of federal law in states where marijuana has been legalized. As you are aware, marijuana is a Schedule I drug under the Controlled Substances Act.

a. Under your leadership, how will you navigate the Justice Department's enforcement of federal law in states where marijuana has been legalized?

RESPONSE: As I suggested at my hearing, I do not think it the best use of the Department's limited resources to pursue prosecutions of those who are complying with the laws in states that have legalized and are effectively regulating marijuana. I do think we need to be sure, for example, that there are no end runs around the state laws by criminal enterprises, and that access is prohibited to minors.

b. What do you see the role of the Justice Department to be in the changing landscape of marijuana legalization, decriminalization, and recreational use?

RESPONSE: The Department of Justice has not historically devoted resources to prosecuting individuals for simple possession of marijuana. As I suggested at my hearing, I do not think it the best use of the Department's limited resources to pursue prosecutions of those who are complying with the laws in states that have legalized and are effectively regulating marijuana. I do think we need to be sure, for example, that

there are no end runs around the state laws by criminal enterprises, and that access is prohibited to minors.

Responses to Questions for the Record to Judge Merrick Garland, Nominee to be United States Attorney General, Question 46.[1]

***Third***, Maine argued that Congress consented to state attempts to burden the interstate market in cannabis by enacting the Controlled Substances Act. *Id*. at 550. The First Circuit concluded that while Congress has the power to consent to state burdens on interstate commerce, Congress did not do so through the Controlled Substances Act. *Id*. at 551.

The First Circuit noted that "[o]rdinarily, **Congress must 'expressly state' an intent** to obviate the dormant Commerce Clause's limitation on protectionist state regulation." *Id*. (emphasis added) (citing *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 960 (1982); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343 (1982); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 427 (1946). The usual requirement that Congress must be "unmistakably clear" about its "intent and policy to sustain state legislation from attack under the Commerce Clause" "is mandated by the policies underlying dormant Commerce Clause doctrine." *Id*. (cleaned up) (citing *S.-Cent. Timber*, 467 U.S. at 91-92 (1996); *Sporhase v. Nebraska, ex rel. Douglas*, 458 U.S. 941, 960 (1982); *New England Power Co. v. New Hampshire*, 455 U.S. 331, 343 (1982)). The Controlled Substances Act, however, does not condone state discrimination against out-of-state business interests in cannabis. *Ne. Patients Grp.*, 45 F.4th at 554.

The dissent in the First Circuit would conclude the dormant Commerce Clause does not apply to cannabis licenses. The dissent concluded the dormant Commerce Clause's purpose is to preserve a

---

[1] A*vailable at* https://www.judiciary.senate.gov/imo/media/doc/QFR%20Responses%202-281.pdf

national market for competition undisturbed by preferential advantages conferred by a state upon its residents.  Id. at 558.  Because cannabis is federally illegal, the dissent reasoned, the dormant Commerce Clause does not protect a national market for cannabis.

***The majority in the First Circuit correctly concluded that the dissent's interpretation would require a reversal of the standard presumption that state protectionism is not permitted absent congressional approval.***  "[W]e would have to do more than abandon the ordinary rule that Congress does not mean to consent to such measures unless it does so in unmistakably clear terms.  We would have to adopt the presumption that Congress does mean to consent to such measures whenever it makes participation in an interstate market a crime."  Id. at 554.

The majority also pointed out that a protectionist cannabis licensing program does nothing to advance the goal of the Controlled Substances Act.  Rather than prevent any cannabis from being sold, residency requirements just ensure the profits from cannabis sales are retained by state residents:

> [I]t can hardly be said that a state effort to protect a market in medical marijuana from out-of-state competition necessarily advances Congress's evident goal in the CSA of preventing entry into that market. Such protectionism does, of course, stop out-of-staters from entering the market. But, it does so only by simultaneously insulating in-state actors who do choose to enter that market from competition. It thus threatens, in the way that protectionist measures necessarily do, to encourage precisely what the CSA seeks to stop—trade by in-staters in the relevant market. ***Indeed, if that were not Maine's aim in imposing the residency requirement, then why would Maine not have simply prohibited dispensaries altogether, rather than protected those run by Mainers from outside competition? For these reasons, we conclude that, while Maine's residency requirement does limit some actors from trading in medical***

9

> *marijuana, it does so in a way that, due to its protectionist nature, in no sense "aid[s]" the policy expressed by Congress in the CSA*.

*Id*. at 554-55.  Thus, the protectionist statutes do nothing to aid the federal government, and instead protect state monopolies.

*Purpose of the dormant Commerce Clause*. Additionally, though not addressed by the First Circuit, the purpose of the dormant Commerce Clause is not solely to preserve competition in the national markets.  Rather, the primary purpose of the dormant Commerce Clause is to prevent trade wars between the states.  *See Baldwin v. G.A.F. Seelig, Inc*., 294 U.S. 511, 522 (1935) ("We are reminded in the opinion below that a chief occasion of the commerce clauses was 'the mutual jealousies and aggressions of the States, taking form in customs barriers and other economic retaliation.'").

In fact, the Commerce Clause (and the dormant aspect thereto) was a principal reason the Framers called for the Constitutional Convention.

> The few simple words of the Commerce Clause—"The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . "—reflected a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.

*Hughes v. Oklahoma*, 441 U.S. 322, 325 (1979).

As to cannabis, state trade wars are already sprouting.  For example, Washington and California have passed legislation allowing the governors to enter into interstate trade agreements on

a state-by-state basis. *See* Rev. Code WA § 43.06.495; Cal. Bus. & Prof. Code § 26301. (No such agreements have been entered to date, to the best of Plaintiffs' knowledge.)

***Medical cannabis***. In the Order, the Court distinguished the First Circuit case because it involved only medical cannabis. ***But the First Circuit case related only to medical cannabis because Maine's attorney general concluded that any litigation attempting to defend Maine's residency requirement for adult use cannabis licenses would be futile, and Maine chose to voluntarily abandon the law***.

Maine had a residency requirement for adult use cannabis licenses. *NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *2 (D. Me. Aug. 14, 2020). When faced with a dormant Commerce Clause lawsuit, the State of Maine abandoned the law rather than fight a losing battle on the advice of its attorney general. *Id*. The Maine Office of Marijuana Policy published the statement:

> At its core, the lawsuit alleged that the residency requirement found in the [Marijuana Legalization Act] is a violation of the dormant Commerce Clause of the United States Constitution by explicitly and purposefully favoring Maine residents over nonresidents. [¶] On Monday, the [Office of the Attorney General] and counsel for [the plaintiffs] filed a joint stipulation of dismissal in federal court acknowledging that the State of Maine was unlikely to prevail in a legal challenge to the adult use residency requirement and stating that the relevant sections of state law and administrative regulation would no longer be enforced.

State of Maine, *State of Maine Will Not Enforce Marijuana Residency Requirement.*[2]

**Seventh Circuit**. The Seventh Circuit ruled on an appeal of the denial of a preliminary injunction, thereby indicating that the dormant Commerce Clause applies to cannabis. *Finch v. Treto*, 82 F.4th 572, 575 (7th Cir. 2023). The court affirmed a denial of a preliminary injunction on complicated facts far removed from this case, including that the plaintiffs never even applied in the Illinois license application program (one of the two plaintiffs would not even state whether he was aware of the application program before it ended) and they brought their suit nearly two years after the state selected the applicants for licensing.

In *Finch*, Illinois took applications for cannabis licenses until January 2020. In September 2020, the state announced that there were more applications with perfect scores than there were available licenses, so the state would hold lotteries to select among the perfect-scoring applicants. *Id*. The state held the lotteries in July and August 2020 and announced the winners in September 2020. *Id*. at *5.

The plaintiffs filed the lawsuit in March 2022. *Id*. at *6. Notably, Illinois would not have rejected the plaintiffs' applications if the plaintiffs had applied. Rather than barring out-of-state applicants, Illinois accepted applications from anyone, and just gave additional points to local residents. *Id*. at *3. Thus, nothing prevented the plaintiffs from submitting timely applications.

The court concluded the plaintiffs had standing to challenge the program notwithstanding that they had never even applied for licenses and brought their lawsuit two years after applicants were

---

[2] Available at https://www.maine.gov/dafs/omp/news-events/news/aump-lawsuit-residency-requirement.

chosen. *Id*. at *9. The court, however, denied a preliminary injunction based on the unique facts of the case.

The Seventh Circuit affirmed the denial of the preliminary injunction based on a combination of factors. The plaintiffs waited to bring the lawsuit until more than two years after the license application program closed and the winners had been chosen and tie-breaking lotteries were held; state court judges had ruled in multiple state-court cases brought by participants in the licensing program and lotteries, and a the preliminary injunction would have upended those state court decisions; and because the plaintiffs had not applied for licenses, the court could not even determine for which geographic area of the state the plaintiff should be considered. *Id*. at 17-20. The court concluded that "although no single argument by the [defendants] is conclusive on its own, together the arguments show why equitable relief (here, an injunction) is unwarranted." *Id*. at *8.

Here, by contrast, Plaintiffs were not formed until approximately three weeks before they brought the litigation. The majority owners, whose ownership created standing in the Plaintiffs were not owners until approximately two weeks before Plaintiffs brought the litigation.

Moreover, Defendants did not announce the Application Program or the Regulations that underly it until approximately three months before Plaintiffs brought suit. (Affirmation Jensen ¶¶ 4-6.) Prior to Defendants releasing the Regulations, Plaintiffs would have had no reason to suspect Defendants would bring an unconstitutional program, even if Plaintiffs had existed at the time. Plaintiffs' minority owner is an owner of a company that settled a previous lawsuit over Defendants' violation of the dormant Commerce Clause, and thus expected Defendants to set forth constitutional programs in the future.

In the Order, the Court incorrectly stated that Plaintiffs delayed too long because more than a year had passed since Defendants adopted the New York cannabis conviction requirement. That is

13

incorrect because, as the Court noted, the Regulations did not become final until September 12, 2023, approximately three months before Plaintiffs filed the lawsuit. (Order n.33.) Plaintiffs, even if they had existed before Defendants adopted the final Regulations, had no standing to challenge them because draft Regulations are not ripe. *See Finch*, 82 F.4th at 579 ("The judge also declined to enjoin the continuation of the 2022 licensing process. She held that the plaintiffs' challenge was unripe because the Department's proposed administrative rule governing the 2022 licenses was not yet final and, in the end, might not contain residency criteria. . . . That too was a sound judgment. Indeed, the Department has since withdrawn the residency criteria.")

**Second Circuit**. The Northern District of New York issued a preliminary injunction against the State of New York's application program. *Variscite NY One, Inc. v. New York*, 640 F. Supp. 3d 232 (N.D.N.Y. 2022), reconsideration denied, No. 122CV1013GLSDJS, 2023 WL 1420662 (N.D.N.Y. Jan. 31, 2023). The state appealed to the Second Circuit. While the appeal was pending, the state moved in the Second Circuit for a stay of the preliminary injunction or in the alternative a narrowing of the preliminary injunction. The Second Circuit denied the state's request for a stay and instead left the preliminary injunction in place, and merely narrowed the preliminary injunction to cover only the geographic area of New York were the plaintiff could be eligible for a license. Thus, the available authority from the Second Circuit, while not determinative, indicates the Second Circuit would hold that the dormant Commerce Clause applies to cannabis.

**District courts**.   District courts have held that the dormant Commerce Clause applies to cannabis licensing programs. *See Toigo v. Dep't of Health & Senior Servs.*, 549 F. Supp. 3d 985, 992 (W.D. Mo. 2021) ("Although the State has a legitimate interest in enforcing laws concerning controlled substances (including those laws that prevent medical marijuana from being used recreationally or outside its borders), Supreme Court precedent makes clear that categorical durational

14

residency requirements are not narrowly tailored to advance that interest."); *NPG, LLC v. City of Portland, Maine*, No. 2:20-CV-00208-NT, 2020 WL 4741913, at *6 (D. Me. Aug. 14, 2020) ("The City portrays the Controlled Substances Act as a form of congressional consent.  But the Act nowhere says that states may enact laws that give preference to in-state economic interests.  In other words, although the Controlled Substances Act criminalizes marijuana, it does not affirmatively grant states the power to 'burden interstate commerce 'in a manner which would otherwise not be permissible.'") (internal citations omitted); *Lowe v. City of Detroit*, 544 F. Supp. 3d 804, 815 (E.D. Mich. 2021).

***Minority jurisdiction***. As noted in the Order, the Western District of Washington held in a previous case that the dormant Commerce Clause does not apply to cannabis licenses.  *See Brinkmeyer v. Washington State Liquor & Cannabis Bd.*, No. C20-5661 BHS, 2023 WL 1798173 (W.D. Wash. Feb. 7, 2023).  There, the judge incorrectly concluded that "Although Washington's 'legalization' of cannabis certainly does not align with Congress's intent, the residency requirements do.  The residency requirements attempt to prevent any interstate commerce in cannabis and to prevent cannabis from Washington from moving into states where it remains illegal, like Idaho." *Id*. at *12.

The *Brinkmeyer* judge's reasoning has no application to this case because Plaintiffs do not challenge any prohibition on cannabis crossing state lines. Plaintiffs challenge only the residency preferences for "extra priority."  The challenged statute and regulations have nothing to do with cannabis products crossing state lines.[3]

---

[3] The Order cites *Brinkmeyer* for the proposition that a person does not have a federal property right to cannabis while it remains federally illegal or a right to participate in the market.  Plaintiffs, however, are not bringing a due process claim of denial of a property right.  Rather, Plaintiffs assert their right under the dormant Commerce Clause to participate in in the Application Program on the same footing as New York residents.

15

The District of Oklahoma also concluded the dormant Commerce Clause does not apply to cannabis licenses in *Original Investments, LLC v. State of Oklahoma*, 542 F. Supp. 3d 1230, 1233 (W.D. Okla. 2021). The court refused to enjoin residency requirements because the court concluded that would be using the court's equitable powers to facilitate a violation of the Controlled Substances Act by helping an out-of-state person obtain an Oklahoma cannabis license. *Id*.

The court's analysis of equity is incorrect. For example, a party is not subject to the unclean hands defense merely because it engaged in wrongful activity. Rather, the court must balance the wrongful conduct of both parties. *Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) ("The bankruptcy court failed to conduct the required balancing, instead concluding solely from the fact that Northbay had engaged in wrongful activity that the doctrine of unclean hands applied. In so doing, the bankruptcy court made an error of law, and thus abused its discretion.").

In light of the balancing test, "the application of this doctrine [does not] make equitable sense in a [cannabis licensing] case like this one, where the plaintiff seeks to participate in a state-sanctioned (but federally illegal) market and the defendant has allegedly engaged in a constitutional violation in organizing that market. If the 'unclean hands' notion has any purchase here, both parties have 'unclean hands' in that they are engaging with the business of distributing a controlled substance, ***but only one party has soiled the federal Constitution***." *Finch*, 606 F. Supp. 3d at 833–34 (citation omitted) (emphasis added).

Likewise, a request for an injunction is not subject to an illegality defense. "[E]njoining the licenses awarded under the [cannabis license] lotteries or enjoining the Department from using discriminatory criteria in its licensing scheme would not compel any party to violate federal law, award any illegally derived profits, or entangle this court in the production, sale, or distribution of cannabis. It would prevent [state government] from discriminating against nonresidents in awarding

conditional dispensary licenses, only after which would the state award such a license and then regulate cannabis-related conduct." *Finch,* 606 F. Supp. 3d at 833–34.

Thus, Plaintiffs ask the Court to follow majority jurisdiction and conclude the dormant Commerce Clause applies to cannabis licenses.

## IV.   CONCLUSION

For the reasons set forth above, Plaintiffs ask this Court to deny Defendants' Motion to Dismiss.

Dated: February 14, 2024

                                         Respectfully submitted,

**JEFFREY M. JENSEN**

By:   /s/ Jeffrey M. Jensen
       Jeffrey M. Jensen, Esq.
       *Pro Hac Vice*
       New York Reg. No.: 5375704
       *Attorney for Plaintiffs – Lead Counsel*
       9903 Santa Monica Blvd. #890
       Beverly Hills, CA 90212
       (310) 909-7043
       Email: jeff@jensen2.com